1   **STEVEN AMES BROWN**
    Entertainment Law 83363
2   69 Grand View Avenue
    San Francisco, California 94114-2741
3   415/647-7700 Tele
    415/285-3048 Fax
4   sabrown@entertainmentlaw.com

5   **THERESE Y. CANNATA**, SBN 88032
    Cannata, Ching & O'Toole, LLP
6   100 Pine Street
    San Francisco, California 94111
7   415/409-8900 Tele
    415/409-8904 Fax
8   tcannata@ccolaw.com

9   Attorneys for Plaintiff Brown

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                    OAKLAND DIVISION

14

15  STEVEN AMES BROWN,
                                    CIVIL NO. 08-02348 JSW (MEJ)
16          Plaintiff,
        v.                          Related Case: 13-1079 JSW (MEJ)
17
    ANDREW B. STROUD, an individual and
18  *dba* STROUD PRODUCTIONS AND        ADMINISTRATIVE MOTION TO
    ENTERPRISES, INC.                   UNSEAL TRANSCRIPT;
19                                      DECLARATION OF STEVEN
            Defendant.                  AMES BROWN
20  _____/

21  METHVEN & ASSOCIATES
    PROFESSIONAL CORPORATION,           Ctrm: HON. MARIA-ELENA JAMES
22
            Plaintiff
23
        v.
24
    SCARLETT PARADIES-STROUD, *ET AL,*
25
            Defendants
26  _____/

SUMMARY

On October 14, 2014 a settlement conference was held on the record before this Court.  At the conference a settlement agreement was read into the record.  On October 24, 2014 the Court ordered the transcript of the settlement sealed.  *Brown v. Stroud, Document 646, Methven v. Paradise-Stroud, Document 165.*

On April 30, 2015 Sony Music filed counterclaims against Brown and the Simone Estate in both cases.  *Brown v. Stroud, Document 670, Methven v. Paradise-Stroud, Document 192*.   Instead of simply pleading in general terms, Sony attached the entire transcript as an exhibit to its counterclaims and described its contents in detail in its charging allegations.  *Brown v. Stroud, Document 670,* pg. 7:10-8:10.  In so doing, Sony has specifically placed at-issue in a complaint the very financial terms embodied in the settlement transcript.  Sony has filed the counterclaims with redactions of those very terms and has sought an order from Judge White to seal them, *inter-alia*, on the basis that this Court sealed the transcript.

"*First,* Magistrate Judge Elena-James (sic) has already ordered the transcript of the parties' settlement conference is (sic) sealable". [ ] Publically referencing and revealing the content of the sealed transcript potentially exposes Sony Music to civil contempt".  *Document 669,* pg. 4:20-5:3. Thus, Sony is using this Court's sealing order as a justification for the filing of a sealed complaint.

Brown wishes to counterclaim against Sony for material breach of the settlement agreement and therefore moves to unseal the record, because he must now respond to Sony's allegations.

This court and others in the Ninth Circuit have consistently held that a complaint can only be sealed for compelling reasons "because a complaint is the foundation of a lawsuit."  *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2013 WL 5366963, at *2 (N.D. Cal. Sept. 25, 2013), citing *Dunbar v. Google, Inc.*, 12–3305, 2013 WL 4428853

(N.D.Cal. Aug. 14, 2013); *In re NVIDIA Corp. Derivative Litig.*, 06–06110, 2008 WL 1859067, at *3 (N.D.Cal. Apr. 23, 2008); *Nucal Foods, Inc. v. Quality Egg LLC*, 10–3105, 2012 WL 260078 (E.D.Cal. Jan. 27, 2012); *TriQuint Semiconductor, Inc. v. Avago Technologies Ltd.*, 09–1531, 2010 WL 2474387 (D. Ariz. June 11, 2010).

"To overcome this strong presumption, a party seeking to seal a judicial record must articulate 'compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure". *Id.* (citation omitted). Sony cannot demonstrate compelling reasons for forcing Brown to file his counterclaims under seal. First, the very royalty rates which Sony renegotiated on October 14, 2014 are those contained in Nina Simone's March 1, 1992 agreement, which contains <u>no confidentiality</u> clause, even though it was a settlement of a disputed claim, just as the one at bar. *Exhibit 1.* That document is highlighted to set out Nina Simone royalty rates. Second, Nina Simone's June 20, 1994 agreement with Sony Music was also a settlement of a disputed claim and it contains no confidentiality provision. *Exhibit 2.* Again, some of the royalty clauses are highlighted. Nina Simone's royalty rates were never confidential in fact. Any statement by Sony Music that confidentiality agreements are routinely to be found royalty agreements would be nothing short of perjury.

In fact, Sony's business practice is to file artist agreements in judicial proceedings without redaction or sealing. Attached as *Exhibit 3* is a true copy of a declaration filed by a Sony attorney in a lawsuit over the recording artist Toto's royalties. Sony and its business affairs director, Gil Aronow, are well aware that Sony files artist agreements in judicial proceedings without redaction because at the October 14, 2014 settlement conference, they presented an order entered in that same case and argued over its meaning. Of particular note is the confidentiality clause in one of the publically filed Toto contracts; it specifically said that it did not apply to judicial proceedings. "[N]othing in

this paragraph 3 shall prohibit disclosure of such Confidential Information: (c) to any judicial, governmental or regulatory body." *Exhibit 3,* pg. 87. Not only does Sony file artist agreements without redaction or sealing, even when it includes a confidentiality agreement in a settlement, it specifically excludes judicial proceedings from its scope. If anyone wants to know what Sony pays a major recording artist, it's right there in the public record, at Sony's insistence, for the world to see.

Nor can Sony claim that it is entitled to confidentiality based on it being a material term of the settlement because they've served a notice of rescission. "By failing to provide the promised consideration, the settlement agreement is rescinded and the settlement agreement is extinguished…" *Brown v. Stroud, Document 670,* pg. 12:23-13:2. Sony cannot both rescind and enforce the agreement. By declaring the settlement agreement a nullity, they have given up their right to enforce its terms.

Moreover, the royalty rates that Sony promised to Brown on October 14, 2014 are not Sony's confidential information, the information is known to Brown and he since he has represented hundreds of recording artists in nearly four decades that information is already known to the attorney for all of those people, namely Brown. The information is also already known to Dorothy Weber, attorney for the Simone Estate who has just as substantial a music industry client base as Brown.

Finally, it cannot be overstated that the public right to access to judicial records attaches because of "the important interest in contemporaneous review by the public of judicial performance." *In re Coord. Pretrial Proc. In Pet. Prod. Antitrust Litigation,* 101 F.R. D. 34, 43 (CD CA 2/9/84). Brown has a constitutional right to a public trial and that starts with the foundational document, the complaint. Sony tendered the specific terms of the settlement agreement in its counterclaim and cannot meet its burden of demonstrating that compelling reasons justify maintaining a seal on the settlement conference transcript.

CONCLUSION

Justice requires the immediate unsealing of the October 14, 2014 settlement conference transcript so that Brown can defend himself in open court through his own counterclaims alleging Sony's material breach thereof.


Dated: May 1, 2015

Respectfully submitted,

/X/
STEVEN AMES BROWN,
Plaintiff in *Pro Se*

DECLARATION OF STEVEN AMES BROWN

I, STEVEN AMES BROWN, declare:

1.  I am the Plaintiff in *Brown v. Stroud* and a defendant in *Methven v. Paradise-Stroud.*

2.  I attach as *Exhibit 1,* a true copy of the March 1, 1992 settlement agreement I negotiated for Nina Simone's RCA recordings, which are the subject of the October 14, 2014 settlement terms adjusting royalty rates.

3.  I attach as *Exhibit 2,* a true copy of the June 20, 1994 settlement agreement I negotiated for Nina Simone with Sony Music.

4.  Nina Simone's royalty rates have never been secret in the past.  In fact, at no time prior to October 14, 2014 had Sony ever asked me to keep confidential Nina's royalty rates.

5.  I have read hundreds of artist agreements in the decades I have practiced.  I cannot recall seeing one with a confidentiality clause.  I have seen a smattering of settlement agreements with confidentiality clauses but they are the exception, not the rule.  In any event, royalty rates are not confidential.  They are openly discussed at continuing education seminars.

6.  The royalty rates that Sony promised to pay me on October 14, 2014 are not competitive information because they are neither the highest nor the lowest rates I've seen.  The rate is not only typical, it is essentially the same as I am paid for other artists at other labels.  Put another way, knowing what Sony agreed to pay me on October 14, 2014 did not give me the slightest competitive advantage.  Further, the business affairs executives who negotiate these rates on behalf of record companies frequently move to other companies, taking their information with them.  Indeed, the executives with whom I negotiated Nina's 1992 and 1994 agreements both went on to work for Sony's competitors.  They took their knowledge of Sony's (and its predecessor) with them to

Sony's competitors.

7.  Attached as *Exhibit 3* is a true copy of a declaration filed by Sony in the SDNY which I downloaded from Pacer.  I only knew of this case because Sony's counsel, Ms. Greer, and Sony's head of business affairs, Gil Aronow, presented copies of an order in that action to the Court and to me at the October 14th settlement conference and thereafter made arguments about how Toto's artist royalty rates are property computed.

Pursuant to the laws of the United States, I declare under penalty of perjury the foregoing is true and correct.

Dated: May 1, 2015

/X/
STEVEN AMES BROWN

## SETTLEMENT AGREEMENT

AGREEMENT, dated as of March 1, 1992, between BMG Music, as successor-in-interest to RCA Records ("BMG"), 1540 Broadway, New York, NY  10036-4021 and Nina Simone ("Simone"), c/o Steven Ames Brown, Esq., 59 Grand View Avenue, San Francisco, CA  94114-2741.

