Controlled Compositions shall be licensed to CBS at one-half (1/2) of said rate.

(b) Notwithstanding the foregoing, CBS shall not be required to pay an aggregate copyright royalty in excess of ten (10) times the rate provided in the first sentence of subparagraph 12.01(a) for any Album or twice that rate for any single Reord consisting of Recordings made hereunder.

(c) CBS will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you. On the next May 15th, August 15th, November 15th, or February 15th, CBS will send a statement covering those royalties and will pay any net royalties which are due. Mechanical Royalty reserves maintained by CBS against anticipated returns and credits will not be held for an unreasonable period of time. If CBS makes any overpayment of Mechanical Royalties to any Person you will reimburse CBS for it; CBS may also recoup it from any payments due or becoming due to you. Notwithstanding the preceding sentence, if CBS makes an overpayment of Mechanical Royalties to any Person other than you or a Person owned or controlled by you solely by reason of CBS' accounting error (but not, for example, because the total Mechanical Royalty payable exceeds the applicable limit specified in paragraph 12.01(b) above), you shall not be responsible for such overpayment but you shall cooperate with CBS in attempting to obtain reimbursement by CBS for such overpayment from such Person. If CBS pays any Mechanical Royalties on Records which are returned later, those royalties will be considered overpayments. If the total amount of the Mechanical Royalties which CBS pays on any Record consisting of Master Recordings made under this agreement (including Mechanical Royalties for compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under subparagraph 12.01(b), that excess amount will be considered an overpayment also.

12.02.   Any assignment made of the ownership or copyright in, or right to license the use of, any Controlled Compositions referred to in this paragraph shall be made subject to the provisions hereof.

12.03.   The provisions of this Article 12 shall constitute and are accepted by you, on your own behalf and on behalf of any other owner of any Controlled Compositions or any rights therein, as full compliance by CBS with all of its obligations, under the compulsory license provisions of the Copyright Law, as the same may be amended, or otherwise,

ID:1577C                                            RB [CRU 82-564.3(1)] 1h (1/2778

-19-

Exhibit 3

Exhibit 3  Page 53

arising from any use by CBS of Controlled Compositions as provided herein.

12.04.    If any Recordings made hereunder contain one (1) or more Compositions, other than Controlled Compositions, not in the public domain and not subject to compulsory license, you will obtain, at CBS' election and for CBS' benefit, mechanical licenses covering such Compositions on the same terms applicable to Controlled Compositions pursuant to this Article 12.

12.05.    You also grant to CBS, for promotional purposes only, an irrevocable license under copyright to reproduce each Controlled Composition in motion pictures and other audiovisual works ("pictures") and to distribute and to perform those pictures throughout the world, and to authorize others to do so. CBS will not be required to make any payment in connection with those uses, and that license will apply whether or not CBS receives any payment in connection with those pictures.

12.06.    You will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada. The terms of such licenses shall be not less favorable to CBS or its Licensees than the terms generally prevailing in the country concerned.

13. WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES

13.01.    You warrant and represent:

(a)  You have the right and power to enter into and fully perform this agreement.

(b)  CBS shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by CBS pursuant to this agreement except as specifically provided in this agreement.

(c)  Artist is or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of Artist's services hereunder.

(d)  No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person. "Materials," as used in this Article, means: (1) all Controlled

ID/1577C)

RB [CRU 82-564.3(1)] 1h (1/27/78RJS

-20-

Exhibit 3

Exhibit 3  Page 54

Compositions, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist or any Producer and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

13.02. During the term of this agreement, neither you nor the Artist will enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder, and neither you nor the Artist will perform or render any services for the purpose of making Phonograph Records or Master Recordings derived from the Artist's performances for any person other than CBS. After the expiration of the term of this agreement, for any reason whatsoever, the Artist will not perform any Composition which shall have been recorded hereunder for any person other than CBS for the purpose of making Phonograph Records or Master Recordings prior to whichever of the following dates shall be later: (a) the date five (5) years subsequent to the date such Composition is recorded hereunder, or (b) the date two (2) years subsequent to the expiration date of the term of this agreement. Neither you nor the Artist shall authorize or knowingly permit Artist's performances to be recorded for any purpose without an express written agreement prohibing the use of such recording on Phonograph Records in violation of the foregoing restrictions.