WHEREAS, pursuant to (a) the Agreement dated November 23, 1966 between BMG and Simone, as amended (the "First Simone Agreement"), (b) the Agreement dated May 3, 1971 between BMG and Simone, as successor-in-interest to CFNS Productions, as amended (the "Second Simone Agreement"), and (c) the Agreement dated December 1, 1972 between BMG and Simone, as amended (the "Third Simone Agreement") (the First Simone Agreement, the Second Simone Agreement and Third Simone Agreement, collectively, the "Simone Agreements"), Simone furnished to BMG her services as a recording artist, BMG has manufactured, distributed and sold Records embodying Simone Masters (as such terms are defined below) and BMG has paid royalties and made other payments to Simone; and

WHEREAS, BMG and Simone wish to settle certain claims which relate to BMG's exploitation of Records and to agree upon the manner of accounting rendered and to be rendered to Simone by BMG;

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, BMG and Simone hereby agrees as follows:

1.    (a)  Simone hereby acknowledges and agrees that all payments heretofore made to Simone and BMG's regular accounting practices as exemplified in statements previously rendered to Simone in connection with all accounting periods through the accounting period ended February 28, 1992 under any and all Simone Agreements, in connection with BMG's exploitation of "Simone Masters" (as defined below) are the correct and proper payments and practices with respect to all such Simone Masters.  Simone fully discharges BMG from any and all royalty or other payment obligations under any and all Simone Agreements for Records shipped for sale or any other use of Simone Masters by BMG before March 1, 1992.  Simone agrees to execute a general release ("Release") in favor of BMG in the form attached hereto as Exhibit "A".

      (b)  BMG has heretofore established two royalty accounts for Simone pursuant to the Simone Agreements -- an artist account No. 00008309 and a producer account No. 04008309.  Simone and BMG agree that as of March 1, 1992, BMG shall combine the two accounts into one single artist account No. 00008309.  BMG agrees to eliminate any outstanding debit balance in such single artist account as of March 1, 1992.  BMG agrees to accrue royalties to Simone hereunder only to such single artist account.  Notwithstanding anything to the contrary in any Simone Agreement, and without limiting the

generality of anythi   herein, BMG also agrees     accrue to such single artist account certain synchronization license fees received by BMG in connection with BMG's exploitation of Simone Masters in the film "Point of No Return", which fees shall be computed and adjusted in accordance with the provisions of subparagraph 3(b)(x) below.

(c)   (i)   Reference is hereby made to the agreement dated May 1, 1968 (the "Producer Agreement") between BMG and Stroud Productions and Enterprises, Inc. ("Stroud") with respect to the furnishing of producer services on certain Simone Masters.   The Simone Masters with respect to which BMG is accruing a royalty to Stroud are listed on Exhibit "A" attached hereto and made a part hereof.   Royalties accruing to Stroud pursuant to the Producer Agreement are accrued to BMG's producer account No. 040-8624.   BMG agrees to eliminate any outstanding debit balance in such producer account as of March 1, 1992.

(ii) Simone, acting in her capacity as an authorized representative of Stroud, hereby requests and directs that as of March 1, 1992 any producer royalty payments to be made pursuant to the Producer Agreement be sent to Stroud in care of Simone's address as set forth above.   BMG agrees to honor such address change.

(iii)      (A)   Simone hereby represents and warrants that she is an authorized representative of Stroud and has the corporate power and authority in such capacity to make the request and direction set forth in subparagraph 1(c)(ii) above.   Simone further represents and warrants that no consent or authorization of any third party (including, without limitation, any producer of Simone Masters furnished by Stroud under the Producer Agreement) is required in order to effectuate the request and direction set forth in subparagraph 1(c)(ii) above and that the address change as enacted by BMG shall not violate the rights of any such third party.

(B) Simone agrees to indemnify BMG and hold BMG harmless from any and all losses, damages or expenses arising out of or connected with any claim, action or proceeding made or brought against BMG which is inconsistent with Simone's representations and warranties set forth in subparagraph 1(c)(iii)(A) above; provided, however, that this sentence shall not operate unless and until a final judgment is rendered against BMG or settlement entered into by BMG.

2.   As used herein:

(a)   (i)   "Master Recording" means the original material object in which sounds, with or without visual images, are fixed by any method now known or later developed and from which sounds, with or without visual images, can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine, device or process.

Exhibit 1

(ii) "Simone Masters" shall mean Master Recordings embodying the performances of Simone and recorded under any of the Simone Agreements.

(b) "Record" means any reproduction of a Master Recording in any form now known or later developed for which sounds, with or without visual images, can be perceived, and which is manufactured or exploited primarily for home, school or juke box use or use in means of transportation.

(c) "Singles Record" means a Record with up to four (4) Sides or with a playing time of thirteen (13) minutes or less. "Twelve (12") Inch Single" means a Record with up to six (6) Sides and a playing time of twenty-five (25) minutes or less but no less than thirteen (13) minutes.

(d) "LP" means a Record containing not fewer than eight (8) Sides thereon and totalling not less than thirty-five (35) minutes of playing time.

(e) "Audiophile Record" means a Record embodying sound without visual images, which is made for digital playback and includes, without limitation, compact discs.

(f) "Album" means one (1) or more LPs packaged together by BMG for marketing as a single unit. "Multiple LP Album" means an Album containing sixteen (16) or more Sides and/or two (2) or more LPs packaged together by BMG for marketing as a single unit.

(g) "Container Deduction" means twenty-five (25%) percent (except fifteen (15%) percent for LPs in black vinyl disc form) of either the "suggested retail list price," "list category," "advertised price", "constructed price" or "actual selling price" of such Record, whichever is the applicable price in computing the royalty on such Record.

(h) "Records sold", "Record sales" and "sales" mean one hundred (100%) percent of those Records shipped by BMG hereunder for which BMG is paid and which are neither returned to nor exchanged by BMG nor (in the case of any record configuration as to which BMG does not identify returns of Records according to selection number) treated as returned to BMG under BMG's then current policy with respect to the percentage of shipped units so treated. For the purpose of this subparagraph 2(h):

(i) If Records are shipped subject to a discount or merchandise plan, the number of such Records deemed to have been shipped shall be determined by reducing the number of Records shipped by the percentage of discount granted.

Exhibit 1

(ii) If a discount is granted in the form of "free" or "bonus" Records, such "free" or "bonus" Records  shall not be deemed included in the number of Records sold.

(iii)    If Records which are shipped subject to a discount or merchandising plan, or respecting which a discount was granted in the form of "free" or "bonus" Records, are returned to BMG, the number of such Records deemed to have been returned shall be determined by reducing the number of Records returned by the percentage of discount in effect under the BMG discount or merchandising plan applicable to returns at the time of such returns.

(i) "Sales through Normal Trade Channels" and "sold through Normal Trade Channels" mean all sales or uses hereunder, including, without limitation, under subparagraph 3(b)(iii) and (iv) below, but excluding all other sales or uses set forth in subparagraph 3(b) (except subparagraph 3(b)(iii)) and (iv) below.

(j) "Top Line" means BMG's top "price line" or highest "list category" of Records of a particular type sold in a particular country or territory.   "Mid-price line" means (with respect to Records of a particular type for which BMG has established a SRLP in a particular country or territory) a "price line" or "list category" which is not lower than sixty-five percent (65%) and not higher than eighty-six (86%) percent of BMG's Top Line in the applicable particular country or territory for Records of such particular type and (with respect to Records of a particular type for which BMG has not established a SRLP in a particular country or territory) a "price line" or "list category" which is BMG's secondary "price line" or "list category" in the applicable particular country or territory for records of such particular type.  "Budget line" means (with respect to Records of a particular type for which BMG has established a SRLP in a particular country or territory) a "price line" or "list category" which is lower than three-fifths (3/5) of BMG's Top Line in the applicable particular country or territory for Records of such particular type and (with respect to Records of a particular type for which BMG has not established a SRLP in a particular country or territory) a "price line" or "list category" which is BMG's tertiary or lower "price line" or "list category" in the applicable particular country or territory for Records of such particular type.

(k) "Side" means one continuous performance of material embodied on a Simone Master.

3.   In lieu of what is set forth in any Simone Agreement with respect to the computation of royalties for sales of Simone Records, the following provisions will apply:

(a)  With respect to Simone Records sold, BMG shall accrue to Simone's credit a royalty at the "all-in" rate (i.e. inclusive of

Exhibit 1

royalties payable to a producer or other third party) ("Basic Rate") of ten (10%) percent in lieu of what is set forth in any Simone Agreement, calculated on a royalty base of the "suggested retail list price" or "list category" ("SRLP") of Simone Records (less Container Deductions and any taxes) in the country of sale (except in the country of manufacture if BMG is paid on such basis).

(b)   (i)   (A)   With respect to each Simone Record sold outside the United States (including Simone Records exported to third parties outside the United States and for which BMG is paid by such third parties on a royalty-inclusive basis), royalties shall be at one-half (1/2) the applicable Basic Rate under subparagraph 3(a) above.   Such royalties shall be computed in the same national currency as BMG is accounted to, at the rate of exchange in effect at the time of payment to BMG for such Simone Records, and shall not accrue until payment for the Simone Record sales to which such royalties are attributable has been received by BMG in the United States.   If, however, at the time such sales are reported to BMG in the United States such payment is instead applied to recoup an earlier advance received from a third party by BMG in the United States, then such royalty shall accrue when such sales are so reported and such payment is so applied.   If BMG is paid for Simone Records sold outside the United States but BMG cannot receive such payment in the United States, then BMG shall, at Simone's election and expense, deposit the royalties payable to Simone with respect to such Simone Record sales in the currency in which BMG receives payment therefor, and such deposit shall be made to Simone's account in a depository selected by Simone and located in the country in which payment to BMG is made for such Simone Record sales.   Deposit and notice to Simone shall discharge BMG of the royalty obligation for Record sales to which such royalties are applicable.

(B)   If the maximum rate of the royalty to which BMG is entitled under the foreign exchange remittance regulations of any country shall be equal to or less than the aggregate of (I) the royalty rate ("Your Rate") specified in subparagraph 3(b)(i)(A) above, (II) the aggregate royalty rate ("Other Rate") accruable to the credit of any royalty participants ("Other Participants") other than Simone and any applicable producer, and (III) three (3%) percent, then the royalty rate accruable under said subparagraph 3(b)(i)(A) with respect to sales in such country shall be a fraction of the amount by which the maximum rate of the royalty permissible by such foreign exchange remittance regulations exceeds three (3%) percent.   The fraction referred to in the immediately preceding sentence shall have a numerator of Your Rate and a denominator of the aggregate of the Other Rate and Your Rate.