13.02.1 The Artist may perform as a background vocalist or instrumentalist accompanying a featured artist for the purposes of making Phonograph Records for others, provided:

(a) Such activity does not in any way interfere with the performance of your obligations hereunder;

(b) (1) The Artist will not render a vocal solo or vocal "step-out" performance; and

(2) The musical style of the Recording shall not be substantially similar to the characteristic musical style of Recordings made by the Artist for CBS;

(c) The compositions so recorded shall not have been recorded by the Artist for CBS, and the Artist shall not be restricted from recording the same compositions for CBS thereafter;

ID:1577C

RB [CRU 82-564.3(1)] lh (1/27/8

-21-

Exhibit 3

Exhibit 3  Page 55

(d) (1) The Artist's name may be used in connection with such records, in the form of a courtesy credit to Columbia Records on the Album liners used for such Records, in the same position as the credits accorded to other sidemen and in type of the same size and prominence; and

(2) Except as expressly provided in section 13.02.1(d)(1) above, neither the Artist's name (or any similar name) nor any picture, portrait or likeness of the Artist shall be used in connection with such Recordings, including, without limitation, on the front covers of the Album containers, on sleeves or labels used for single Records, or in advertising, publicity or other form of promotion or exploitation, without CBS' express written consent, which CBS may withhold in its unrestricted discretion notwithstanding any other provisions of this agreement.

13.03.  If you or Artist shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions, you and Artist shall notify CBS thereof and shall cooperate with CBS in the event that CBS commences any action or proceeding against such third party.

13.04.  The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and CBS shall be entitled to injunctive relief to enforce the provisions of this agreement. This paragraph is not intended to affect your ability to oppose CBS' rights to injunctive relief in respect of the particular facts which may be in issue; provided, however, that you will at no time claim that the services of the Artist are not unique and extraordinary or that the loss thereof can be adequately compensated in damages and you hereby stipulate that the Artist's services are unique and extraordinary and the loss thereof cannot be adequately compensated in damages.

13.04.1  (a) You warrant and represent that each member of the Artist will be compensated by you for his services under this agreement at a rate of not less than Six Thousand Dollars ($6,000.00) per Fiscal Year. "Fiscal Year," as used in this paragraph 13.04.1, means the annual period beginning on the date of commencement of the term of this agreement and each subsequent annual period during the continuance of that term beginning on the anniversary of that commencement date.

(b) If, for any given Fiscal Year, you do not intend to so compensate the Artist, you will notify CBS in writing of such fact at least forty (40) days before the end



ID:1577C         RB [CRU 82-564.3(1)] lh (1/27/83)

-22-

Exhibit 3

Exhibit 3  Page 56

of the Fiscal Year concerned, and CBS will make any such necessary payments directly to the Artist concerned, all of which payments shall be recoupable from any and all monies payable hereunder. Nothing contained herein shall be deemed CBS' acceptance or acknowledgement of the applicability of California law to any provision hereof but reflects only CBS' concern with any potential claim which would prejudice, hinder or delay its rights to injunctive relief or its rights to the Artist's full services and Recordings hereunder.

13.05.  You will at all times indemnify and hold harmless CBS and any Licensee of CBS from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or agreement made by you herein, provided the claim concerned has resulted in a judgment against CBS or its Licensees or has been settled with your consent. You will reimburse CBS and/or its Licensees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which CBS or its Licensees are entitled to be indemnified.

14. DEFINITIONS

As used in this agreement the following terms shall have the meanings set forth below:

14.01.  "Master Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of phonograph records.

14.02.  "Inception of Recording" - the first recording of performances and/or other sounds with a view to the ultimate fixation of a Master Recording. "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this agreement.

14.03.  "Matrix" any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording.

14.04.  "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

ID:1577C                                    RB [CRU 82-564.3(1)] 1h (1/27/78)

-23-

Exhibit 3

Exhibit 3  Page 57

14.05. "Records" and "Phonograph Records" – all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (a) sound alone or (b) sound coupled with visual images, e.g., "sight and sound" devices.

14.06. "Wholesale Price" – (a) With respect to Records sold for distribution in the United States or Canada: (1) the average net price received by CBS from independent distributors for Phonograph Records during the six-month period immediately preceding the accounting period concerned, calculated separately for each separately priced Record series manufactured and sold by CBS; or (2) if there are no applicable independent distributors, CBS' published subdistributor price in effect as of the commencement of the accounting period concerned, less ten percent. (b) With respect to Records sold for distribution outside of the United States and Canada, the suggested or applicable retail list price in the country of sale. If a different base is used for computing Mechanical Royalties on the Records concerned by agreement between Record manufacturers and a licensing organization, such as BIEM, CBS will use that base instead of the retail list price as the basis for defining the Wholesale Price in computing your royalties on those Records if no retail list price is applicable to them. If neither a retail list price nor an agreed mechanical royalty base is applicable to the Records concerned, the base generally used by CBS' principal Licensee in the country concerned to calculate the royalties it pays to recording artists will be used instead as the basis for defining the Wholesale Price in computing your royalties on those Records.