(ii)   (A)   With respect to Simone Records sold through a Record club (including, without limitation, a Record club affiliated with BMG), or through a sales operation of the type commonly known as "TV/key outlet merchandising" wherein BMG is a

licensor, and with respect to Master Recordings licensed by BMG to others for their distribution of Simone Records in the United States (other than Simone Records as described in subparagraph 3(b)(ii)(B) below), the royalty shall be a fraction of fifty (50%) percent of all royalties received by BMG in the United States from its licensees arising out of the foregoing sales or other distribution of Simone Records hereunder, after deduction of all applicable copyright, union, or other third party payments.  The fraction ("Simone's Fraction") referred to in the immediately preceding sentence shall have a numerator of the Basic Rate set forth above and a denominator of the aggregate of the Basic Rate set forth above and the royalty rates accruable to any royalty participants other than Simone.  Royalties shall be accrued on all such Simone Records as to which BMG is paid or credited, but not less than fifty (50%) percent of Simone Records hereunder distributed by a Record club affiliated with BMG.

(B)  With respect to Simone Records manufactured by or for BMG and sold to or through a direct-to-consumer mail-fulfillment sales operation other than a Record club and with respect to Simone Records manufactured by or for BMG and sold through TV/key outlet merchandising wherein BMG is not a licensor, royalties shall be at one-half (1/2) the rate otherwise applicable and the royalty base shall be the actual selling price (less Container Deductions and any taxes) to the consumer.

(iii) (A) With respect to sales hereunder of Simone Records in analog cassette form, royalties shall be at the rate applicable to Records in black vinyl disc form in lieu of what is set forth in any Simone Agreement.

(B)  With respect to sales hereunder of Simone Records that are Audiophile Records, the royalty shall be the same dollars-and-cents royalty which accrues hereunder with respect to analog cassette Simone Records which are sold in the same country or territory (as applicable) as said Audiophile Records, are sold through the same trade channel as said Audiophile Records, are sold in a price category corresponding to the category in which said Audiophile Records are sold, and embody the same or substantially the same Master Recordings as are embodied on said Audiophile Records; provided, however, that if there exist no such analog cassette Records as described above, then the royalty accruable on sales of a particular Audiophile Record hereunder shall be the same royalty which would accrue hereunder with respect to sales in such country or territory (as applicable) through such trade channel and in such category of a single analog cassette Record in the same configuration and which embodies like repertoire (e.g., pop, classical, etc.), as is embodied on said Audiophile Record.

(C)  Notwithstanding the foregoing, with respect to sales hereunder of compact disc Albums or digital compact cassette Albums, the provisions of subparagraph 3(b)(iii)(B) above shall not

Exhibit 1

apply, and for any such Records, royalties shall be at eighty-five (85%) percent of the rate otherwise applicable.

(D)  If BMG modifies its general policy with respect to the royalty base price for the computation of royalties for sales in the United States of Audiophile Records (including, without limitation, compact discs or digital compact cassettes) by the majority of its then current popular artist on a basis more favorable than that provided herein, then, effective as of the semi-annual accounting period within which such modified general policy becomes effective, such policy shall be applied hereunder.

(iv) (A)  With respect to Simone Records sold on BMG's Mid-price line, royalties shall be at the rate otherwise applicable.

(B)  With respect to Simone Records sold on BMG's Budget line, royalties shall be at one-half (1/2) the rate otherwise applicable.

(v)  With respect to Multiple LP Albums of Simone Records, and with respect to Simone Records sold to any government or its subdivisions, departments or agencies (other than military exchanges) or to educational institutions or libraries, royalties shall be at one-half (1/2) the rate otherwise applicable.  With respect to Simone Records sold to military exchanges, royalties shall be at the rate otherwise applicable.

(vi) With respect to Simone Records sold to a commercial purchaser for use as a premium, promotional item, sales incentive or for a similar purpose ("premium Record(s)"), royalties shall be at one-half (1/2) the rate otherwise applicable and the royalty base shall be BMG's actual selling price of such premium Record (less Container Deductions and any taxes).

(vii)  With respect to Simone Records ("Coupled Records(s)") sold embodying Sides recorded under a Simone Agreement coupled with Sides not recorded under a Simone Agreement, royalties shall be at that proportion of the rate otherwise applicable which the number of such Sides recorded under a Simone Agreement and included on such Coupled Record bears to the total number of Sides comprising such Coupled Record.

(viii) Intentionally Omitted.

(ix) Intentionally Omitted.

(x) If BMG receives income from the use of Simone Masters hereunder in synchronization with motion picture or television soundtracks, or if BMG licenses the use of any Simone Master hereunder to any third party, BMG shall accrue an additional royalty hereunder of Simone's Fraction of fifty (50%) percent of the net amount of such income so received by BMG, whether such income is on a flat-fee or royalty basis.  For purposes of this subparagraph, "net amount" shall mean the gross amounts received by BMG in connection with the subject matter hereof, less unreimbursed

Exhibit 1

duplication costs and less BMG's out-of-pocket costs and any amounts which BMG is obligated to pay to third parties (such as, without limitation, mechanical copyright payments, AFM and other union fund payments).

(xi) No royalties whatsoever shall accrue hereunder with respect to (A) Simone Records distributed to any Person primarily for purposes of promotion or critique, (B) Simone Records sold as "scrap", "overstock" or "surplus," which terms shall mean excess inventory of a particular Simone Record which is listed in the BMG catalog and sold at one-third (1/3) or less of BMG's then current sub-distributor price, and (C) Simone Records cut out of the BMG catalog and sold as discontinued merchandise.

(xii) In any instance when the SRLP is to be utilized in computing any royalty hereunder, and, with respect to particular Simone Records sold, there exists no such SRLP, and royalties are received by BMG with respect to such particular Simone Records on the basis of a "constructed price" (such as a price agreed upon, or based on a formula agreed upon, between the copyright society of the particular country involved and the recording industry of such country, for the purpose of computing mechanical royalties), then, in computing such royalty hereunder with respect to such particular Simone Records sold, such "constructed price" (less Container Deductions and any taxes) shall be utilized hereunder in lieu of the SRLP (less Container Deductions and any taxes).

(xiii) If (A) the use of the "constructed price" is discontinued in any country where royalties have, prior to such discontinuance, been calculated on the basis of a "constructed price" and there is no SRLP in effect at the time of such discontinuance or

(B) the use of the SRLP is discontinued and there is no "constructed price" in effect at the time of such discontinuance, then:

(I) the royalties accruable hereunder with respect to such country shall be based on that percentage (the "New Percentage") of BMG's then-current subdistributor or equivalent price (in local currency) in effect immediately prior to such discontinuance (less any taxes) (the "Customer Price") which results in the same amount of royalties (in local currency) as was accrued hereunder on the basis of the last "constructed price" or SRLP (as applicable) for the Records concerned.

(II) thereafter, with respect to such country, the royalty rate shall be the New Percentage and the royalty base shall be the Customer Price, as the latter may be increased or decreased from time to time; and

(III) likewise, with respect to any Simone Record first released after such discontinuance, the royalty rate shall be the New Percentage and the royalty base shall be the Customer Price of such record as in effect from time to time.

Exhibit 1

(iv) If BMG shall become entitled by law to receive royalties (or the like) on account of the public performance in the United States of Simone Records, then (unless such law provides for the direct payment to Simone from a third party source of any related royalties (or the like); or unless such law shall provide for BMG to allocate such royalties as between Simone and BMG in any specified manner, in which latter event BMG shall comply therewith), BMG shall accrue fifty (50%) percent of such royalties that are specifically attributable to such Simone Records to Simone's credit hereunder.

(c)  As used in this Paragraph 3, the words "any taxes" shall mean any taxes which are stated as part of, rather than separately from, the applicable price upon which royalties are computed.

4.   Without limiting or detracting from BMG's rights under any Simone Agreement, all Simone Masters (including all duplicates and derivatives thereof) and all Records made therefrom (including the copyright in such Simone Masters for the full term of copyright and any renewal and/or extension of such copyright), together with the performances embodied therein, are exclusively and perpetually BMG's property, free of any claim whatsoever by Simone or any Person deriving any rights from Simone.  All such Simone Masters, from the inception of recording, shall be deemed works made for hire within the meaning of the United States Copyright Act. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in any Simone Agreement, Simone hereby assigns to BMG all of Simone's right and title to the copyrights in perpetuity in and to such Simone Masters, and BMG and its subsidiaries, affiliates, licensees and assigns shall have the sole, exclusive and unlimited right throughout the universe to manufacture Records, by any methods now or hereafter known embodying any portions or all of the performances embodied in Simone Masters recorded during the Term; to perform publicly and to permit public performance of such Records; to repackage, sell, transfer, deal in, exploit or otherwise dispose of such Simone Masters and Records at such times and places, in any and all media and manner and on any price-line (including, without limitation, the unrestricted right to sell such Records as cut-outs or excess inventory), and under any trademarks, trade names or labels, as shall be determined by BMG in its sole and exclusive discretion (including, without limitation, the unrestricted right to sell such Records as premium Records or in Record clubs); couple without restriction any Simone Masters with any other Master Recordings; or, notwithstanding any provisions hereof, BMG and/or its subsidiaries, affiliates, licensees and assigns may, at their election, delay or refrain from doing any of the foregoing.  From the date hereof, BMG's sole obligation with respect to Simone Masters shall be to accrue royalties hereunder at the applicable rates set forth herein, notwithstanding anything to the contrary in any Simone Agreement.  BMG may use Simone Masters for synchronization in motion picture, television and other audiovisual

Exhibit 1

soundtracks, including commercials, background music and any other purposes without restriction from or consultation with Simone.

5.   Without limitation of the foregoing, Simone acknowledges, understands and agrees that:

(a)   the entire consideration for the releases and waivers granted by BMG hereunder is as set forth herein;

(b)   Said consideration does not constitute admission or concession by BMG of any liability for damages, costs, expenses and attorneys' fees, taxable or otherwise, incurred in connection with or arising out of any claims whatsoever relating to royalties prior to March 1, 1992; and

(c)   any breach of any provision set forth in any Simone Agreement or any other agreement between Simone on the one hand, and BMG, on the other hand, executed on or subsequent to the date hereof, shall in no way affect the force, effect or validity of the said releases and waivers set forth in this agreement, impair the finality of this settlement agreement or constitute any basis for the revision of the settlement.

6.   Each of the parties hereto represents, warrants and agrees as follows:

(a)   Each party has received independent legal advice from its attorneys with respect to the advisability of making the settlement provided for herein, and with respect to the advisability of executing this agreement.

(b)   No party (nor any officer, agent, employee, representative, or attorney of or for any party), has made any statement or representation to any other party regarding any fact relied upon by the other party in entering into this agreement, and each party does not rely upon any statement, representation or promise of any other party (or of any officer, agent, employee, representative, or alternate for the other party), in executing this agreement except as expressly stated herein.