14.07. "Royalty Base Price" – the applicable Wholesale Price of Phonograph Records less all taxes and less the applicable container charge. (The Royalty Base Price will not be used in computing the royalties (for both disc and tape) referred to in clause 9.01(a)(1)(i).) The Royalty Base Price for Records sold through any Club Operation will be the same as that for the identical Records Sold Through Normal Retail Channels in the territory concerned.

14.08. "Container Charge" – (a) with respect to disc Phonograph Records, ten percent (10%) of the applicable Wholesale Price of such Phongraph Records; and (b) with respect to Phonograph Records in non-disc configurations, twenty percent (20%) of the applicable Wholesale Price of such Phonograph Records. (The Container Charge will not be used in computing the royalties (for both disc and tape) referred to in clause 9.01(a)(1)(i).)

ID:1577C

RB [CRU 82-564.3(1)] lh (1/27/82)

-24-

Exhibit 3

Exhibit 3 Page 58

14.09.   "Net Sales" – gross sales less returns and credits computed after deduction of reserves against anticipated returns and credits. As used herein, the term Net Sales in conjunction with specific language regarding CBS' right to maintain reserves against anticipated returns and credits shall not be interpreted as permitting CBS to deduct such reserves more than once.

14.10.   "Club Operation" – any direct sales to consumers conducted on a mail order basis by CBS or its Licensees, e.g., the Columbia Record Club.

14.11   "Contract Period" – the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

14.12.   "Advance" – a prepayment of royalties. CBS may recoup Advances from royalties to be paid to or on behalf of you or Artist pursuant to this or any other agreement relating to Artist's recording services, including without limitation the Prior Agreement. Notwithstanding the preceding sentence:

(a)   CBS shall not recoup Advances hereunder from royalties payable to you for the semi-annual accounting period ending on December 31, 1982, or from royalties payable to you with respect to sales outside the United States of the Album entitled "Toto IV" reported in the semi-annual accounting period ending on June 30, 1983;

(b)   CBS shall not recoup Advances hereunder from royalties payable to you for USNRC Net Sales (after provision for reasonable reserves not to exceed twenty-five percent (25%) for returns and credits) of the Album entitled "Toto IV" (and Records derived therefrom) for the semi-annual accounting period ending on June 30, 1983 (the amount of such royalties is referred to below as the "Amount"). If, as of the last date for timely Delivery of the third Album of your Recording Commitment pursuant to Article 3, your royalty account is in an "unearned position" (i.e., there are unrecouped Advances or other offsets against your royalties) according to CBS' monthly artist trial balance accounting statement (after provision for reasonable reserves not to exceed twenty-five percent (25%) for returns and credits but with no provision for reserves in foreign territories where CBS' Licensee does not allow returns) but without taking into account any Advances made to you in connection with such third Album of your Recording Commitment, then CBS shall have the right to deduct from the otherwise applicable Recording

ID:1577C                               RB [CRU 82-564.3(1)] 1h (1/27/

-25-

Exhibit 3

Exhibit 3  Page 59

Funds for the third and fourth Albums of your Recording Commitment, in equal portions, the lesser of (i) the amount by which your royalty account is in an "unearned position", as described above, or (ii) the Amount. In determining whether your royalty account is in an "unearned position," royalties calculated for sales that have been made outside the United States but have not been credited to your account shall be treated in the same manner as in the parenthetical at the end of subparagraph 6.02(b) above.

14.13.   "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.14.   "Controlled Composition" a composition written, owned or controlled by you, the Artist and/or Producer and/or any person in which you, the Artist and/or the Producer has a direct or indirect interest.

14.15.   (a) "Album" - one or more twelve-inch 33-1/3 rpm Records, or the equivalent, at least 35 minutes in playing time, sold in a single package. (b) "Single" - a disc Record not more than seven inches in diameter, or the equivalent in a non-disc configuration. An audiophile "compact disc" that contains all the Master Recordings contained on the equivalent Album shall not be deemed a Single.

14.16.   "Side" - a Recording of sufficient playing time to constitute one (1) side of a 45 rpm record, but not less than two and one-quarter (2-1/4) minutes of continuous sound.