(c)   Each party has made such investigation of the facts pertaining to this agreement and of all the matters pertaining thereto as it deems necessary.

(d)   Each of the persons executing this agreement is empowered to do so.

7.   Each of the parties hereto represents and warrants to the other party that it is the sole and lawful owner of all right, title and interest in and to every matter and thing released herein, and that it has not heretofore assigned or transferred or purported to assign or transfer, to any person or entity any claims or other matters released herein.

Exhibit 1

8.    This agreement effects the settlement of claims which are denied and contested, and nothing contained herein shall be construed as an admission by BMG of any liability of any kind to BMG, all such liability being expressly denied.    Additionally, nothing contained herein (including without limitation the Release) shall be construed to be a waiver of BMG's or Simone's rights or remedies or defenses (including without limitation the statute of limitations) either at law, or in equity.

9.    In connection with the Release, Simone acknowledges that she is aware that she may hereafter discover claims or facts in addition to or different from those which she now knows or believes to be true with respect to the matters related herein and she expressly accepts and assumes the risk of such possible additions to or differences from those claims or facts now known or believed to be true, but that it is her intention hereby to fully, finally and forever settle and release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed between Simone, on the one hand, and BMG, on the other hand.   In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of all such matters notwithstanding the discovery or existence of any such additional claims or facts.    Simone knowingly and voluntarily waives the provisions of Section 1542 of the California Civil Code or the analogous provisions of any law of any other applicable jurisdiction, and acknowledges and agrees that this waiver is an essential and material term of this settlement agreement and Release.  Simone has been advised by legal counsel and understands and   acknowledges   the   significance   and   consequence   of   this settlement agreement and Release and the specific waiver of Section 1542 or other applicable law.

10.  This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, or discharge of this agreement or any provision hereof shall be binding upon either party unless confirmed by a written instrument signed by an authorized signatory on behalf of the other party.  No waiver of any provision of or default under this agreement shall affect the right of either party thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the State of New York.

Exhibit 1

11. Except as may be expressly or by necessary implication modified hereby, the provisions of each Simone Agreement are ratified and confirmed and shall remain in full force and effect in accordance with their terms.   In the event of any inconsistency between any of the provisions of any Simone Agreement and the provisions hereof, the latter shall control.

BMG Music


By: _____


_____
Nina Simone, in her individual capacity
and as authorized representative of Stroud
Productions and Enterprises, Inc.

Exhibit 1

# GENERAL RELEASE

The undersigned, Nina Simone, as RELEASOR, in consideration of the credit to RELEASOR'S royalty account as set forth in the agreement dated as of March 1, 1992 between RELEASOR and BMG Music by BMG Music, as RELEASEE, and for other good and valuable consideration as set forth in such agreement, receipt and sufficiency whereof is hereby acknowledged, releases and discharges the RELEASEE and its successors, representatives, officers, directors (including former officers and directors), shareholders, licensees, agents, servants, employees, successors, assigns and all affiliated parent and subsidiary corporations and partnerships from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, which against RELEASEE, the undersigned or its heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may have arising out of payments, royalties or royalty accountings from the beginning of the world up to and through the accounting period ended February 28, 1992 and from costs and expenses (including attorneys' fees), whenever incurred, relating to any such matter, cause or thing. Simone knowingly and voluntarily waives the provisions of Section 1542 of the California Civil Code or the analogous provisions of any law of any other applicable jurisdiction, and acknowledges and agrees that this waiver is an essential and material term of this release. Simone has been advised by legal counsel and understands and acknowledges the significance and consequence of this release and the specific waiver of Section 1542 or other applicable law.

_____

Nina Simone

STATE OF _____

COUNTY OF _____

On 23 June, 1993, before me personally came Nina Simone, to me known, and known by me to be ██████████████████████████ executed the foregoing RELEA███████████████████████████ she executed the same on its████████████████████████████

NOTAIRES
25, avenue George V
75008 PARIS
Tél : 47 23 61 67

m:\legal\1100\1199R.wp

Exhibit
"A"

AINT GOT NO I GO
ANOTHER SPRING
BLACK IS THE COLOR
COMPENSATION
DAY AND NIGHT
DO WHAT YOU GOTTA DO
EVERYONES GONE TO THE
GIN HOUSE BLUES
GO TO HELL
I CANT SEE NOBODY
I GET ALONG WITHOUT
I LOVES YOU PORGY
I SHALL BE RELEASED
I THINK ITS GOING TO
I WANT A LITTLE SUG
I WISH I KNEW HOW I
IN THE MORNING
IT BES THAT WAY SO
JUST LIKE TOM THUMB
MY MANS GONE NOW
NOBODYS FAUL BUT MINE
PEACE OF MIND
PLEASE READ ME
REVOLUTION
SEEMS IM NEVER TIRE
SUNDAY IN SAVANNAH
SUZANNE
TAKE MY HAND PRECIOUS LORD
THE ASSIGNMENT SOUND
THE BACKLASH BLUES
THE DESPERATE ONES
THE HUMAN TOUCH
THE TIMES THEY ARE
TO BE YOUNG GIFTED
TO LOVE SOMEBODY
TURN TURN TURN
WESTWIND
WHO AM I
WHO KNOWS WHERE THE
WHY

Exhibit 1

Agreement made as of June 20, 1994 between Nina Simone, c/o Steven Ames Brown, Esq., 69 Grand View Avenue, San Francisco, California 94114-2741 (hereinafter "you"), and Sony Music, A Group of Sony Music Entertainment Inc., 550 Madison Avenue, New York, New York 10022 (hereinafter "Sony").

WHEREAS, you acknowledge that pursuant to an agreement between you and Creed Taylor Inc. ("CTI"), date unknown, you granted all right, title and interest in the Masters (as defined below) to CTI;

WHEREAS, you and Sony acknowledge that pursuant to the agreement dated as of February 4, 1980 (the "Transfer Date"), as amended, supplemented or modified (the "Earlier Agreement"), between CTI and Sony's predecessor, CBS Records, A Division of CBS Inc., all right, title and interest in the Masters were previously transferred to Sony as of the Transfer Date; and

WHEREAS, you and Sony wish to reaffirm the rights granted to Sony pursuant to the Earlier Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements contained herein, the parties agree as follows:

## 1. MASTER RECORDINGS; TERRITORY

1.01.    The "Masters", below, mean the sound recordings of the performances by you of the musical compositions listed in Schedule A attached, previously released on Phonograph Records in the Territory on the Album titled "Baltimore". (You are sometimes called "the Artist" below; all references in this agreement to "you and the Artist," and the like, will be understood to refer to you alone.)

1.02.    The "Territory", below, means the world.

## 2. TRANSFER OF RIGHTS

2.01.    You hereby acknowledge and reaffirm that all rights and interests of every kind in the Masters, including but not limited to all copyrights and extensions and renewals of copyright were transferred and assigned to Sony as of the Transfer Date, perpetually, throughout the Territory, free of encumbrances.

2.02.    Without limiting the generality of the foregoing:

ID: 16213/rjs                    -1-        MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

(a)    The Masters (from the Inception of
Recording), all performances reproduced in the Masters, and
all Matrices and Phonograph Records manufactured from them
shall be the sole property of Sony, free from any claims by
you or any other Person; and Sony shall have the exclusive
right to copyright the Masters in its name and to secure any
and all renewals and extensions of such copyright,
throughout the Territory.

(b)    Sony shall have the unlimited, exclusive
rights, throughout the Territory: (1) to manufacture
Phonograph Records in any form and by any method now or
hereafter known, derived from the Masters; (2) to sell,
transfer or otherwise deal in the same under any trademarks,
trade names and labels, or to refrain from such manufacture,
sale and dealing; and (3) to reproduce, adapt, and otherwise
use the Masters in any medium and in any manner, including
but not limited to use in audiovisual works, without payment
of any compensation to you or the Artist except the
royalties, if any, which may be expressly prescribed for the
use concerned under Article 5.

(c)    Sony and its Licensees shall have the non-
exclusive right and may grant to others the non-exclusive
right to reproduce, print, publish, or disseminate in any
medium your name and the name, portrait, picture and
likeness of the Artist in connection with Phonograph Records
containing the Masters (including, without limitation, all
professional, group, and other assumed or fictitious names
used by Artist), and biographical material concerning
Artist, as news or information, for the purposes of trade,
or for advertising purposes, and you shall have no right to
object to the use of the name, portrait, picture and
likeness of any other Person performing services in
connection with Phonograph Records containing the Masters.

2.03.    You will execute and deliver to Sony such
instruments of transfer and other documents regarding the rights
of Sony in the Masters as Sony may reasonably request to carry
out the purposes of this agreement, and Sony may sign such
documents in your name or the name of the Artist and make
appropriate disposition of them.

3.    DELIVERY

3.01.    Intentionally Deleted.



Exhibit 2

## 4. ADVANCE

**4.01.** Promptly after the complete execution of this agreement, Sony will pay you an Advance of $5,000 payable as set forth in Article 4B.

**4.02.** All Special Packaging Costs incurred by Sony will constitute Advances, provided that Special Packaging Costs incurred in connection with the use of the cover layout and the picture or art embodied on the original Album entitled "Baltimore" shall not be deemed an Advance..

**4.03.** Sony acknowledges that it shall not have the right to deduct as Advances hereunder any mastering costs incurred in connection with the production of Phonograph Records containing the Masters hereunder.

## 4A. MARKETING

**4A.01.** In preparation for the initial release in the United States of the Album containing the Masters, the following procedure will be followed:

(a) Sony will undertake to consult with the Artist regarding the proposed Album cover layout and the picture or art to be used on the cover. The proposed Album cover will be made available to the Artist at Sony's offices for review and comment. If within ten (10) days following Sony's notice to you that the Album cover layout and the picture or art are available, you do not disapprove of such Album cover layout and the picture or art to be used on the cover, such items shall be deemed approved by you. Unless otherwise provided in this paragraph 4A.01, Sony will make such changes in the artwork as you or the Artist reasonably request.

(b) Sony shall not be required to make any changes which would delay the release of the Album containing the Masters beyond the scheduled date or which would require Sony to incur Special Packaging Costs. Any premium charges incurred to meet the release schedule because of delays in approvals by you or the Artist will constitute Advances.

(c) All rights in any artwork or related material furnished by you or at your request, including copyright and the right to secure copyright, will be Sony's property throughout the world and in perpetuity.