14.17.   "Joint Recording" - any Master Recording embodying the Artist's performance, together with the performance of another artist(s) with respect to which CBS is obligated to pay royalties.

14.18.   "Sales Through Normal Retail Channels in the United States" - sales other than as described in paragraphs 9.02, 9.03, 9.05, 9.06 and 9.07 hereof.

14.19.   Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of CBS Inc.

14.20.   "Delivery" or "Delivered," when used with respect to Master Recordings, means the actual receipt by CBS of fully mixed and edited Master Recordings, satisfactory to CBS and ready for CBS' manufacture of Phoograph Records, and all necessary licenses and applicable approvals and consents and all materials required to be

ID:1577C                                                  RB [CRU 82-564.3(1)] 1h (1/27/83)

-26-

Exhibit 3

Exhibit 3  Page 60

furnished by you to CBS for use in the packaging and marketing of the Records.

14.21. "Reissue Label" - a label, such as the Harmony or Odyssey label, used primarily for reissues of recordings released previously.

14.22. "Budget Record" - a Record bearing a Wholesale Price at least forty-one percent (41%) lower than the Wholesale Price of the top line Phonograph Records embodying performances of pop artists released by CBS or its Licensees in the territory concerned.

14.23. "Midline Record" - a Record bearing a Wholesale Price at least twenty-five percent (25%) but not more than forty-one percent (41%) lower than the Wholesale Price of the top line Phonograph Records embodying performances of pop artists released by CBS or its Licensees in the territory concerned.

14.24. "Multiple Record Set" - an Album containing two or more 12-inch 33 1/3 rpm Records packaged as a single unit, or the equivalent.

14.25. "Mechanical Royalties" - royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

14.26. "Special Packaging Costs" - include, without limitation, all costs incurred by CBS in creating and producing Album covers, sleeves, and other packaging elements prepared from material furnished by you or the Artist or used at your request, in excess of the following amounts: (a) $3,500 per Album for design of artwork (including expenses for reproduction rights); (b) $1,600 per Album for engraving; (c) 20¢ per Album unit in disc packaging manufacturing costs for Albums manufactured for distribution in the United States or Canada (If CBS' current actual per-unit cost of manufacturing a standard disc album package [i.e.; a 4-color Shorepak (or the equivalent) and a plain white paper sleeve] changes, the aforementioned 20¢ figure will be adjusted proportionally.); and (d) for Albums manufactured for distribution elsewhere, the standard packaging manufacturing costs incurred by CBS or the CBS Licensee concerned for disc Albums manufactured in the same territory as the Album units concerned.

15. REMEDIES

15.01. If you do not fulfill any portion of your Recording Commitment within the time prescribed in Article 3, CBS will have the following options:

ID: 1577C                                RB [CRU 82-564.3(1)] 1h (1/27/83)

-27-

Exhibit 3

Exhibit 3  Page 61

(a) to suspend CBS' obligations to make payments to you under this agreement until you have cured the default;

(b) to terminate the term of this agreement at any time, whether or not you have commenced curing the default before such termination occurs, provided, however, that CBS may not terminate the term of this agreement unless you fail to cure the default within three (3) months after the last date specified in Article 3 for timely Delivery of the Album concerned. If CBS so terminates the term of this agreement, CBS may also, at its option require you to repay to CBS the amount, not then recouped, of any Advance previously paid to you by CBS and not specifically attributable under Article 6 to an Album which has actually been fully Delivered.

CBS may exercise each of those options by sending you the appropriate notice. If CBS terminates the term under clause 15.01(b) all parties will be deemed to have fulfilled all of their obligations under this agreement except those obligations which survive the end of the term (such as indemnification obligations, re-recording restrictions, and your obligations under clause 15.01(c).) No exercise of an option under this paragraph will limit CBS' rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02. If CBS fails without cause to allow you to fulfill your Recording Commitment for any Contract Period and if, not later than sixty (60) days after that refusal takes place, you notify CBS of your desire to fulfill such Recording Commitment, then CBS shall permit you to fulfill said Recording Commitment by notice to you to such effect within sixty (60) days of CBS' receipt of your notice. Should CBS fail to give such notice, you shall have the option to terminate the term of this agreement by notice given to CBS within thirty (30) days after the expiration of said sixty (60) day period; on receipt by CBS of such notice the term of this agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties), at which time CBS shall pay you, in full settlement of its obligation in connection therewith, an Advance in the amount equal to:

(1) The aggregate of the minimum Recording Funds fixed in subparagrah 6.02(a) for each Album, then remaining unrecorded, of the Recording

ID:1577C  RB [CRU 82-564.3(1)] 1h (1/27/8

-28-

Exhibit 3

Exhibit 3  Page 62

Commitment for the Contract Period in respect of which such termination occurs,

less:

(2) The average amount of the Recording Costs (defined in paragraph 5.02) for the last two (2) Albums recorded hereunder (or, if only one (1) Album has been recorded, the amount of the Recording Costs for that Album), <u>multiplied by the number of such unrecorded Albums referred to in clause (1)</u>.