ID: 16213/rjs                      -3-          MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)

Exhibit 2

(d)  All matters relating to Sony's trademarks or to notices or disclosures deemed advisable by Sony's attorneys, and any matter other than the album cover layout and the picture or art to be used on the cover, will be determined in Sony's sole discretion. Sony will not be deemed unreasonable in rejecting any requested change upon the advice of its attorneys.

(e)  You hereby are deemed to have approved the Album cover layout and the picture or art used on the original Album entitled "Baltimore".

4A.02.   Sony will not use the Masters on "Premium Records" without your consent and notwithstanding anything in Article 5. (A "Premium Record" is a Record, produced for use in promoting the sale of merchandise other than Phonograph Records, which bears the name of the sponsor for whom the Record is produced.)

4A.03.   Sony will not grant so-called "master use" licenses authorizing synchronization of the Masters hereunder with visual images, other than commercials advertising Phonograph Records made hereunder, without your consent, which consent can be withheld for artistic or financial reasons.

4A.04.   Sony will not, without your consent and notwithstanding anything in Article 5, couple Masters made under this agreement with recordings not embodying the Artist's performances on any other Record, except promotional Records, in respect of Records manufactured for sale in the United States. Sony shall request Sony's Licensees outside the United States to comply with this paragraph 4A.04, but Sony shall have no liability by reason of any failure by such Licensees to so comply.

## 4B.   PAYMENTS

4B.01.   You hereby request and irrevocably authorize Sony to pay all payments otherwise payable to you under this agreement to Steven Ames Brown, Client Trust o.b.o. Nina Simone, 69 Grand View Avenue, San Francisco, California 94114-2741 (taxpayer identification number - 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) ("Brown").  Sony's compliance with this authorization will constitute an accommodation to you alone; Brown is not a beneficiary of it. All payments to Brown under this authorization will constitute payment to you and Sony will have no liability by reason of any erroneous payment or failure to comply with this authorization. You will indemnify and hold us harmless against any claims asserted against us and any damages, losses or expenses we incur

ID: 16213/rjs                    -4-        MJR    (SMU 94-223.3(1))
10/12/94 (16218 RL)



by reason of any such payment or otherwise in connection herewith.

---

## 5. ROYALTIES

5.01. Sony will pay you a royalty computed at the applicable percentage, indicated below, of the applicable Royalty Base Price in respect of Net Sales of Phonograph Records (other than audiovisual Records) consisting entirely of the Masters and sold by Sony or its Licensees Through Normal Retail Channels:

(a) United States:  On Records sold for distribution in the

(1) On Albums: 32%.

(2) On Singles: 20%.

---

(b) United States: On Records sold for distribution outside the

(1) 27.2% on Albums and 17% on Singles sold for distribution in Canada, Belgium, Germany, France, Italy, Luxembourg, the Netherlands, The United Kingdom, The Republic of Ireland, Denmark, Greece, Spain or Portugal;

(2) 24% on Albums and 15% on Singles sold for distribution elsewhere.

5.02. (a) With respect to Records (other than audiovisual Records) licensed by Sony for sale through any Club Operation in the United States, other than a Direct Club Operation, Sony shall pay you fifty percent (50%) of Sony's Net Receipts solely attributable to the Masters.

(b) With respect to Records (other than audiovisual Records) sold through any Direct Club Operation in the United States, the royalty rate shall be one-half (1/2) of the otherwise applicable rate set forth in subparagraph 5.01(a). With respect to Records (other than audiovisual Records) sold through any Club Operation outside of the United States, the applicable royalty rate shall be seven percent (7%) multiplied by a fraction, the numerator of which is the royalty rate under subparagraph 5.01(b) for the territory concerned, and the denominator of which is the royalty rate under section 5.01(a)(1). Such royalties shall be computed on the basis of ninety percent (90%) of Net Sales of such Records.

ID: 16213/rjs                                   -5-            MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

(c)   No royalty shall be payable with respect to: (1) Records received by members of any Club Operation in an introductory offer in connection with joining it or upon recommending that another join it or as a result of the purchase of a required number of Records including, without limitation, Records distributed as "bonus" or "free" Records; or (2) Records for which the Club Operation is not paid.  Notwithstanding the foregoing, at least fifty percent (50%) of all Records distributed through any Club Operation, on which you would otherwise be entitled to a royalty under this paragraph 5.02 (without regard to the first sentence of this subparagraph 5.02(c)), shall be deemed to have been sold.  Such computations shall be made on a cumulative basis, and your royalty account adjusted accordingly, each sixth accounting period upon your request.

5.03.   The royalty rate on any Record described in clause (a), (b), or (c) of this sentence will be one-half (1/2) of the royalty rate that would apply if the Record concerned were sold through Normal Retail Channels:  (a)  any catalog Phonograph Record sold by Sony's special products operations (hereinafter, "SMSP") to educational institutions or libraries, or to other SMSP clients for their promotion or sales incentive purposes (but not for sale to the general public through normal retail channels); (b) any Record sold in conjunction with a television advertising campaign for Records embodying the performance of the Artist during the calendar semi-annual period in which that campaign begins or either of the next two (2) such periods; and (c) any non-catalog Phonograph Record created on a custom basis for clients of SMSP.  The royalty on any Record described in clause (c) will be computed on the basis of SMSP's actual sales price less all taxes and Container Charges.

5.04.   (a)  The royalty rate on any Record sold for distribution through military exchange channels will be three-fourths (3/4) of the applicable royalty rate prescribed in paragraph 5.01.  The royalty rate on any Budget Record will be two-thirds (2/3) of the applicable royalty rate prescribed in paragraph 5.01.   (The preceding sentence shall not apply to a Budget Record sold within twenty-four (24) months after the initial release of the Masters concerned on Records in the United States).  The royalty rate on any Mid-price Record will be three-fourths (3/4) of the applicable royalty rate prescribed in paragraph 5.01.  The royalty rate on any Record which is not an Album or a Single (for example, a twelve-inch "dance single") will be one half (1/2) of the applicable Album royalty rate prescribed in paragraph 5.01.

ID: 16213/rjs                    -6-        MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

(b)  The royalty rate on any Audiophile Record will be eighty percent (80%) of the rate which would otherwise be applicable under this agreement.

5.05.  Intentionally Deleted.

5.06.  (a)  (1)  The royalty rate on Net Sales of audiovisual Records which contain Masters hereunder and are manufactured and distributed by Sony Music Entertainment Inc. ("SMEI", below) in the United States or by components of Sony Music International ("SMI", below) elsewhere, shall be fifteen percent (15%) on units distributed in the United States and twelve and one-half percent (12.5%) on units distributed outside the United States. Notwithstanding the immediately preceding sentence, on units distributed through Club Operations, such royalty rates shall be the lower of: (i) fifty percent (50%) of the foregoing applicable rate set forth in this section 5.06(a)(1) or (ii) ten percent (10%) of the Club Operation's selling price.

(2)  For the purposes of this paragraph 5.06 only:  (i) audiovisual Records manufactured by SMEI or components of SMI include only audiovisual Records which are manufactured for the account of SMEI or the component of SMI concerned; they do not include audiovisual Records which are manufactured for the account of any other Person, even though the audiovisual Record may be manufactured under rights derived from SMEI or a component of SMI or distributed by SMEI or a component of SMI; and (ii) a "component" of SMI means a wholly or partly owned subsidiary or affiliate of SMEI, of Sony Corporation, or of any of their subsidiaries, or a joint venture in which any of the foregoing or their subsidiaries participate, which is the principal licensee of SMEI for the distribution of Records, other than Audiovisual Records, in a particular country.

(b)  (1)  With respect to uses of Covered Videos which produce revenues directly for Sony, other than the uses described in subparagraph 5.06(a), Sony shall pay you a royalty equal to a percentage of Sony's Net Receipts derived from such uses (the "Net Receipts Royalty"), in accordance with the provisions of paragraph 5.07 below.

(2)  The uses on which the Net Receipts Royalty shall be payable include, without limitation, uses on audiovisual Records manufactured for distribution by divisions and components of SMEI or Sony Corporation, or joint ventures in which they participate, other than those specified in subparagraph 5.06(a).

ID: 16213/rjs                        -7-           MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)


Exhibit 2

(c) The following amounts shall be charged in reduction of all royalties payable or becoming payable to you in connection with uses of audiovisual Recordings under this paragraph 5.06:

(1) (i) All royalties and other compensation which may become payable to any Person, notwithstanding paragraphs 8.02 and 8.03, for the right to make any uses of Controlled Compositions in audiovisual Recordings; and (ii) Fifty percent (50%) of all such amounts which may become payable in connection with other Compositions.

(2) (i) All payments to record producers or other Persons, except those referred to in clause (ii) of this sentence, which are measured by uses of audiovisual Recordings or proceeds from those uses, whether such payments are to be computed as royalties on sales, as participations in revenues, or in any other manner; and (ii) Fifty percent (50%) of all such payments which are attributable to the production of Covered Videos. (The amounts chargeable under this section 5.06(c)(2) shall not include non-contingent advances, but shall include payments, including payments in fixed amounts, which accrue by reason that such sales, revenues or other bases for computation attain particular levels.)

5.07. (a) Sony shall credit your royalty account hereunder with an amount equal to fifty percent (50%) of Sony's Net Receipts from any royalty or other payment paid to Sony and attributed to the Masters licensed by Sony to another Person for use: (1) in the manufacture and distribution of Phonograph Records; or (2) in synchronization with theatrical motion pictures, television programs, or radio or television commercials.

(b) Provided that a royalty or other payment is not otherwise provided for such uses elsewhere in this Article 5, including, without limitation, pursuant to paragraph 5.07(a) above, in respect of any Master licensed by Sony to another Person for which license Sony receives a royalty or other payment that is readily and directly attributed to the use of such Master (the "Per-Use Fee"), Sony shall credit your royalty account hereunder with an amount equal to a percentage of Sony's Net Receipts from such Per-Use Fee which is the same as the percentage of the rate set forth in subparagraph 5.01(a).

(c) If another recording artist, producer or any other Person is entitled to a royalty or other payment with respect to the same use of the Master as provided for under this

ID: 16213/rjs        -8-        MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

paragraph 5.07, the amount to be credited to your royalty account under this paragraph shall be apportioned in the same ratio as that among your and that other Person's respective basic royalty percentages.