CBS shall have no obligation to you for failing to permit you to fulfill such Recording Commitment, except to pay you the Advance provided for in this paragraph 15.02.

15.03. If because of: act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of a similar or different nature not reasonably within CBS' control; CBS is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting CBS' rights, CBS shall have the option by giving you notice to suspend the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that CBS shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the next following option period. Any such extension of the then current Contract Period, due to a labor controversy or adjustment thereof which involves only CBS Records, shall be limited to a period of six (6) months.

16. AGREEMENTS, APPROVAL & CONSENT

16.01. As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld.

16.02. Your agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify CBS otherwise within ten (10) business days following the date of CBS' written request therefor.

ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/83)

-29-

Exhibit 3

Exhibit 3 Page 63

17. ASSIGNMENT

17.01.   CBS may assign its rights hereunder in whole or in part to any subsidiary, affiliated or controlling corporation or to any Person owning or acquiring a substantial portion of the stock or assets of CBS or to any partnership or other venture in which CBS participates, and such rights may be assigned by any assignee thereof; provided, however, that any such assignemnt shall not relieve CBS of any of is obligations hereunder. CBS may also assign its rights hereunder to any of its Licensees to the extent necessary or advisable in CBS' sole discretion to implement the license granted.

18. NOTICES

18.01.   Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party. Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt. Each notice sent to CBS shall be directed to its Vice-President, Business Affairs, and a copy of each such notice shall be sent simultaneously to CBS Law Department, 51 West 52nd Street, New York, New York 10019, Attention: Associate General Counsel, Records Section. CBS will undertake to send a copy of each notice sent to you to Alfred W. Schlesinger, Esq., Schlesinger & Guggenheim, 6255 Sunset Boulevard, Suite 1214, Los Angeles, CA  90028 but CBS' failure to send such copy will no constitute a breach of this agreement or impair effectiveness of the notice concerned.

19. EVENTS OF DEFAULT

19.01.   In the event of your dissolution or the liquidation of your assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this agreement for any other reason, then at any time after the occurrence of any such event, in addition to any other remedies which may be available, CBS shall have the option by notice to require

ID:[57C

RB [CRU 82-564.3(1)] 1h (1/27/

-30-

Exhibit 3

Exhibit 3  Page 64

that the Artist render his personal services directly to it for the remaining balance of the term of this agreement, including any extensions thereof, for the purpose of making phonograph records, upon all the same terms and conditions as are herein contained, including, without limitation, the provisions of Articles 3 and 9 hereof. In such event the Artist shall be deemed substituted for you as a Party to this agreement as of the date of CBS' option exercise, and, in respect of Master Recordings of the Artist's performances recorded subsequently, the royalties and any Advances payable hereunder shall be payable to the Artist, subject to recoupment of all Advances.

20. MISCELLANEOUS

    20.01.    Intentionally deleted.

    20.02.    This agreement contains the entire understanding of the Parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by an officer of CBS. A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

    20.03.    Those provisions of any applicable collective bargaining agreement between CBS and any labor organization which are required, by the terms of such agreement, to be included in this agreement shall be deemed incorporated herein.



    20.04.    Each option and/or election granted to CBS hereunder including, without limitation, to suspend the running of one (1) or more periods of time specified in this agreement, to extend the term of this agreement, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by CBS in its notice of exercise of such option or election.



    20.05.    (a) You shall not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by CBS of its material obligations hereunder, unless CBS has failed to remedy such breach within a reasonable time following receipt of your notice thereof. (CBS will use its best efforts to cure any such breach

ID:1577C          RB [CRU 82-564.3(1)] 1h (1/27/83)S

-31-

Exhibit 3

Exhibit 3  Page 65

within sixty (60) business days after it receives your notice.)