(d) Notwithstanding anything to the contrary expressed or implied in this paragraph 5.07, this paragraph 5.07 shall not be deemed to apply to (1) any payments received by Sony pursuant to any statute or other legislation (including, without limitation, payments for the public performance of Recordings, or royalties payable for the sale of blank cassettes or for the sale of recording equipment) or (2) any so-called "blanket licenses" (including, without limitation, performance licenses) between Sony and a Licensee under which the Licensee is granted access to all or a significant portion of Sony's catalogue of Master Recordings.

(e) For purposes of this paragraph 5.07 only, "Sony" shall be deemed to refer to Sony with respect to Records sold for distribution in the United States or Canada, and, with respect to distribution of Records in territories other than the United States or Canada, shall be deemed to refer to Sony's principal Licensee in the territory concerned.

## 6. MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Article 5:

6.01.    The royalty rate on a Phonograph Record containing the Masters and other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides embodying the Masters and the denominator of which is the total number of Sides contained on such Record. The royalty rate on an audiovisual Record containing a Covered Video and other audiovisual works will be determined by apportionment based on actual playing time on the Record concerned.

6.02.    No royalties will be payable to you in respect of Phonograph Records sold or distributed by Sony or its Licensees for promotional purposes; as surplus, overstock, or scrap; as cutouts after the listing of such Records has been deleted from the catalog of Sony or the particular Licensee; as "free," "no charge" or "bonus" Records (whether or not intended for resale); to Sony employees and their relatives; to radio station; or in territories where the Recordings concerned are in the public domain. No royalties will be payable to you on Records containing Recordings of not more than two (2) Compositions made under this agreement, intended for free distribution as

ID: 16213/rjs                    -9-          MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)


Exhibit 2

"samplers" to automobile or audio equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use on transportation carriers.

## 7. ROYALTY ACCOUNTINGS

7.01. Sony will compute your royalties as of each June 30th and December 31st for the prior six (6) months, in respect of each such six-month period in which there are sales or returns of Records or any other transactions on which royalties are payable to you. On the next September 30th or March 31st Sony will send you a statement covering those royalties and will pay you any royalties which are due after deducting unrecouped Advances. Sony will not act unreasonably in maintaining royalty reserves against anticipated returns and credits or anticipated payments referred to in subparagraph 5.06(c). If Sony makes any overpayment to you, you will reimburse Sony for it; Sony may also deduct it from any payments due or becoming due to you. If Sony pays you any royalties on Records which are returned later, those royalties will be considered overpayments.

7.02. Sales of Records for distribution outside the United States are called "foreign sales" below. Sony will compute your royalties for any foreign sale in the same national currency in which Sony's Licensee pays Sony for that sale, and Sony will credit those royalties to your account at the same rate of exchange at which the Licensee pays Sony. For purposes of accounting to you, Sony will treat any foreign sale as a sale made during the same six-month period in which Sony receives its Licensee's accounting and payment for that sale. If any Sony Licensee deducts any taxes from its payments to Sony, Sony may deduct a proportionate amount of those taxes from your royalties. If any law, any government ruling, or any other restriction affects the amount of the payments which a Sony Licensee can remit to Sony, Sony may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to Sony. If Sony cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale, except as provided in the next sentence. Sony will, at your request and at your expense, deduct from the monies so blocked and deposit in a foreign depository the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position. All such deposits will constitute royalty payments to you for accounting purposes.

ID: 16213/rjs                          -10-         MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)


Exhibit 2

7.03.      Sony will maintain books and records which report the sales of Phonograph Records and any other transactions on which royalties are payable to you. You may, at your own expense, examine those books and records, as provided in this paragraph only. You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under paragraph 7.01. You may make such an examination for a particular statement only once, and only within two years after the date when Sony is required to send you that statement under paragraph 7.01. You may make those examinations only during Sony's usual business hours, and at the place where it keeps the books and records to be examined. If you wish to make an examination you will be required to notify Sony at least thirty (30) days before the date when you plan to begin it. Sony may postpone the commencement of your examination by notice given to you not later than five (5) days before the commencement date specified in your notice; if it does so, the running of the time within which the examination may be made will be suspended during the postponement. If your examination has not been completed within one month from the time you begin it, Sony may require you to terminate it on seven (7) days' notice to you at any time; Sony will not be required to permit you to continue the examination after the end of that seven-day period. You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales or other distributions of Phonograph Records or other transactions on which royalties are payable to you. You may appoint a certified public accountant to make such an examination for you, but not if he or his firm has begun an examination of Sony's books and records for any Person except you unless the examination has been concluded and any applicable audit issues have been resolved.

7.03.1.     Notwithstanding the last sentence of paragraph 7.03, if Sony notifies you that the representative designated by you to conduct an examination of Sony's books and records under paragraph 7.03 is engaged in an examination on behalf of another Person ("Other Examination"), you may nevertheless have your examination conducted by your designee, and the running of the time within which such examination may be made shall be suspended until your designee has completed the Other Examination, subject to the following conditions:

(a)   You shall notify Sony of your election to that effect within 15 days after the date of Sony's said notice to you;

(b)   Your designee shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and Sony; and

ID: 16213/rjs                        -11-        MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)

Exhibit 2

(c) Your examination shall not be commenced by your designee before the delivery to Sony of the final report on the Other Examination, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous manner.

(The preceding provisions of this paragraph 7.03.1 will not apply if Sony elects to waive the provisions of the last sentence of paragraph 7.03 which require that your representative shall not be engaged in any Other Examination.)

7.04. If you have any objections to a royalty statement, you will give Sony specific notice of that objection and your reasons for it within two years after the date when Sony is required to send you that statement under paragraph 7.01. Each royalty statement will become conclusively binding on you at the end of that two-year period, and you will no longer have any right to make any other objections to it. You will not have the right to sue Sony in connection with any royalty accounting, or to sue Sony for royalties on Records sold or Net Receipts derived by Sony during the period a royalty accounting covers, unless you commence the suit within that two-year period. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you or the Artist by reason of any claim related to Sony's royalty accountings. Without limiting the generality of the preceding sentence, neither you nor the Artist will have any right to seek termination of this agreement or avoid the performance of your obligations under it by reason of any such claim.

## 8. LICENSES FOR MUSICAL COMPOSITIONS

8.01. (a) (1) You grant to Sony an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records other than audiovisual Records, and to distribute them in the United States and Canada.

(2) For that license, Sony will pay Mechanical Royalties, on the basis of Net Sales, at the following rates:

(i) On Records sold for distribution in the United States: The rate equal to seventy-five percent (75%) of the minimum compulsory license rate applicable to

ID: 16213/rjs                    -12-       MJR    (SMU 94-223.3(1))
10/12/94 (16218 RL)



the use of musical compositions on phonorecords under the United States copyright law on the date of this agreement (i.e., seventy-five percent (75%) of six and six-tenths cents (6.60¢) per Composition.)

(ii) On Records sold for distribution in Canada: The rate prescribed in subsection (i) above or the rate equal to seventy-five percent (75%) of the lowest Mechanical Royalty rate prevailing in Canada on a general basis with respect the use of musical Compositions on Standard Records, whichever is lower.

The Mechanical Royalty on any Record described in subparagraph 5.04(a), any Multiple Record Set or any Record sold through a Club Operation will be three-fourths (3/4) of the amount fixed above. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be half of the amount fixed in clause (i) or clause (ii) above. No Mechanical Royalties will be payable for any Records described in paragraph 6.02.

(3) If a Person not in any of the categories referred to in paragraph 10.12 holds a joint ownership interest ("Independent Interest") in a Controlled Composition, Sony will have the right, at its election, to pay or credit directly to that Person a share of the Mechanical Royalty payable with respect to that Composition under clause (i) of section 8.01(a)(2), proportionate to the amount of the Independent Interest, and increased proportionately on the basis of the full amount of the minimum statutory rate applicable under clause (i) of section 8.01(a)(2) (for example, 3.30¢ if the Independent Interest is a one-half ownership interest and the applicable minimum statutory rate is 6.60¢).

(b) Intentionally Deleted.

(c) Sony will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you. On the next May 15th, August 15th, November 15th, or February 15th, Sony will send a statement covering those royalties and will pay any net royalties which are due. Mechanical Royalty reserves maintained by Sony against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case. If Sony makes any overpayment of Mechanical Royalties to any Person you will reimburse Sony for it; Sony may also recoup it from any payments due or becoming due to you. If Sony pays any Mechanical

ID: 16213/rjs                    -13-        MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

Royalties on Records which are returned later, those royalties will be considered overpayments. Paragraphs 7.03, 7.03.1, and 7.04 will apply to Mechanical Royalty accountings.

8.02. You also grant to Sony an irrevocable license under copyright to reproduce each Controlled Composition in Covered Videos, to reproduce those Videos, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute audiovisual Records and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so. Sony will not be required to make any payment in connection with those uses, and that license will apply whether or not Sony receives any payment in connection with any use of any Covered Video.

9. <u>WARRANTIES AND REPRESENTATIONS; RESTRICTIONS; INDEMNITIES</u>

9.01. You warrant and represent:

(a) (1) As of the date of this agreement, none of the musical Compositions recorded in the Masters are Controlled Compositions.

(2) You have the right and power to enter into and fully perform this agreement.

(b) (1) No Phonograph Records have been manufactured from the Masters by you or, to the best of your knowledge, by any other Person, nor have any other uses of the Masters been made by you or, to the best of your knowledge, by anyone else.

(2) To the best of your knowledge, no Person other than Sony has any right to use any existing Master Recordings of the Artist's performances for making, promoting, or marketing Phonograph Records.

(c) (1) Each Person who rendered any service in connection with, or who otherwise contributed in any way to the creation of the Masters, or who granted to you any rights referred to in this agreement, to the best of your knowledge, had the full right and power to do so, and, to the best of your knowledge, was not bound by any agreement which would restrict him from rendering such services or granting such rights.

MNR

(2) To the best of your knowledge, all costs and expenses with respect to the creation of the Masters have been paid.

(3) To the best of your knowledge, all the Masters were made in accordance with the rules and regulations of all unions having jurisdiction. Without limiting the generality of the preceding sentence: (i) the requirements of paragraph 17 of the Phonograph Record Labor Agreement between the AFM and Sony Music, effective as of February, 1987 (and the corresponding provisions of any predecessor or successor agreement) have been satisfied (which warranty and representation is included herein for the benefit of the AFM, among others, and may be enforced by the AFM or by such person or persons as it may designate); and (ii) all artists whose performances embodied on the Masters were recorded in the United States of America have been paid the minimum rates specified in the AFTRA Code of Fair Practice for Phonograph Recordings or the applicable Code then in effect at the time the Masters were made, and all payments due to the AFTRA Pension and Welfare Funds have been made.