(b) CBS shall not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by you of your material obligations hereunder unless you have failed to remedy such breach within a reasonable time following receipt of CBS' notice thereof. This subparagraph 20.05(b) shall not apply in respect of your obligations as provided in Article 3 and/or paragraph 13.01 and/or any other obligation for which a period of time for you to remedy a breach has been specified elsewhere in this agreement.

20.06. This agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, or breach of this agreement. Any process in any action or proceeding commenced in the courts of the State of New York or elsewhere arising out of any such claim, dispute or disagreement, may among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to Article 18 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York or the jurisdiction in which such action or proceeding may be commenced.

20.07. In entering into this agreement, and in providing services pursuant hereto, you and the Artist have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you or the Artist as CBS' agents or employees.

20.08. This agreement shall not become effective until executed by all proposed Parties hereto.

20.09. Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and CBS.

20.10. You warrant and represent that to the best of your knowledge each member of the Artist is in good physical health and that you are not aware of any physical condition that could interfere with the full and timely performance by you of all of your obligations hereunder. You agree that you will cooperate fully with CBS in the event CBS should

ID:1577C     RB [CRU 82-564.3(1)] 1h (1/27/8

-32-

Exhibit 3

Exhibit 3  Page 66

desire to take out a life insurance policy (or increase the coverage on any existing policy) on any member of the Artist during the term of this agreement. At CBS' request and upon reasonable notice, each member of the Artist will submit to such physical examinations and supply such data concerning his physical health as are needed by CBS to obtain and maintain the life insurance policy concerned. CBS' failure to obtain and/or retain insurance on any member of the Artist's life for medical or other reasons shall not be deemed a breach by you of this paragraph 20.10. CBS shall not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by you of your obligations under this paragraph 20.10 unless you have failed to remedy such breach within sixty (60) days following receipt of CBS' written notice thereof. (All references to you in this paragraph 20.10 shall be deemed references to both you and each member of the Artist.)

20.11.   (a) You hereby forever release and discharge CBS Inc. and all of its units, firms, divisions and corporations and its representatives, assigns, agents, employees and attorneys associated with, employed by or controlled by CBS, and each of them (referred to in this paragraph individually and collectively as "us" or "CBS"), from any and all claims, demands, actions, causes of action, suits, sums of money, accounts, covenants, agreements, contracts, and promises in law or in equity, which you now have, have had, or at any time may have, against us, our successors and assigns, whether or not they have been subject to dispute or otherwise and whether known or unknown to you, by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date hereof, including, without limitation, any and all obligations to make or release any recordings or to make any payments to you (except as provided in subparagraph 20.11(b) below) under the Prior Agreement. CBS hereby forever releases and discharges you and the Artist from any and all obligations to perform for or deliver to CBS Master Recordings under the Prior Agreement.

(b) Nothing contained in this agreement shall affect CBS' obligation to pay you royalties (or any right you may have to object to CBS' accountings, except as provided in paragraph 20.12 below) in accordance with the Agreement, or, except as specifically released herein, your obligations and CBS' rights as provided for in the Prior Agreement.

(c) You and CBS each acknowledge that you and CBS intend this agreement as a full and final accord and satisfaction and release of every matter referred to in subparagraph 20.11(a) above, and that you and CBS are

ID:1577C

RB [CRU 82-564.3(1)] lh (1/2⌐/8⌐)

-33-

Exhibit 3

Exhibit 3  Page 67

familiar with Section 1542 of the Civil Code of California, which provides:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

You and CBS each waive and relinquish any right and benefit which you or CBS may have under Section 1542 to the extent that you or CBS may lawfully do so in connection with the subject matter hereof.

20.12.   Promptly after February 1, 1983, we will pay you Two Hundred Fifty Thousand Dollars ($250,000.00), which amount shall not be recoupable as an Advance hereunder. All controversies between you and us with respect to our royalty accountings rendered to you for all periods through December 31, 1980, are hereby finally compromised and settled, and said accountings shall be deemed conclusively accepted by and binding upon you. You hereby withdraw and waive all objections which you have asserted or might have asserted with respect to said accountings, and we shall be deemed to have fulfilled all of our obligations regarding royalties or other payments due you in respect of said periods, under any agreement between you and us or otherwise. Nothing contained herein shall be deemed to waive CBS' right (and you expressly agree that CBS shall have the right) to continue to account to you based on a twenty percent (20%) Container Charge for sales after December 31, 1980, of Records in non-disc configurations made pursuant to the Prior Agreement.