(d) Sony shall have the sole and exclusive rights to manufacture, advertise, distribute, sell and otherwise exploit and deal in the Masters and Phonograph Records and other reproductions derived from them, free from any liability or obligation to make any payments to you except the royalties payable to you pursuant to Article 5 and Mechanical Royalties in accordance with Article 8.

(e) No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person; provided, that with respect to clause (1) below, such representation shall be to the best of your knowledge. "Materials," as used in this Article, means: (1) the Masters, (2) all Controlled Compositions, (3) each name used by the Artist, individually or as a group, in connection with the Masters, and (4) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you or the Artist and contained in or used in connection with the Masters or their packaging, sale, distribution, advertising, publicizing or other exploitation.

(f) Sony shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Sony

ID: 16213/rjs                    -15-        MJR     (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

pursuant to this agreement except as specifically provided in this agreement.

9.02.    Intentionally Deleted.

9.03.    If you or Artist shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions, you and the Artist shall notify Sony thereof and shall cooperate with Sony in the event that Sony commences any action or proceeding against such third party.

9.04.    Intentionally Deleted.

9.05.    You will at all times indemnify and hold harmless Sony and any Licensee of Sony from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach or alleged breach by you of any warranty or representation made by you in this agreement or any other act or omission by you. Pending the resolution of any claim in respect of which Sony is entitled to be indemnified, Sony will not withhold monies which would otherwise be payable to you under this agreement in an amount exceeding your potential liability to Sony under this paragraph.

## 10.  DEFINITIONS

10.01.    "Master Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

10.02.    "Inception of Recording" - the first recording of performances or other sounds with a view to the eventual fixation of a Master Recording. "The Masters (from the Inception of Recording)" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings created during the production of the Masters.

10.03.    "Matrix" - any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording.

10.04.    "Person" - Any natural person, legal entity, or other organized group of persons or entities. (All pronouns,

ID: 16213/rjs                          -16-          MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)


Exhibit 2

whether personal or impersonal, which refer to Persons include natural persons and other Persons.)

10.05. "Records" and "Phonograph Records" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, including Records of sound alone and audiovisual Records.

10.06. "Royalty Base Price" - the amount specified below ("Gross Royalty Base") applicable to the Phonograph Records concerned, less all taxes and less the applicable Container Charge. The Royalty Base Price for Records sold through any Club Operation will be the same as that for the identical Records Sold Through Normal Retail Channels in the territory concerned.

(a) WITH RESPECT TO RECORDS SOLD FOR DISTRIBUTION IN THE UNITED STATES OR CANADA: The Gross Royalty Base for an audiovisual Record is the amount computed under section (1) below. The Gross Royalty Base for a Record reproducing sound only is the amount computed under section (1) or section (2) below, whichever is lower:

(1) Sony's published subdistributor price applicable to the price series of the unit concerned at the commencement of the accounting period in which the sale occurs, less ten percent (10%); or

(2) One-half (1/2) of the prevailing industry suggested retail list price applicable to Records in the same configuration and the same wholesale price category as the unit concerned. In this section (2):

(i) A "major U.S. Record company" means one which distributes its own Records directly to wholesalers and retailers on a nationwide basis throughout the United States. (Those companies, at the date of this agreement, are Sony, the WEA group, BMG, Capitol/EMI, MCA and Polygram.)

(ii) The "wholesale price" of a Record distributed by another major U.S. record company means its published price corresponding most closely in amount to a subdistributor price for a Record in the same configuration published by Sony.

(iii) The "wholesale price category" of a Record distributed by Sony includes: (A) that

ID: 16213/rjs                     -17-        MJR    (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

Record; and (B) Records in the same configuration sold by other major U.S. record companies whose wholesale prices for those Records correspond most closely in amount to Sony's published subdistributor price for the Sony-distributed Record concerned.

(iv) "Prevailing industry suggested retail list price" means the average of the suggested retail list prices assigned to Records in the wholesale price category concerned by the major U.S. Record companies which publish suggested retail list prices.

Royalties will be calculated separately with respect to each price series in which units of a particular Record release are sold during the semiannual accounting period concerned. References to published prices in this section refer to those in effect at the commencement of the accounting period concerned.

(b) (b) **WITH RESPECT TO RECORDS (INCLUDING AUDIOVISUAL RECORDS) SOLD FOR DISTRIBUTION OUTSIDE OF THE UNITED STATES AND CANADA:** The Gross Royalty Base is the applicable amount specified in sections 10.06(b)(1) or (2) below, in the country of sale, at the commencement of the accounting period concerned, plus taxes:

(1) If the Records concerned have a suggested retail list price in the country concerned, the Gross Royalty Base shall be one-half (1/2) of that price.

(2) If section 10.06(b)(1) above does not apply, the Gross Royalty base shall be one-half (1/2) of the royalty base generally used by Sony's principal Licensee in the country concerned to calculate the royalties that Licensee pays to recording artists ("Licensee Base"). If this section 10.06(b)(2) applies and the Licensee Base is not a "retail-related base" (i.e., it is not a royalty base intended to be an equivalent of or substitute for an actual or hypothetical retail price), the Gross Royalty Base shall be one-half (1/2) of the retail price which may be established by Sony or its Licensee(s) in conformity with the general practice of the Record industry in such country; and, if there is no such established retail price in such country, the Gross Royalty Base shall be one-half (1/2) of the manufacturer's published

-18-        MJR      (SMU 94-223.3(1))


Exhibit 2

price to dealers with respect to the Record concerned, multiplied by one hundred twenty-six percent (126%).

(c)   Notwithstanding anything to the contrary expressed or implied elsewhere herein:

(1)   The Gross Royalty Base for any Record sold directly to consumers, by Sony in the United States or Canada, or in any territory outside the United States and Canada by Sony's principal Licensee in the territory concerned, via direct mail, through mail order operations (including, without limitation, Direct Club Operations in the United States, but excluding Club Operations outside of the United States) or via any other means of transmission or communication, shall be one-half (1/2) of the price paid by the consumer to Sony or Sony's Licensee, as applicable, for the Record concerned; and

(2)   The Gross Royalty Base for Records sold through a Club Operation outside of the United States shall be the same as that for the identical Records sold Through Normal Retail Channels in the territory concerned.

10.07.   "Container Charge" - The applicable percentage, specified below, of the Gross Royalty Base applicable to the Records concerned:

(a)   Audiovisual Records - fifteen percent (15%).

(b)   Audiophile Records - twenty-five percent (25%).

(c)   Other Records - ten percent (10%) on disc Records and twenty percent (20%) on Records in non-disc configurations.

10.08.   "Net Sales" - eighty-five percent (85%) of gross sales, less returns, credits, and reserves against anticipated returns and credits.

10.09.   "Club Operation" - any direct sales to consumers through a record club (for example, sales through Columbia House in the United States or Bertelsmann in Europe).   A "Direct Club Operation" is a Club Operation conducted directly by Sony and not by another Person through a licensing arrangement with Sony (with respect to distribution in the United States and/or Canada) or with Sony's principal Licensee in any territory outside the United States and Canada (with respect to distribution in such

ID: 16213/rjs                         -19-         MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)


Exhibit 2

territories). For example, Columbia House in the United States and Bertelsmann in Europe are not Direct Club Operations).

10.10. "Advance" - a prepayment of royalties. Sony may recoup Advances from royalties to be paid to or on behalf of you or Artist pursuant to this or any other agreement, and from Mechanical Royalties payable for the use of Controlled Compositions on Phonograph Records distributed by Sony.

10.11. "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley. Recordings of more than one arrangement or version of the same Composition, reproduced on the same Record, will be considered, collectively, a recording of one Composition for all purposes under this agreement.

10.12. "Controlled Composition" - a Composition wholly or partly written, owned or controlled by you, the Artist, or any Person in which you or the Artist has a direct or indirect interest.

10.13. (a) "Album" - one or more twelve-inch 33 1/3 rpm Records, or the equivalent, at least thirty-five (35) minutes in playing time, sold in a single package. (b) "Single" - a disc Record not more than seven (7) inches in diameter, or the equivalent in a non-disc configuration. (Audiovisual Records are not Albums or Singles.)

10.14. "Side" - A Master Recording of a continuous performance of a particular arrangement or version of a Composition, not less than two and one quarter (2 1/4) minutes in playing time.

10.15. "Sales Through Normal Retail Channels" - sales other than as described in paragraphs 5.02, 5.03, 5.05, 5.06, and 6.02.

10.16. "Licensees" - includes, without limitation, wholly or partly owned subsidiaries, affiliates, and other divisions or components of Sony Music Entertainment Inc.

10.17. "Reissue Label" - A label, such as the Odyssey label, used primarily for reissues of recordings released previously.

10.18. "Budget Record" - "Budget Record" - A Record, whether or not previously released, bearing a Gross Royalty Base more than thirty-five percent (35%) lower than the Gross Royalty Base applicable to the Top Line Records in the same configuration (e.g., whether it is a tape cassette, compact disc, or vinyl



Exhibit 2

Record and whether it is an Album or a Single) released by Sony or its Licensees in the territory concerned. A "Top Line" Record release is one bearing the same Gross Royalty Base as the majority (or plurality) of the Record releases in the same configuration (other than classical releases, including but not limited to Sony Classical and Masterworks releases) then in initial release in Sony's active catalog. (For the purposes of the preceding sentence, a Record release will not be deemed in its initial release if it bears a Gross Royalty Base lower than that which applied to it when it was first released by Sony.)

10.18.1. "Mid-price Record" - A Record, whether or not previously released, bearing a Gross Royalty Base at least seventeen and one-half percent (17.5%), but not more than thirty-five percent (35%), lower than the Gross Royalty Base applicable to the Top Line Standard Records (defined in paragraph 10.18) in the same configuration.

10.19. Intentionally Deleted.

10.20. "Mechanical Royalties" - Royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records other than audiovisual Records.

10.21. (a) "Audiophile" Records, units, etc. - Records (other than audiovisual Records) marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical or artistic characteristics. (All Records made for digital playback are Audiophile Records.)

(b) "Standard" Records, units, etc. - Records other than Audiophile Records and audiovisual Records.

10.22. "Covered Video" - An audiovisual work owned or controlled by Sony and containing one or more Masters.