20.13.   You acknowledge, understand, and agree and each member of the Artist acknowledges, understands, and agrees that it is the essence of this agreement that all albums in fulfillment of your recording commitment hereunder (including albums to which CBS would be entitled pursuant to its exercise of the option provided for in paragraph 1.02 above) be delivered to CBS. You further acknowledge, understand, and agree and each member of Artist acknowledges, understands, and agrees that a portion of the advances and royalties specified herein are predicated upon the delivery of all such albums and would otherwise be payable to you solely upon the delivery of all such albums. However, as an accommodation to you, and in reliance on your representations and warranties that you will deliver all such albums to CBS, CBS is hereby agreeing to pre-pay such portion to you. You acknowledge, understand, and agree and each member of Artist acknowledges, understands, and agrees that, without limiting CBS' rights or remedies, you will be

ID:15776                                RB [CRU 82-564.3(1)] lh (1/27/83)

-34-

Exhibit 3

Exhibit 3  Page 68

required to refund to CBS the portion of monies pre-paid by CBS if all such albums are not delivered regardless of any reason, justification, or excuse for such non-delivery other than as specified below. The pre-paid monies shall be refunded to CBS promptly after you cease to deliver such albums to CBS. The pre-paid amounts shall be determined by calculating the amount by which the total amount paid to you by CBS pursuant to this agreement exceeds the amount that would have been payable to you by CBS had the Albums delivered hereunder been delivered pursuant to the Prior Agreement. This paragraph 20.13 shall not apply if your failure to so deliver is solely the result of the following: (a) the members of the Artist in good faith cease to perform and record as a group (provided that in no event shall any member use the name "Toto" for a period of two and one-half (2-1/2) years in connection with any group he may perform with in the future unless he is performing for CBS); or (b) all or some of the members of the Artist die or are permanently disabled and the remaining members in good faith cease to perform and record as a group (provided that in no event shall any remaining member use the name "Toto" for a period of two and one-half (2-1/2) years in connection with any group he may perform with in the future unless he is performing for CBS); or (c) CBS fails to exercise its option to extend the term of this agreement pursuant to paragraph 1.02 above; or (d) CBS terminates the term of this agreement pursuant to clause 2.01.2(a)(2) of the Group Artist Rider to this agreement; or (e) you terminate the term of this agreement due to CBS' material breach of this agreement and you had not materially breached this agreement prior to CBS' breach, provided that a court of competent jurisdiction renders a final judgment adjudicating that CBS materially breached this agreement.

TOTO INCORPORATED

By _____
An Authorized Signatory

CBS RECORDS, A Division of CBS Inc

By _____
SR. VICE PRESIDENT, BUSINESS AFFAIRS

ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/88)

-35-

Exhibit 3

Exhibit 3  Page 69

GROUP ARTIST RIDER annexed to and made part of the agreement [CRU 82-564.3(1)] dated January 27, 1983 between CBS Records and Toto Incorporated

The provisions of this Rider shall be deemed to be part of the aforesaid agreement. To the extent that anything in said agreement is inconsistent with any provision of this Rider, the latter shall govern. Numerical designations in this Rider refer to the related provisions of the aforesaid agreement.

2.01.1 The Artist's obligations under this agreement are joint and several and all references herein to the "Artist" shall include all members of the group inclusively and each member of the group individually, unless otherwise specified.

2.01.2 If any member of the Artist shall cease to perform as a member of the group:

(a) (1) You shall promptly notify CBS thereof and such leaving member shall be replaced by a new member, if you and CBS so agree. Such new member shall thereafter be deemed substituted as a party to this agreement in the place of such leaving member and, upon CBS' request, you will cause any such new member to execute and deliver to CBS such documents as CBS, in its judgment, may deem necessary or advisable to effectuate such substitution. Thereafter, you shall have no further obligation to furnish the services of the leaving member for performances hereunder, but you (and such leaving member individually) shall continue to be bound by the other provisions of this agreement, including, without limitation, subparagraph 2.01.2(b) below. If the leaving member is a Key Member (as defined below), then paragraph 2.01.3 shall also apply.