10.23. "Special Packaging Costs" - costs incurred by Sony at your request pursuant to paragraph 4A.01 in creating and producing Album covers, sleeves, and other packaging elements, in excess of Sony's standard packaging costs for Records which at present are the following amounts: (a) ten thousand dollars ($10,000) per Album for design of artwork (including expenses for reproduction rights) and for engraving; and (b) for Albums manufactured for distribution in the United States or Canada, packaging manufacturing costs equal to those necessary to manufacture the following packaging elements: (1) for vinyl LP's, a four-color jacket and a one-color inner sleeve; (2) for cassettes including digital compact cassettes, a six-panel inlay card with a four-color front panel and black and white other



Exhibit 2

panels, and a standard color Norelco box; and (3) for compact discs and other configurations not described above and an eight-page booklet with four-color front and back pages and black and white other pages, and a standard color jewel box. "Color" in the preceding sentence means those colors for which Sony is charged a standard fee. The packaging elements referred to in clauses (c)(1), (2), and (3) bove are deemed for purposes of this paragraph 10.23 to be on standard weight paper or cardboard. For Albums in those configurations manufactured for distribution elsewhere, costs in excess of the standard packaging element manufacturing costs incurred by Sony or the Sony Licensee concerned for Records manufactured in the same territory as the Records concerned. Sony agrees that Special Packaging Costs shall not include costs incurred by Sony in correcting incomplete or inaccurate information unless such inaccuracy or incompleteness was a result of information, or the lack of information, supplied by you or omitted by you.

10.24. "Net Receipts" - means Gross Receipts, after deduction by Sony of all direct expenses, taxes, and adjustments incurred in connection with the production of the Masters and/or Covered Video concerned, the acquisition of rights in them, applicable exploitation of the Master and/or Covered Video concerned, and/or in connection with the collection and receipt of those Gross Receipts in the United States (including, without limitation, all copyright payments, all re-use payments under Sony's agreements with the American Federation of Musicians and any other third-party payments). For purposes of section 5.06(b)(1) above, only, Net Receipts shall be determined after deducting the foregoing as well as after deducting a marketing and distribution fee equal to fifteen percent (15%) of the applicable Gross Receipts. If any item deducted from Gross Receipts in determining Net Receipts is attributable to a Master and/or a Covered Video hereunder and to other Master Recordings, the amount of that item to be deducted in determining Net Receipts hereunder shall be determined by reasonable apportionment.

10.25. "Gross Receipts" - means all monies (including non-returnable advances) actually earned and received by Sony in the United States, directly from the applicable exploitation of the Masters and/or Covered Videos concerned. (For the purposes of determining Gross Receipts, any royalties credited to Sony's account but charged in recoupment of a prior advance made to Sony and retained by the payor by reason of that charge shall be deemed paid to Sony and received by Sony when Sony receives the accounting reflecting the credit and charge concerned.) If any monies included in Gross Receipts is attributable to a Master and/or a Covered Video hereunder and to other Master Recordings, the amount of that item to be included in Gross Receipts



Exhibit 2

hereunder shall be reasonably apportioned. If a use of a Master and/or a Covered Video on which a Net Receipts Royalty is payable hereunder is made by another division or component of Sony Music Entertainment Inc. or by a joint venture as to which Sony, Sony Music Entertainment Inc. or Sony Corporation is a party, Sony's discretion in negotiating the amount of the compensation (if any) to be paid or credited to Sony for that use and included in Gross Receipts shall be conclusive, provided that amount is fair and reasonable under the circumstances. (The preceding sentence shall apply whether or not the user derives revenues from the use, and the user's revenues shall not be deemed Gross Receipts.) Any such amount shall be deemed fair and reasonable if it is comparable to compensation then being negotiated by Sony with unaffiliated users for comparable uses, or if Sony notifies you that it proposes to agree to the amount concerned and you do not notify Sony of your objection within two (2) weeks from the date of delivery of the notice by Sony to you. If you make any such objection you shall also notify Sony of your reasons therefor and shall negotiate with Sony in good faith to resolve the difference underlying such objection if Sony so requests. Notwithstanding the foregoing, or anything to the contrary expressed or implied elsewhere herein, with respect to receipts payable from a Club Operation, Gross Receipts shall specifically not include any profits received by Sony or any Licensee as a joint venturer in such Club Operation (e.g., the Columbia House Company).

## 11. NOTICES

11.01. Except as otherwise specifically provided herein, all notices under this agreement shall be in writing and shall be given by courier or other personal delivery or by registered or certified mail at the appropriate address shown or at a substitute address designated by notice by the party concerned. Each notice to Sony shall be addressed for the attention of its Senior Vice President, Business Affairs & Administration, and a copy of each such notice shall be sent simultaneously to the Sony Music Entertainment Inc. Law Department for the attention of its Senior Vice President and General Counsel. Notices shall be deemed given when mailed, except that a notice of change of address shall be effective only from the date of its receipt.

## 12. MISCELLANEOUS

12.01. This agreement contains the entire understanding of the parties relating to its subject matter. No change or termination of this agreement will be binding upon Sony unless it is made by an instrument signed by an officer of Sony. A waiver by either party of any provision of this agreement in any

ID: 16213/rjs                    -23-        MJR    (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

instance shall not be deemed to waive it for the future. All remedies, rights, undertakings, and obligations contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either party. The captions of the Articles in this agreement are included for convenience only and will not affect the interpretation of any provision.

12.02. Those provisions of any applicable collective bargaining agreement between Sony and any labor organization which are required, by the terms of such agreement, to be included in this agreement shall be deemed incorporated herein.

12.03. Sony may assign its rights under this agreement in whole or in part.

12.04. Neither Party shall be entitled to recover damages or seek any other remedy by reason of any breach by the other Party of its material obligations hereunder, unless the latter Party has failed to remedy such breach within a reasonable time following receipt of notice thereof. If any royalty provisions different from those in Sony's standard contract forms require calculations which cannot practicably be accommodated in Sony's automated data processing systems, any amounts payable by reason of those provisions will be computed and paid to you following your request made after the rendition of Sony's royalty statements for the accounting periods concerned.

12.05. THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF NEW YORK, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER NEW YORK LAW). THE NEW YORK COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, IN NEW YORK COUNTY, AND NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS. ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BE DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS FIRST ABOVE WRITTEN OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE PURSUANT TO ARTICLE 11. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON THE ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE SONY TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS FIRST ABOVE WRITTEN OR SUCH OTHER ADDRESS AS THE ARTIST OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN THE MANNER PRESCRIBED IN ARTICLE 11. ANY SUCH DELIVERY OR

ID: 16213/rjs                    -24-       MJR    (SMU 94-223.3(1))
10/12/94 (16218 RL)

Exhibit 2

MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF NEW YORK.

12.06. Monies to be paid to you under this agreement will not be assignable by you without Sony's written consent, which Sony may withhold in its unrestricted discretion; provided that we acknowledge that you have previously assigned such monies to Steven Ames Brown, Esq.

12.07. This agreement shall not become effective until executed by all proposed parties hereto.

12.08. Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and Sony.

12.09. You and your agents, heirs, executors, administrators, estates, guardians, trustees, legal successors and assigns hereby irrevocably forever release and discharge Sony from any and all claims, demands, actions, causes of action, suits, sums of money, accounts, covenants, agreements, contracts, and promises in law or in equity, which you now have, have had, or at any time may have, against Sony hereto, its predecessors, legal successors and assigns, its servants, officers, agents, employees, heirs, executors, administrators, estates, guardians and trustees with respect to the rights granted to Sony in the Masters pursuant to the Earlier Agreement, whether or not they have been subject to dispute or otherwise and whether known or unknown to you, by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date hereof. Nothing contained in this paragraph 12.09 will affect Sony's obligation to pay you royalties (or any right you may have to object to Sony's accountings) in accordance with the Earlier Agreement, or except as specifically released herein, your obligations and Sony's rights as provided in the Earlier Agreement.

_____
NINA SIMONE

Sony Music, A Group of
Sony Music Entertainment Inc.

By _____

Ron Wilcox
Senior Vice President
Business Affairs and Administration

ID: 16213/rjs                    -25-        MJR        (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

My taxpayer identification number (social security number or employer identification number) is ███████. Under the penalties of perjury, I certify that this information is true, correct, and complete.

NINA SIMONE


Exhibit 2

## SCHEDULE A

(reference paragraph 1.01)

1.  Baltimore
2.  Everything Must Change
3.  The Family
4.  My Father
5.  Music For Lovers
6.  Rich Girl
7.  That's All I Want From You
8.  Forget
9.  Balm in Gilead
10. If You Pray Right

ID: 16213/rjs          -27-      MJR      (SMU 94-223.3(1))
10/12/94 (16218 RL)



Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                       :

TOTO, INC.,                               :         Civ. No. 12-cv-1434 (LAK)

                Plaintiff,         :         **ECF CASE**

            - against -          :

SONY MUSIC ENTERTAINMENT,       :

            Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## DECLARATION OF GINA R. MERRILL

       GINA R. MERRILL declares as follows pursuant to 28 U.S.C. § 1746:

       1.    I am a member in good standing of the bar of this Court and an attorney with Covington & Burling LLP, counsel to Sony Music Entertainment ("SME") in this action.  I make this declaration in support of SME's Motion to Dismiss and to place before the court documents and information necessary to its determination of this motion.

       2.    A true and correct copy of the December 10, 1977 agreement between Toto, Inc. and SME's predecessor-in-interest, CBS Records (the "1977 Agreement"), is attached as Exhibit 1.

       3.    A true and correct copy of the January 27, 1983 agreement between Toto, Inc. and CBS Records (the "1983 Agreement") is attached as Exhibit 2.

       4.    A true and correct copy of the August 12, 1986 amendment between Toto, Inc. and CBS Records (the "1986 Amendment") is attached as Exhibit 3.

Exhibit 3

Exhibit 3  Page 1

5.      A true and correct copy of the February 4, 2002 agreement between Toto, Inc. and SME's predecessor-in-interst, Sony Music Entertainment, Inc. (the "2002 Amendment") is attached as Exhibit 4.

6.      A true and correct copy of Plaintiff Toto, Inc.'s Complaint, dated February 27, 2012, is attached as Exhibit 5.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2012 in New York, New York.


_____*s/ Gina R. Merrill*_____

Gina R. Merrill

Exhibit 3

Exhibit 3  Page 2