(2) Notwithstanding anything to the contrary contained herein, if such leaving member is a Key Member (as defined below), CBS shall have the right to terminate the term of this agreement with respect to the remaining members of the Artist by written notice given to you at any time prior to the expiration of ninety (90) days after CBS' receipt of your said notice to CBS. If you so request after giving CBS such notice, CBS will consult with you before exercising that right of termination, but CBS' determination regarding such exercise will be made in CBS sole discretion. In the event of such termination, all of the members of the Artist will be deemed leaving members as of the date of such termination notice, and paragraph 2.01.2(b) below

ID:1577C  RB [CRU 82-564.3(1)] 1h (1/27/78

-36-

Exhibit 3

Exhibit 3 Page 70

will apply to all of them, collectively or individually as CBS shall elect. If a Key Member (as defined below) becomes a leaving member before the Delivery of the second Album of your Recording Commitment and if CBS elects to terminate the term of this agreement pursuant to this clause 2.01.2(a)(2), then you shall pay CBS promptly after such termination the amount by which your royalty account is not in a recouped position (i.e., an amount equal to all unrecouped Advances and other offsets against your royalties).

(b) CBS shall have, and you and the Artist hereby grant to CBS, an option to engage the exclusive services of such leaving member as a recording artist ("Leaving Member Option"). Such Leaving Member Option may be exercised by CBS by notice to such leaving member at any time prior to the expiration of ninety (90) days after the date of: (i) CBS' receipt of your notice provided for in clause 2.01.2(a)(1), or (ii) CBS' termination notice pursuant to clause 2.01.2(a)(2), as the case may be. If CBS exercises such Option, the leaving member concerned shall be deemed to have executed CBS' then current standard form of term recording agreement for the services of an individual artist containing the following provisions:

(1) a term consisting of an initial Period commencing on the date of CBS' exercise of such Leaving Member Option, which term may be extended by CBS, at its election exercisable in the manner provided in paragraph 1.02, for the number of Option Periods indicated below:

(i) five (5) Option Periods, if CBS exercises the Leaving Member Option after the Delivery of one (1) Album under this agreement;

(ii) four (4) Option Periods, if CBS exercises the Leaving Member Option after the Delivery of two (2) Albums;

(iii) three (3) Option Periods, if CBS exerciss the Leaving Member Option after the Delivery of three (3) Albums;

(iv) two (2) Option Periods, if CBS exercises the Leaving Member Option after the Delivery of four (4) Albums; and

(v) one (1) Option Period, if CBS exercises its Leaving Member Option after the Delivery of five (5) Albums.

ID:1577C          RB [CRU 82-564.3(1)] 1h (1/27/83)

-37-

Exhibit 3

Exhibit 3  Page 71

(2) a Recording Commitment, for each Contract Period of such term, of one (1) Album, or the equivalent; and

(3) a basic royalty at the rate of fourteen percent (14%), exclusive of Producer, in respect of phonograph records embodying performances recorded during such term.

If your royalty account is in an unrecouped position (i.e., there are unrecouped Advances or other offsets against your royalties) as of the date of CBS' exercise of the Leaving Member Option and such exercise occurs before the Delivery of the second Album of your Recording Commitment, then one-sixth (1/6) of that unrecouped balance will, to the extent not recouped from your royalties, constitute an advance recoupable from the royalties payable to the leaving member pursuant to this clause (3).

Any leaving member with respect to whom CBS exercises its Leaving Member Option who does not perform for CBS pursuant to the terms of this subparagraph 2.01.2(b) shall be responsible for refunding to CBS one-half (1/2) of the pre-paid monies specified in paragraph 20.13 if such leaving member is a Key Member, as defined below (or if such leaving member is not a Key Member, as defined below, one-sixth (1/6) of such monies). The preceding sentence shall not apply if such leaving member's failure to perform is solely the result of the following: (a) such leaving member permanently ceases to record as a featured or royalty artist for any Person other than CBS (or CBS releases such leaving member from performing for CBS) [if such leaving member at some time in the future begins recording again, he will do so only for CBS but only to the extent of his remaining Recording Commitment pursuant to such leaving members' recording agreement]; (b) such leaving member dies or is permanently disabled and can no longer perform and record; (c) CBS fails to exercise its option to extend the term of such leaving member's recording agreement; or (d) such leaving member terminates the term of his recording agreement with CBS due to CBS' material breach of that agreement and such leaving member had not materially breached that agreement prior to CBS' breach, provided that a court of competent jurisdiction renders a final judgment adjudicating that CBS materially breached that agreement.

2.01.3  (a) If a Key Member (as defined below) becomes a leaving member, the Recording Fund pursuant to paragraph 6.02(a) for the first Album ("Album #1") recorded in whole or in part after the departure of such Key Member will be reduced to $525,000.00 and subparagraphs 6.02(b) and (c) shall not apply.



ID:1577C                                      RB [CRU 82-564.3(1)] lh (1/27/83)

-38-

Exhibit 3

Exhibit 3  Page 72