# EXHIBIT 1

Exhibit 3

Exhibit 3  Page 3

Agreement made this 10th day of December, 1977, between TOTO
INCORPORATED, c/o Alfred W. Schlesinger, Esq., Schlesinger &
Guggenheim, 6430 Sunset Boulevard, Los Angeles, California
90028 (hereinafter "you") and CBS Records, a Division of CBS
Inc., 51 West 52 Street, New York, New York 10019 (hereinafter
"CBS").

1.   TERM

   1.01.      This agreement shall commence as of January
1, 1978, and shall continue in force for a term which shall
consist of an initial period of two (2) years and six (6)
months ending June 30, 1980 (unless extended or suspended as
provided herein) and the additional period or periods, if
any, for which such term may be extended through CBS' exercise
of one or more of the options granted to CBS below.

   1.02.      You grant CBS the option to extend the term
of this agreement for an additional period of two (2) years
(the "Option Period") upon all the terms and conditions
herein contained.  CBS may exercise that option by giving
you notice at least thirty (30) days prior to the expiration
of the initial Contract Period.

2.   SERVICES

   2.01.      During the term of this agreement you will
furnish the services of David Paich, Jeffrey T. Porcaro,
Steven M. Porcaro, William David Hungate, Robert T. Kimball,
and Steven L. Lukather, p/k/a "TOTO" (hereinafter referred)
to as the "Artist") to perform for the purpose of making
Phonograph Records as provided in Article 3.

   2.02.      You shall furnish the services of producers
in connection with the Master Recordings to be made by the
Artist hereunder (hereinafter, "Producers"), and you shall
be solely responsible for engaging and paying them.  If,
however, the producers whose services are rendered in connection
with any Recordings made hereunder are employed by CBS on its
staff when their services are rendered, CBS will be responsible
for their compensation and the royalty otherwise payable to
you in respect of Master Recordings produced by them will be

AJG (1) CRU 77-646. 2 1a (3/14/78).

Exhibit 3

Exhibit 3  Page 4

reduced by the amount of a royalty computed under this
agreement, calculated at a basic rate of 6% under paragraph
9.01 and adjusted as provided elsewhere herein.

3.   RECORDING COMMITMENT

   3.01.   The Minimum Recording Commitment in respect
of each Contract Period shall be as follows:

        Initial Period:  Three (3) Albums.

        Option Period:  Two (2) Albums.

   3.02.   The Recordings made pursuant to the Minimum
Recording Commitment will be Delivered at the following
times:

        (a)   Initial Contract Period:

              (1)   First Album: within the first six
              (6) months of the term of this agreement.

              (2)   Second Album: not earlier than the
              seventh (7th) month, or later than the
              end of the eighteenth (18th) month of
              that term.

              (3)   Third Album: not earlier than the
              nineteenth (19th) month, or later than
              the end of the twenty-seventh (27th)
              month of that term.

        (b)   Option Period:

              (1)   First Album: not earlier than the
              beginning of the Option Period or later
              than the end of the twelfth (12th) month
              of that Period.

              (2)   Second Album: not earlier than the
              thirteenth (13th) month, or later than
              the end of the twenty-first (21st) month
              of the Option Period.

        (c)   No such Album will be Delivered within
four (4) months after the Delivery of the preceding
Album recorded under paragraph 3.01.

                    -2-

                              CRW 77-646.2

Exhibit 3

Exhibit 3  Page 5

3.03.    Only Master Recordings consisting of Compositions not previously recorded by the Artist shall apply in reduction of the Recording Commitment.

3.04.    The Artist shall not be required to perform hereunder together with any other royalty artist without the Artist's consent.  CBS shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

4.    RECORDING PROCEDURE

4.01.    You will follow the procedure set forth below in connection with Master Recordings made hereunder:

(a)  Except as expressly noted otherwise in this agreement, prior to the commencement of recording in each instance you shall obtain the approval of CBS of each of the following, in order, before proceeding further:

(1)  Selection of Producer.  (The members of the Artist will be deemed approved as Producers.)

(2)  Selection of material, including the number of Compositions to be recorded.  CBS may reject any request to record an Album consisting of more than one twelve-inch 33 1/3 rpm Record, or any material disapproved on the advice of its attorneys; otherwise, the material selected by you will be approved by CBS.  You shall advise CBS of the content of all medleys prior to the recording thereof.  The Master Recordings to be included in any Album released under this agreement will be selected from those recorded by the Artist by mutual agreement (or by CBS, if CBS and you do not reach such agreement.)



-3-

CRU 17-646.2

Exhibit 3

Exhibit 3  Page 6

(b)   (1)   You will notify CBS of the times and places scheduled for all recording sessions.  CBS will book all studio time.  CBS' engineers will be used, to the extent of CBS' union requirements.

(2)  You shall notify the appropriate local of the American Federation of Musicians in advance of each recording session.

(c)   As and when required by CBS, you shall allow CBS' representatives to attend any or all recording sessions hereunder.

(d)   You shall timely supply CBS with all of the information it needs in order: (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations CBS may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.  Without limiting the generality of clause (2) of the preceding sentence, you shall furnish CBS with all information it requires to comply with its obligations under its union agreements, including, without limitation, the following:

(i)   If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such exist-ing tracks were made, and the AFM Phonograph Recording Contract (Form "B") number(s) covering such sessions.

(ii)   Each change of title of any composi-tion listed in an AFM Phonograph Recording Contract (Form "B").

(iii)   A listing of all the musical selec-tions contained in recordings made at location sessions and delivered to CBS hereunder.

-4-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 7

(e)  You shall submit to CBS fully edited Master Recordings, satisfactory for its manufacture and sale of Phonograph Records, and deliver to CBS all original and duplicate Master Recordings of the material recorded, together with all necessary licenses and appropriate permissions.

4.02.     No "live" Recording or Recording not made in full compliance with the provisions of this agreement will apply in fulfillment of your Recording Commitment, nor will CBS be required to make any payment in connection with any such Recording, unless CBS so agrees in writing or such Recording is actually released by CBS.  No Joint Recording will apply in fulfillment of your Recording Commitment, nor will CBS be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is actually released by CBS. No Recordings shall be made by unauthorized dubbing.

4.03.      CBS shall have the right to terminate any recording session or project, even if previously approved hereunder, if CBS reasonably anticipates that the Recording Costs for the Album concerned will exceed the applicable Recording Fund prescribed in paragraph 6.03 (or exceed $100,00.00, if the Album concerned is the third Album recorded under this agreement and subparagraph 6.03(c) applies).

5.   RECORDING COSTS

5.01.     CBS will pay all union scale payments required to be made to Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel and arrangements and copying specifically approved by CBS in respect of the recording of such Master Recordings, and all other amounts required to be paid by CBS pursuant to any applicable law or any collective bargaining agreement between CBS and any union representing persons who render services in connection with such Master Recordings.

5.02.     All amounts described in paragraph 5.01 above plus all other amounts representing direct expenses paid by CBS, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, advances to producers and all studio and engineering charges, in connection with CBS' facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute Advances.  The cost of metal parts, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "per-record royalties"), shall not constitute Advances.  Any Recording

-5-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 8

Costs in excess of the applicable Recording Fund prescribed in paragraph 6.03 (or $100,000.00, if the Album concerned is the third Album recorded under this agreement and sub-paragraph 6.03(c) applies) will be your sole responsibility and will be promptly paid by you (or reimbursed by you if paid by CBS).

    5.03.    In determining the portion of the Recording Costs (other than payments to the Artist) applicable to any Joint Recording which shall be charged against your royalties, such portion shall be computed by multiplying the aggregate amount of such Recording Costs by the same fraction used in determining the royalties payable to you in respect of such Joint Recording.

## 6.   ADDITIONAL ADVANCES

    6.01.    All monies paid to or on behalf of you or Artist during the term of this agreement at your or Artist's request, other than royalties paid pursuant to Articles 9 and 12 hereof, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of CBS.

    6.02.    Following the execution of this agreement, CBS will make an Advance to you in the amount of $100,000.00. The Recording Fund referred to in subparagraph 6.03(a) with respect to the first Album Delivered hereunder will be reduced by the amount of that payment.

    6.03.    (a)  In connection with each Album recorded pursuant to your Recording Commitment, CBS will make an Advance to you in the amount by which the applicable sum indicated below ("Recording Fund") exceeds the Recording Costs for the Album:

          (1)  Albums recorded during the initial Contract Period:  $300,000.00 (subject to subparagraph 6.03(C) below).

          (2)  Albums recorded during the first Option Period:  $500,000.00.

All royalties paid to you during the term of this agreement shall apply in reduction of such Advances which may there-after become payable under this paragraph.  Each such Advance will be paid to you within 30 days after the Delivery of the Album concerned, except to the extent, if any, to which a portion of it is payable earlier under subparagraph 6.03(b) below.

        (b)  Following the commencement of recording of each of the Albums specified below, CBS will Advance to you the applicable portion, indicated below, of the Recording

-6-

page 6a follows

Fund for the Album concerned (but not more, in any event, than the amount by which that Recording Fund exceeds the Recording Costs incurred in connection with the last Album which has then been recorded under this agreement):

    (1) <u>Second Album</u>:  $75,000,00, less that amount, if any, by which the Recording Costs for the first Album exceed $225,000.00.

    (2) <u>Third Album</u>:  $75,000.00.

    (3) <u>Albums recorded during the Option Period</u>: $100,000.00.

   (c) If the aggregate amount of the Recording Costs and the Advances paid under section 6.03(a)(1) in connection with the first two Albums recorded during the initial Contract Period has not been recouped from your royalties according to CBS' trial balance accounting statement as of the end of the calendar month before the month in which you begin recording the third such Album (computed after provision for reserves for returns and credits), subparagraphs 6.03(a) and (b) will not apply to the third Album.  Reserves established for the purposes of the preceding sentence will not exceed 25% of the aggregate amount of Records shipped.



         -6a-
       page 7 follows

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 10

7.  GRANT OF RIGHTS

    7.01.   All Master Recordings recorded hereunder from the Inception of Recording thereof, and all Matrices and Phonograph Records manufactured therefrom, together with the performances embodied thereon, shall be the sole property of CBS, free from any claims whatsoever by you or any other Person; and CBS shall have the exclusive right to copyright such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright.

    7.02.   Without limiting the generality of the foregoing, CBS and any Person authorized by CBS shall have the unlimited right to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

    7.03.   CBS and any Licensee of CBS each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and Producer(s) and all other persons performing services in connection with the recording of such Master Recordings (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, for the purposes of trade, or for advertising purposes. No direct endorsement by any such Person of any product or service shall be used without his written consent. During the term of this agreement neither you nor Artist shall authorize any Party other than CBS to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist) in connection with the advertising or sale of Phonograph Records.

-7-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 11

8.   MARKETING PROCEDURES

8.01.      During the term of this agreement, in respect
of Records manufactured for sale in the United States, CBS
will not, without your consent and notwithstanding anything
in Article 9:

(a)   couple Master Recordings made hereunder
with Recordings not embodying the Artist's perform-
ances on any Phonograph Records, except as provided
in paragraph 8.01.1 below.  (CBS may couple without
restriction on Records sold after the end of the
term.)   This subparagraph (a) will not apply to promotional
Records and programs for use on public transportation
carriers and facilities;

(b)   INTENTIONALLY DELETED

(c)   initially release any such Master Recording
under any record label other than the Columbia label,
or other label then used by CBS for the majority of
CBS' best selling pop artists then under exclusive
term contract to CBS;

(d)   release any such Master Recording through
a Club Operation earlier than six months after its
initial release in the United States; or

(e)   release any such Master Recording on non-
catalog Phonograph Records created on a custom basis
for clients of CBS' special products operations.

8.01.1   CBS may couple Master Recordings made under
this agreement with Recordings not embodying your perform-
ances on "sampler" Records in tape form intended for free
distribution to automobile purchasers, but no such sampler
will contain more than one Recording made under this agree-
ment.

8.02.      CBS shall not record "sight and sound" per-
formances hereunder without your prior consent, which may
be withheld for any reason.

-8-
page 8a follows

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 12

8.03.     CBS will furnish you with any biographical
material, liner notes, and photographs to be used on the
disc Album jacket for the initial release of each Album
recorded under this agreement, and will consult with you
regarding their use.

9.   ROYALTIES

You will be paid royalties on Net Sales of Records as
hereinafter set forth:

9.01.     (a)  (1)  CBS will pay you a basic royalty as
follows in respect of Net Sales of Phonograph Records
consisting entirely of Master Recordings performed by the
Artist and recorded hereunder and sold by CBS or its Licensee
Through Normal Retail Channels for distribution in the United
States ("USNRC Net Sales"):

(i)  On Albums:  90¢ per unit on
Recordings made during the initial Contract
Period, and $1.05 per unit on Recordings
made during the Option Period.

(ii)  On Single Records:  13¢ per unit.

(2)  If the first three (3) Albums re-
corded under this agreement achieve aggregate USNRC Net Sales
of more than one million (1,000,000) units, computed after
provision for reasonable reserves for returns and credits,
not later than six (6) months after the initial release
of the third Album in the United States, the basic Album
royalty prescribed in subsection 9.01(a)(1)(i) will be
increased retroactively to $1.05 per unit on all Albums.

(3)  If the disc version of any Album
released hereunder bears a suggested retail list price other
than  $7.98, the basic royalty fixed in subsection 9.01(a)(1)(i)
with respect to that Album (as it may be increased under section
9.01(a)(2)) will be increased or decreased in proportion to
such variance in the suggested retail list price, effective
as of the beginning of the semi-annual accounting period
following the effective date of the price variance.

(b)  Solely for the purpose of computing royalties
under paragraphs 9.02, 9.03, 9.04, 9.05, 10.01, 10.02
and 14.08, the basic royalty shall be deemed to be 28% of
the applicable Royalty Base Price on Albums and 20% of the appli-
cable Royalty Base Price on "single" Records.

-8a-
page 9 follows

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 13

9.02.      In respect of Phonograph Records sold through
any Club Operation, the royalty rate shall be determined by
multiplying the otherwise applicable royalty rate by a
fraction, the numerator of which is 7 and the denominator of
which is the basic royalty fixed in paragraph 9.01, and such
royalties shall be computed on the basis of 90% of Net Sales
of such Records.  Notwithstanding the foregoing, no royalty
shall be payable to you with respect to (a) Phonograph
Records received by members of any such Club Operation in an
introductory offer in connection with joining it or upon
recommending that another join it or as a result of the
purchase of a required number of Records including, without
limitation, records distributed as "bonus" or "free" Records,
or (b) Phonograph Records for which such Club Operation is
not paid.

9.02.1.    Notwithstanding clause (a) of the last
sentence of paragraph 9.02, at least 50% of all Phonograph
Records distributed through any Club Operation during the
term of this agreement will be deemed to have been sold.
Such computation shall be made on an overall basis rather
than at the end of each accounting period.

9.03.      In respect of catalog Phonograph Records sold
by CBS' special products operations (hereinafter, "CSP") to
educational institutions or libraries or to other CSP
clients for their promotion or sales incentive purposes (but
not for sale to the general public through normal retail
channels), the royalty shall be one-half (1/2) of the royalty
rate otherwise payable. In respect of non-catalog Phonograph
Records created on a custom basis for clients of CSP, the
royalty rate shall be one-half (1/2) of the royalty rate
otherwise payable and shall be computed on the basis of
CSP's actual sales price therefor (less all taxes and
container charges).  In respect of any Master Recording
leased by CBS to others for their distribution of Phonograph
Records in the United States, CBS will pay you 50% of CBS'
net receipts therefrom after deduction of all copyright, AFM
and other applicable third party payments; if another artist,
a producer, or any other Person is entitled to royalties in
respect of such Records, said payment will be divided among
you in the same ratio as that among your respective basic
royalty percentage rates.

-9-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 14

9.04.   In respect of Phonograph Records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be the applicable royalty rate which would have been payable to you if such Records were sold in disc form.

9.05.   The royalty rate on any Budget Record, Record bearing a Reissue Label, or twelve-inch "disco single" shall be one-half (1/2) of the otherwise applicable royalty rate.

9.06.   The basic royalty under paragraph 9.01 on Phonograph Records sold by CBS or its Licensees for distribution outside of the United States of America shall be computed at the applicable percentage indicated below:

    (a)   On Records sold for distribution in any country in which CBS' principal distributing Licensee is a subsidiary corporation controlled by CBS, and more than 50% of the corporate stock of which is owned by CBS:  18%

    (b)   On Records sold for distribution elsewhere:  15%

Royalties on the Records referred to in clause "(b)" above will be computed on the basis of 90% of Net Sales of such Records, but if any CBS Licensee accounts to CBS on the basis of more than 90% of such Net Sales CBS will account to you on the same basis for the Records concerned.

9.07.   In respect of Phonograph Records derived from Master Recordings leased or otherwise furnished by CBS' Licensees to others for their manufacture and distribution of Records outside the United States, CBS will pay you 50% of the net receipts derived therefrom by CBS after deduction of all applicable third party payments (which payment will be apportioned as provided in the last sentence of paragraph 9.03 if another artist, a producer, or any other Person is entitled to royalties in respect of such Records), but not in excess of the amount of the royalties which would be payable to you for such Records under paragraph 9.06 if they were manufactured and distributed by CBS or its Licensees.

-10-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 15

## 10.  MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Article 9 hereof:

10.01        In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02.       With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of Sides contained on such Record.

10.03.       No royalties shall be payable to you in respect of Phonograph Records sold or distributed by CBS or its Licensees for promotional purposes, as cutouts after the listing of such Records has been deleted from the catalog of CBS or the particular Licensee, as "free," "no charge" or "bonus" Records (whether or not intended for resale), or to radio stations. (The preceding sentence will not apply to any cutouts sold during the term of this agreement.)

## 11.  ROYALTY ACCOUNTINGS

11.01      CBS will compute royalties payable to you hereunder as of June 30th and December 31st for each preceding six-month period during which Records as to which royalties are payable hereunder are sold, and will render a statement and pay such royalties, less any unrecouped Advances, prior to each succeeding September 30th and March 31st, respectively.

11.02.       Royalties for Records sold for distribution outside of the United States ("foreign sales") shall be computed in the national currency in which CBS is paid by its Licensees and shall be paid to you at the same rate of exchange at which CBS is paid.  For accounting purposes, foreign sales shall be deemed to occur in the same semi-annual accounting periods in which CBS' Licensees account to CBS Records therefor.  If CBS is unable, for reasons beyond its control, to receive payment for such sales in United States dollars in the United States, royalties therefor shall not be credited to your account during the continuance of such inability; if any accounting rendered to you hereunder during the continuance of such inability requires the payment of royalties to you, CBS will, at your request and

-11-

CRC 77-646.2

Exhibit 3

Exhibit 3  Page 16

if CBS is able to do so, deposit such royalties to your credit in such foreign currency in a foreign depository selected by you, at your expense.

11.03.    At any time within eighteen (18) months after any royalty statement is due you hereunder you shall have the right to give CBS written notice of your intention to examine CBS' books and records with respect to such statement.  Such examination shall be commenced within thirty (30) days after the date of such notice, at your sole cost and expense, by any certified public accountant or attorney designated by you provided he is not then engaged in an outstanding examination of CBS' books and records on behalf of a person other than you.  Such examination shall be made during CBS' usual business hours at the place where CBS maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to CBS and your examination shall be limited to the foregoing.

11.04.    Your sole right to inspect CBS' books and records shall be as set forth in subparagraph 11.03 hereof, and CBS shall have no obligation to produce such books and records more than once with respect to each statement rendered to you.  Without limiting the generality of the foregoing, CBS shall have no obligation to furnish you with any records that do not specifically show sales or gratis distributions of Phonograph Records as to which royalties are payable hereunder.

11.05.    Unless notice shall have been given to CBS as provided in paragraph 11.03. hereof, each royalty statement rendered to you shall be final, conclusive and binding on you and shall constitute an account stated.  You shall be foreclosed from maintaining any action, claim or proceeding against CBS in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against CBS in a court of competent jurisdiction within three years after the due date of such statement or accounting.

-12-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 17

12.   MECHANICAL LICENSES

   12.01.   (a)  Each Controlled Composition is hereby
licensed to CBS, for the United States and Canada, at the
royalty rate of 2.75¢ for the United States and 2¢ for
Canada (or such higher rate, if any, as shall be equal to
the minimum compulsory license rate applicable under the
copyright law of the country concerned at the time of
recording), on the basis of Net Sales of Phonograph
Records, except that no copyright royalties shall be
payable with respect to Records described in paragraph
10.03.  The royalty rate with respect to Records described
in paragraph 9.05 or distributed through a Club Operation
shall be three-fourths (3/4) of said rate, and arranged
versions of public domain Compositions which are claimed
by you to be Controlled Compositions shall be licensed to
CBS at one-half (1/2) of said rate.

               (b)  Notwithstanding the foregoing, CBS shall
not be required to pay an aggregate copyright royalty in
excess of ten times the rate provided in the first sentence
of subparagraph 12.01(a) for any Album or twice that rate
for any single Record consisting of Recordings made hereunder.

               (c)  Accountings for such royalties shall be
rendered quarter-annually, within forty-five days after the
end of each calendar quarter.

   12.02.   Any assignment made of the ownership or
copyright in, or right to license the use of, any Controlled
Compositions referred to in this paragraph shall be made
subject to the provisions hereof.

-13-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 18

12.03    The provisions of this Article 12 shall constitute and are accepted by you, on your own behalf and on behalf of any other owner of any Controlled Compositions or any rights therein, as full compliance by CBS with all of its obligations, under the compulsory license provisions of the Copyright Law, as the same may be amended, or otherwise, arising from any use by CBS of Controlled Compositions as provided herein.

12.04    If any Recordings made hereunder contain one or more Compositions, other than Controlled Compositions, not in the public domain and not subject to compulsory license, you will obtain, at CBS' election and for CBS' benefit, mechanical licenses covering such Compositions on the same terms applicable to Controlled Compositions pursuant to this Article 12.

13.  WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES

13.01.    You warrant and represent:

(a)  You have the right and power to enter into and fully perform this agreement, except to the extent, if any, set forth in annexed Schedule No. 1.

(b)  CBS shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by CBS pursuant to this agreement except as specifically provided in this agreement.

(c)  Artist is or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of Artist's services hereunder.

(d)  No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person.  "Materials," as used in this Article, means:  (1) all Controlled Compositions, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist or any Producer and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

-14-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 19

13.02.     During the term of this agreement, neither
you nor the Artist will enter into any agreement which would
interfere with the full and prompt performance of your
obligations hereunder, and neither you nor the Artist will
perform or render any services for the purpose of making
Phonograph Records or Master Recordings derived from the
Artist's performances for any person other than CBS.  After
the expiration of the term of this agreement, for any reason
whatsoever, the Artist will not perform any Composition
which shall have been recorded hereunder for any person
other than CBS for the purpose of making Phonograph Records
or Master Recordings prior to whichever of the following
dates shall be later:  (a) the date five (5) years subsequent
to the date such Composition is recorded hereunder, or (b)
the date two (2) years subsequent to the expiration date of
the term of this agreement.  Neither you nor the Artist
shall authorize or knowingly permit Artist's performances to
be recorded for any purpose without an express written
agreement prohibiting the use of such recording on Phonograph
Records in violation of the foregoing restrictions.

13.02.1    The Artist may perform as a background vocal-
ist or instrumentalist accompanying a featured artist for
the purposes of making Phonograph Records for others, provided:

(a)  Such activity does not in any way interfere
with the performance of your obligations hereunder;

(b)  (1)  The Artist will nor render a solo or
"step-out" performance, and

(2)  The musical style of the Recording shall
not be substantially similar to the characteristic
musical style of Recordings made by the Artist for CBS;

(c)  The compositions so recorded shall not have
been recorded by the Artist for CBS, and the Artist
shall not be restricted from recording the same compo-
sitions for CBS thereafter;

(d)  (1)  The Artist's name may be used in connection
with such records, in the form of a courtesy credit to
Columbia      Records on the Album liners used for such
Records, in the same position as the credits accorded
to other sidemen and in type of the same size and
prominence, and

-15-
page 15a follows

CRU 7X-646.2

Exhibit 3

Exhibit 3  Page 20

(2) Except as expressly provided in section 13.02.1(d)(1) above, neither the Artist's name (or any similar name) nor any picture, portrait or likeness of the Artist shall be used in connection with such Recordings, including, without limitation, on the front covers of the Album containers, on sleeves or labels used for single Records, or in advertising, publicity or other form of promotion or exploitation, without CBS' express written consent, which CBS may withhold in its unrestricted discretion notwithstanding any other provisions of this agreement.

13.03    If you or Artist shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions, you and Artist shall notify CBS thereof and shall cooperate with CBS in the event that CBS commences any action or proceeding against such third party.

13.04.    The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and CBS shall be entitled to injunctive relief to enforce the provisions of this agreement.

13.05.    You will at all times indemnify and hold harmless CBS and any Licensee of CBS from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or agreement made by you herein, provided the claim concerned has resulted in a judgment against CBS or its Licensees or has been settled with your consent. You will reimburse CBS and/or its Licensees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which CBS or its Licensees are entitled to be indemnified.

-15a-
page 16 follows

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 21

14.   DEFINITIONS

As used in this agreement the following terms shall have the meanings set forth below:

14.01.   "Master Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of phonograph records;

14.02.   "Inception of Recording" - the first record-ing of performances and/or other sounds with a view to the ultimate fixation of a Master Recording;

14.03.   "Matrix" - any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording;

14.04.   "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing;

14.05.   "Records" and "Phonograph Records" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (a) sound alone or (b) sound coupled with visual images, e.g., "sight and sound" devices;

14.06.   "Wholesale Price" - (a) With respect to Records sold for distribution in the United States or Canada:  (1) the average net price received by CBS from independent distributors for Phonograph Records during the six-month period immediately preceding the accounting period concerned, calculated separately for each separately priced Record  series manufactured and sold by CBS; or (2) if there are no applicable independent distributors, CBS' published subdistributor price in effect as of the commencement of the accounting period concerned, less ten percent.   (b) With respect to Records sold for distribution outside of the United States and Canada, one-half of the suggested or applicable retail list price in the country of sale.

-16-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 22

14.07.   "Royalty Base Price" - the applicable Wholesale Price of Phonograph Records less all taxes and less the applicable container charge.  (The Royalty Base Price will not be used in computing the royalties referred to in subparagraph 9.01(a).)

14.08.   "Container Charge" - (a) with respect to disc Phonograph Records, 10% of the applicable Wholesale Price of such Phonograph Records; and (b) with respect to Phonograph Records in non-disc configurations, 20% of the applicable Wholesale Price of such Phonograph Records.

14.09.   "Net Sales" - gross sales less returns and credits;

14.10.   "Club Operation" - any direct sales to consumers conducted on a mail order basis by CBS or its Licensees, e.g. the Columbia Record Club;

14.11.   "Contract Period" - the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

14.12.   "Advance" - amount recoupable by CBS from royalties to be paid to or on behalf of you or Artist pursuant to this or any other agreement relating to the Artist's recording services.

14.13.   "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.14.   "Controlled Composition" - a composition written, owned or controlled by you, the Artist and/or Producer and/or any person in which you, the Artist and/or the Producer has a direct or indirect interest.

14.15.   "Album" - one or more twelve-inch 33 1/3 rpm records, or the equivalent thereof, sold in a single package, including all Sides, whether or not released, which are recorded in connection with a specific album project, but not including Sides which were recorded in connection with any other album project.  (A "disco single" shall not be deemed an Album.)

14.16.   "Side" - a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than two and one-quarter minutes of continuous sound;

14.17.   "Joint Recording" - any Master Recording embodying the Artist's performance, together with the performance of another artist(s) with respect to which CBS is obligated to pay royalties.

-17-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 23

14.18.   "Sales Through Normal Retail Channels in the United States" - sales other than as described in paragraphs 9.02, 9.03, 9.05, 9.06, and 9.07 hereof.

14.19.   "Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of CBS Inc.

14.20.   "Delivery" or "Delivered," when used with respect to Master Recordings, means the actual receipt by CBS of fully mixed and edited Master Recordings, satisfactory to CBS and ready for CBS' manufacture of Phonograph Records, and all necessary licenses and applicable approvals and consents.

14.21.   "Reissue Label" - A label, such as the Harmony or Odyssey label, used primarily for reissues of recordings released previously.

14.22.   "Budget Record" - A record bearing a suggested retail list price at least  40% lower than the suggested retail list price used for the top line Phonograph Records embodying performances of pop artists released by CBS or its Licensees in the territory concerned.

15.   SUSPENSION AND TERMINATION

15.01.   If at any time you fail, except solely for CBS' refusal without cause to allow you to perform, to fulfill your Recording Commitment within the times set forth herein, then, without limiting CBS' rights, CBS shall have the option, exercisable by notice to you, to:

(a)   suspend the running of the then current Period of the term of this agreement (and extend its expiration date) for the period of the default plus such additional time as is necessary so that CBS shall have no less than sixty (60) days after completion of your Recording Commitment within which to exercise its option, if any, to extend the term for the next Contract Period, and/or to suspend CBS' obligation to make payments to you hereunder during such suspension; or

(b)   increase the Recording Commitment in any subsequent Contract Period by the number of uncompleted Master Recordings, in addition to the otherwise applicable Recording Commitment under paragraph 3.01. above.  The payments due for such Recordings shall be the payments that would have been due had the Recordings been Delivered during the Contract Period in which they were originally required to be Delivered.

15.02.   If CBS fails without cause to allow you to fulfill your Recording Commitment for any Contract Period

-18-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 24

and if, within thirty (30) days after the expiration date of the Contract Period you notify CBS of your desire to fulfill such Recording Commitment, then CBS shall permit you to fulfill said Recording Commitment by notice to you to such effect within sixty (60) days of CBS' receipt of your notice. Should CBS fail to give such notice, you shall have the option to terminate the term of this agreement by notice given to CBS within thirty (30) days after the expiration of said sixty-day period; on receipt by CBS of such notice the term of this agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties), at which time CBS shall pay you, in full settlement of its obligation in connection therewith, an Advance in the amount equal to:

> (1)    The aggregate of the Recording Funds fixed in paragraph 6.03 for each Album, then remaining unrecorded, of the Recording Commitment for the Contract Period in respect of which such termination occurs,

less:

> (2)    The average amount of the Recording Costs (defined in paragraph 5.02) for the last two (2) Albums recorded hereunder (or, if only one Album has been recorded, the amount of the Recording Costs for that Album), multiplied by the number of such unrecorded Albums referred to in clause (1).

~~Notwithstanding the foregoing, CBS shall not be obligated to pay any Advance fixed therefor if CBS shall be in default of its obligation to pay such Advance or in failing to permit you to fulfill such Recording Commitment.~~

15.03.   If because of:  act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of a similar or different nature not reasonably within CBS' control; CBS is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting CBS' rights, CBS shall have

-19-

CRU 77-646.2

Exhibit 3  Page 25

the option by giving you notice to suspend the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that CBS shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the next following option period. Any such extension of the then current Contract Period, due to a labor controversy or adjustment thereof which involves only CBS Records, shall be limited to a period of six (6) months.

16.  AGREEMENTS, APPROVAL & CONSENT

16.01.   As to all matters treated herein to be deter-mined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld.

16.02.   Your agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify CBS otherwise within ten (10) business days following the date of CBS' written request therefor.

17.  ASSIGNMENT

17.01.   CBS may assign its rights hereunder in whole or in part to any subsidiary, affiliated or controlling corporation or to any Person owning or acquiring a substan-tial portion of the stock or assets of CBS, and such rights may be assigned by any assignee thereof; provided, however, that any such assignment shall not relieve CBS of any of its obligations hereunder. CBS may also assign its rights hereunder to any of its Licensees to the extent necessary or advisable in CBS' sole discretion to implement the license granted.

18.  NOTICES

18.01.   Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the respective addresses herein-above set forth, or such other address or addresses as may be designated by either Party. Such notices shall be deemed given when mailed or delivered to a telegraph office, except that notice of change of address shall be effective only from the date of its receipt. A copy of each notice sent to CBS shall be sent simultaneously to Managing Attorney, CBS Law Department, 51 West 52nd Street, New York, New York 10019. CBS will undertake to send a copy of each notice sent

-20-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 26

to you to Fitzgerald & Hartley, Plaza D'Oro, 17175 Ventura
Boulevard, Encino, Claifornia 91316, but CBS' failure to
send such copy will not constitute a breach of this agree-
ment or impair the effectiveness of the notice concerned.

19.  EVENTS OF DEFAULT

91.01.    In the event of your dissolution or the
liquidation of your assets, or the filing of a petition in
bankruptcy or insolvency or for an arrangement or reorgani-
zation, by, for or against you, or in the event of the appoint-
ment of a receiver or a trustee for all or a portion of your
property, or in the event that you shall make an assignment
for the benefit of creditors or commit any act for, or in,
bankruptcy or become insolvent, or in the event you shall
fail to fulfill any of your material obligations under this
agreement for any other reason, then at any time after the
occurrence of any such event, in addition to any other
remedies which may be available, CBS shall have the option
by notice to require that the Artist render his personal
services directly to it for the remaining balance of the
term of this agreement, including any extensions thereof,
for the purpose of making phonograph records, upon all the
same terms and conditions as are herein contained, includ-
ing, without limitation, the provisions of Articles 3 and
9 hereof.  In such event the Artist shall be deemed sub-
stituted for you as a Party to this agreement, effective
from and after the date of CBS' exercise of such option,
and, in respect of Phonograph Records embodying the Artist's
performances recorded subsequently, the royalty and any
Advances payable hereunder shall be payable to the Artist,
subject to recoupment of all Advances.

20.  MISCELLANEOUS

20.01.    (a)  The Artist will, prior to the release of
the first Album hereunder, prepare an act of professional
quality and will, during the term of this agreement, actively
pursue his career as an entertainer in the live engagement
field.

(b)  CBS will consult with you in good faith
regarding the provision of financial support for live per-
formance touring engagements, but its determination in re-
spect of such support will be made in its sole discretion.

20.02.    This agreement contains the entire understand-
ing of the Parties hereto relating to the subject matter
hereof and cannot be changed or terminated except by an
instrument signed by an officer of CBS.  A waiver by either
Party of any term or condition of this agreement in any

-21-

CRU 77-646.

Exhibit 3

Exhibit 3  Page 27

instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligaiton or agreement of either Party.

20.03.     Those provisions of any applicable collective bargaining agreement between CBS and any labor organization which are required, by the terms of such agreement, to be included in this agreement shall be deemed incorporated herein.

20.04.     Each option and/or election granted to CBS hereunder including, without limitation, to suspend the running of one or more periods of time specified in this agreement, to extend the term of this agreement, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by CBS in its notice of exercise of such option or election.

20.05.     You shall not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by CBS of its material obligations hereunder, unless CBS has failed to remedy such breach within a reasonable time following receipt of your notice thereof. (CBS will use its best efforts to cure any such breach within sixty (60) business days after it receives your notice.)

20.06.     This agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, or breach of this agreement. Any process in any action or proceeding commenced in the courts of the State of New York or elsewhere arising out of any such claim, dispute or disagreement, may among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to Article 18 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York or the jurisdiction in which such action or proceeding may be commenced.

20.07.     In entering into this agreement, and in providing services pursuant hereto, you and the Artist have

-22-

CRU 77-646.2
Exhibit 3

Exhibit 3  Page 28

and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you or the Artist as CBS' agents or employees.

20.08.   This agreement shall not become effective until executed by all proposed Parties hereto.

20.09.   Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and CBS.

TOTO INCORPORATED

By

CBS RECORDS, A Division of CBS Inc.

By

VICE PRESIDENT, BUSINESS AFFAIRS

-23-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 29

GROUP ARTIST RIDER annexed to and made part of the agreement
(CRU 77-646.2) dated December 10, 1977, between CBS Records
and TOTO INCORPORATED, with respect to the recording services
of David Paich, Jeffrey T. Porcaro, Steven M. Porcaro, William
David Hungate, Robert T. Kimball, and Steven L. Lukather,
p/k/a TOTO (the "Artist").

The provisions of this Rider shall be deemed to be part of
the aforesaid agreement.  To the extent that anything in said
agreement is inconsistent with any provision of this Rider,
the latter shall govern.  Numerical designations in this Rider
refer to the related provisions of the aforesaid agreement.

2.01.1.    The Artist's obligations under this agreement
are joint and several and all references herein to the "Artist"
shall include all members of the group inclusively and each
member of the group individually, unless otherwise specified.

2.01.2.    If any member of the Artist shall cease to
perform as a member of the group:

(a)   (1)  You shall promptly notify CBS there-
of and such leaving member shall be replaced by a new member,
if you and CBS so agree.  Such new member shall thereafter be
deemed substituted as a party to this agreement in the place
of such leaving member and, upon CBS' request, you will cause
any such new member to execute and deliver to CBS such docu-
ments as CBS, in its judgment, may deem necessary or advisable
to effectuate such substitution.  Thereafter, you shall have
no further obligation to furnish the services of the leaving
member for performances hereunder, but you (and such leaving
member individually) shall continue to be bound by the other
provisions of this agreement, including, without limitation,
subparagraph 2.01.2(b) below.  The Recording Fund for each
Album recorded in whole or part after the departure of the
first leaving member will be reduced to fifty percent (50%)
of the amount prescribed in subparagraph 6.02(a).

(2)  Notwithstanding anything to the con-
trary contained herein, CBS shall have the right to terminate
the term of this agreement with respect to the remaining mem-
bers of the Artist by written notice given to you at any time
prior to the expiration of ninety (90) days after CBS' receipt
of your said notice to CBS.  If you so request after giving
CBS such notice, CBS will consult with you before exercising
that right of termination, but CBS' determination regarding
such exercise will be made in CBS' sole discretion.  In the
event of such termination, all of the members of the Artist
will be deemed leaving members as of the date of such termina-
tion notice, and paragraph 2.01.2(b) below will apply to all
of them, collectively or individually as CBS shall elect.

-24-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 30

(b)   CBS shall have, and you and the Artist hereby grant to CBS, an option to engage the exclusive services of such leaving member as a recording artist ("Leaving Member Option").   Such Leaving Member Option may be exercised by CBS by notice to such leaving member at any time prior to the expiration of ninety (90) days after the date of:   (i) CBS' receipt of your notice provided for in section 2.01.2(a)(1), or (ii) CBS' termination notice pursuant to section 2.01.2(a)(2), as the case may be.   If CBS exercises such Option, the leaving member concerned shall be deemed to have executed CBS' then current standard form of term recording agreement for the services of an individual artist containing the following provisions:

(1)   a term consisting of an initial period of one year commencing on the date of CBS' exercise of such Leaving Member Option, which term may be extended by CBS, at its election exercisable in the manner provided in paragraph 1.01, for the number of Option Periods of one year each indicated below:

(i)   four (4) Option Periods, if CBS exercises the Leaving Member Option during the first Contract Year of the term of this agreement;

(ii)   three (3) Option Periods, if CBS exercises the Leaving Member Option during the second Contract Year;

(iii)   two (2) Option Periods, if CBS exercises the Leaving Member Option during the third Contract Year; and

(iv)   one (1) Option Period, if CBS exercises the Leaving Member Option after the beginning of the fourth Contract Year.

("Contract Year," as used above, means the annual period beginning on the date of commencement of the term of this agreement and each subsequent annual period during the continuance of that term.   If the running of the term of this agreement is suspended under Article 15, the running of the then current Contract Year will be suspended also);

-25-

CBO 77-646.2

Exhibit 3

Exhibit 3  Page 31

        (2)   a Minimum Recording Commitment, for each Contract Period of such term, of one (1) Album, or the equivalent; and

        (3)   a basic royalty at the rate of 14% * in respect of phonograph records embodying performances recorded during such term.


              CBS RECORDS, A Division
              of CBS Inc.

              By_____
                 VICE PRESIDENT, BUSINESS AFFAIRS

TOTO INCORPORATED

By_____


*, exclusive of Producer,

            -26-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 32

In order to induce CBS Records to enter into the foregoing
agreement (CRU 77-646.2) with TOTO INCORPORATED dated December
10, 1977, the undersigned hereby assent to the execution of
such agreement and agree to be bound by the terms and conditions
thereof including, without limitation, any provisions of
such agreement relating to the undersigned and restrictions
imposed upon the undersigned in accordance with the provisions
of such agreement.  The undersigned hereby acknowledge that
CBS Records shall be under no obligation to make any payments
whatsoever to the undersigned, except as specifically provided
in paragraph 5.01. and Article 19 of such agreement, in
connection with the services rendered by the undersigned
and/or the fulfillment of the undersigneds' obligations
pursuant to the foregoing agreement.

---
DAVID PAICH

---
JEFFREY T. PORCARO

---
STEVEN M. PORCARO

---
WILLIAM DAVID HUNGATE

---
ROBERT T. KIMBALL

---
STEVEN L. LUKATHER

p/k/a "TOTO"

-27-

CRU 77-646.2

Exhibit 3

Exhibit 3  Page 33

# EXHIBIT 2

Exhibit 3

Exhibit 3  Page 34

Agreement made this 27th day of January, 1983, between Toto
Incorporated, c/o Fitzgerald Hartley Management, 7250
Beverly Boulevard, Suite 200, Los Angeles, CA 90036
(hereinafter "you") and CBS Records, a Division of CBS Inc.,
51 West 52 Street, New York, New York 10019 (hereinafter
"CBS").

## A.  INTRODUCTION

Reference is made to the agreement dated December 10, 1977,
between CBS and you regarding the recording services of the
group p/k/a "Toto" [CRU 77-646.2], as amended (hereinafter
referred to as the "Prior Agreement").

Although, as a matter of convenience, this agreement
incorporates some provisions the same as or similar to those
in the Prior Agreement, this agreement shall not constitute
nor be deemed a modification or an extension of the Prior
Agreement, as this agreement is a new one and shall have the
full force and effect of a new agreement executed on the
date hereof.  You further acknowledge, understand, and
agree, and each member of the Artist (as hereinafter
defined) acknowledges, understands, and agrees, after
consulting with counsel, that this agreement is a new
promise by you to Deliver Master Recordings as provided
herein, which promise is supported by new consideration from
CBS, and that, to the extent that California Labor Code
Section 2855 is applicable to this agreement (with respect
to which CBS reserves all rights), the seven (7) year period
imposed by that statute shall not commence to run prior to
the date hereof.

Upon the execution of this agreement, the term of the Prior
Agreement is hereby terminated and all parties will be
deemed to have fulfilled all of their obligations thereunder
except those obligations that survive the end of the term
(e.g., warranties, re-recording restrictions, and royalty
payment obligations).

## 1.  TERM

1.01.      The term of this agreement will begin on
January 27, 1983, and will continue for a first Contract
Period ending nine (9) months after whichever of the
following dates is the earlier:

(a)  The date of completion of the lacquer,
copper, or equivalent masters to be used in
manufacturing the disc Phonograph Record units to be
derived from the last Master Recordings made in
fulfillment of your Recording Commitment for that
Contract Period under paragraph 3.01 below; or

ID:1577C                              RB [CRU 82-564.3(1)] 1h (1/27/83)

-1-

Exhibit 3

Exhibit 3  Page 35

(b)  The date thirty (30) days after you give CBS notice that you have completed the Delivery of those Master Recordings;

but in no event earlier than three (3) years after the date hereof.

1.02.    You grant CBS one (1) option to extend that term for an additional Contract Period ("Option Period") on the same terms and conditions, except that in no event shall such Option Period end earlier than two (2) years after the date of its commencement.  CBS may exercise that option by sending you a notice at any time before the expiration date of the initial Contract Period.  If CBS exercises such an option, the Option Period concerned will begin immediately after the end of the initial Contract Period.

2.  <u>SERVICES</u>

2.01.    During the term of this agreement you will Deliver Master Recordings, as provided in this agreement, embodying the performances of David Paich, Steven M. Porcaro, Jeffrey T. Porcaro, Michael Porcaro, Robert T. Kimball, and Steven L. Lukather 'p/k/a "Toto" (the "Artist") to CBS and to no other Person.

2.02.    You shall furnish the services of producers in connection with the Master Recordings to be made by the Artist hereunder (hereinafter, "Producers"), and you shall be solely responsible for engaging and paying them.  If, however, the producers whose services are rendered in connection with any Recordings made hereunder are employed by CBS on its staff when their services are rendered, CBS will be responsible for their compensation and the royalty otherwise payable to you in respect of Master Recordings produced by them will be reduced by the amount of a royalty computed under this agreement, calculated at a basic rate of 6% under paragraph 9.01 and adjusted as provided elsewhere herein.

3.  <u>RECORDING COMMITMENT</u>

3.01.    During each Contract Period you will cause the Artist to perform for the recording of Master Recordings sufficient to constitute the number of Albums specified below, cause those Master Recordings to be produced, and Deliver them to CBS:

(a)  initial Contract Period:  four (4) Albums

(b)  Option Period:          two (2) Albums

ID:1577C           RB [CRU 82-564.3(1)] lh (1/27/8

-2-

Exhibit 3

Exhibit 3  Page 36



3.02.    During each Contract Period:

(a)  You will Deliver the first Album to CBS within the first five (5) months; and

(b)  You will Deliver each successive Album to CBS not earlier than eight (8) months but not later than twelve (12) months after the date when you Deliver the immediately preceding Album.

3.03.    Only Master Recordings consisting of Compositions not previously recorded by the Artist shall apply in reduction of the Recording Commitment.

3.04.    The Artist shall not be required to perform hereunder together with any other royalty artist without the Artist's consent.  CBS shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

3.05.    Each Album will consist entirely of Master Recordings made in the course of that Album recording project.

4.  RECORDING PROCEDURE

4.01.    You will follow the procedure set forth below in connection with Master Recordings made hereunder:

(a)  Except as expressly noted otherwise in this agreement, prior to the commencement of recording in each instance you shall obtain the approval of CBS of each of the following, in order, before proceeding further:

(1)  Selection of Producer.  (The members of the Artist will be deemed approved as Producers.  With respect to your selection of any producer or co-producer other than the members of the Artist ("outside producer") CBS will not unreasonably withhold its approval.  If you propose that an outside producer produces or co-produces an Album of your Recording Commitment and the immediately preceding Album of your Recording Commitment was produced or co-produced by such outside producer and such immediately preceding Album achieved worldwide Net Sales Through Normal Retail Channels equal to at least (i) two-thirds (2/3) of such Net Sales of the immediately preceding Album of your Recording Commitment or (ii) one million (1,000,000) units, whichever is greater, according to CBS' monthly artist trial

ID:1577C                               RB [CRU 82-564.3(1)] 1h (1/27/83

-3-

Exhibit 3

Exhibit 3  Page 37

balance accounting statement (after provision for
reasonable reserves for returns and credits) as of
the date you propose that such outside producer
produce or co-produce an Album hereunder, then CBS
shall be deemed to have approved such outside
producer for such Album.)

(2)   Selection of material, including the
number of Compositions to be recorded.  CBS may
reject any request to record an Album consisting of
more than one (1) twelve-inch 33-1/3 rpm Record, or
any material disapproved on the advice of its
attorneys; otherwise, the material selected by you
will be approved by CBS.  You shall advise CBS of
the content of all medleys prior to the recording
thereof.  The Master Recordings to be included in
any Album released under this agreement will be
selected from those recorded by the Artist by
mutual agreement (or by CBS, if CBS and you do not
reach such agreement.)

(b)   (1)  You will notify CBS of the times and
places scheduled for all recording sessions.  CBS will
book all studio time.  CBS' engineers will be used, to
the extent of CBS' union requirements.  CBS will not be
deemed to be unreasonable in rejecting any request to
begin recording any Album which is a part of the
Recording Commitment within three (3) months after the
Delivery of a prior Album under this agreement.

(2)   You shall notify the appropriate
local of the American Federation of Musicians in advance
of each recording session.

(c)   As and when required by CBS, you shall
allow CBS' representatives to attend any or all
recording sessions hereunder.

(d)   You shall timely supply CBS with all of
the information it needs in order: (1) to make payments
due in connection with such Recordings; (2) to comply
with any other obligations CBS may have in connection
with the making of such Master Recordings; and (3) to
prepare to release Phonograph Records derived from such
Master Recordings.  Without limiting the generality of
clause (2) of the preceding sentence, you shall furnish
CBS with all information it requires to comply with its
obligations under its union agreements, including,
without limitation, the following:

(i)   If a session is held to record new
tracks intended to be mixed with existing tracks
(and if such information is requested by the

1D.1577C                          RB [CRU 82-564.3(1)] 1h (1/27/8

-4-

Exhibit 3

Exhibit 3  Page 38

American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were made, and the AFM Phonograph Recording Contract (Form "B") number(s) covering such sessions.

(ii)   Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B").

(iii)   A listing of all the musical selections contained in recordings made at location sessions and delivered to CBS hereunder.

(e)   You shall submit to CBS fully edited Master Recordings, satisfactory for its manufacture and sale of Phonograph Records, and deliver to CBS all original and duplicate Master Recordings of the material recorded, together with all necessary licenses and appropriate permissions.

4.02.   No "live" Recording or Recording not made in full compliance with the provisions of this agreement will apply in fulfillment of your Recording Commitment, nor will CBS be required to make any payment in connection with any such Recording, unless CBS so agrees in writing or such Recording is actually released by CBS.   No Joint Recording will apply in fulfillment of your Recording Commitment, nor will CBS be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is actually released by CBS.   No Recordings shall be made by unauthorized dubbing.

4.03.   CBS shall have the right to terminate any recording session or project, even if previously approved hereunder, if CBS reasonably anticipates that the Recording Costs for the Album concerned will exceed the applicable Recording Fund prescribed in paragraph 6.02.

5.   RECORDING COSTS; SPECIAL PACKAGING

5.01.   CBS will pay all union scale payments required to be made to Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel and arrangements and copying specifically approved by CBS in respect of the recording of such Master Recordings, and all other amounts required to be paid by CBS pursuant to any applicable law or any collective bargaining agreement between CBS and any union representing persons who render services in connection with such Master Recordings.

ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/83

-5-

Exhibit 3

Exhibit 3  Page 39

5.02.    All amounts described in paragraph 5.01 above plus all other amounts representing direct expenses paid by CBS, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, advances to producers and all studio and engineering charges, in connection with CBS' facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute Advances.  All Special Packaging Costs will constitute Advances also.  With respect to the preparation of a lacquer, copper, or equivalent master from a fully mixed, edited, and equalized master tape, an amount equal to the normal engineering charges which would reasonably be incurred in connection with the production of such a master on a real time basis at CBS' studios (or other studios designated by CBS) will be excluded in the calculation of Recording Costs, but all costs in excess of those normal engineering charges will be included in that calculation. The costs of copper and other masters equivalent to lacquer masters will be chargeable as Recording Costs, but the costs of other metal parts, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "per-record royalties"), shall not constitute Advances.  Any Recording Costs in excess of the applicable Recording Fund pesecibed in paragraph 6.02 will be your sole responsibility and will be promptly paid by you (or reimbursed by you if paid by CBS).

5.03.    Notwithstanding anything to the contrary contained elsewhere in this agreement, in connection with the release of Albums hereunder in non-disc configurations on high quality tape (e.g., CrO2) or in packages that consist of more than solely a standard "jewel box" with cassette sleeve, one-half (1/2) of any additional expenses incurred by CBS in excess of those normally incurred by CBS in connection with the release of Albums in non-disc configurations on standard tape or in packages that consist of solely a standard "jewel box" with cassette sleeve shall be deemed an additional Advance hereunder, provided that such one-half (1/2) shall not exceed ten cents (10¢) in connection with any Album.

6.   ADDITIONAL ADVANCES

6.01.    All monies paid to or on behalf of you or Artist during the term of this agreement at your or Artist's request, other than royalties paid pursuant to Articles 9 and 12 hereof, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of CBS.

6.02.    (a)  In connection with each Album recorded pursuant to your Recording Commitment, CBS will pay you an Advance in the amount by which the applicable sum indicated

ID:1577C                      RB [CRU 82-564.3(1)] 1h (1/27/83)

-6-

Exhibit 3

Exhibit 3  Page 40

below ("Recording Fund") exceeds the Recording Costs for the Album:

            (1)   The first Album recorded during the initial Contract Period:  $650,000.00

            (2)   Albums (other than the first Album) recorded during the initial Contract Period Period: $750,000.00

            (3)   Albums recorded during the Option Period:  $1,000,000.00

            (b)   Subject to subparagraph (c) below and provided you have timely fulfilled all of your obligations under this agreement, the amount of the Recording Fund for each Album of your Recording Commitment other than the first Album will be the amount computed pursuant to this subparagraph (b) rather than the amount specified in subparagraph (a) above if the amount computed pursuant to this subparagraph (b) is greater than the amount specified in subparagraph (a) for the Album concerned:

            (1)   If the amount of the royalties credited to your account on worldwide Net Sales Through Normal Retail Channels of the more recent of the two (2) "Preceding Albums" (defined below) according to CBS' monthly artist trial balance accounting statement (after provision for reasonable reserves not to exceed twenty-five percent (25%) for returns and credits but with no provision for reserves in foreign territories where CBS' Licensee does not allow returns) as of the date one (1) year after the date such more recent Album is Delivered is at least two-thirds (2/3rds) of the amount of such royalties credited for such Net Sales of the earlier of the two (2) Preceding Albums as of the date the Album concerned is Delivered or the date one (1) year after the date such earlier Album is Delivered, then the Recording Fund for the Album concerned shall be:

            (i)   two-thirds (2/3) of the average of the amounts of such royalties credited for such Net Sales of both of the two (2) Preceding Albums computed as of the dates above;

            (2)   If the amount of such royalties for such Net Sales of the more recent of the two (2) Preceding Albums is less than two-thirds (2/3rds) of the amount of such royalties credited for such Net Sales of the earlier of the two (2) Preceding Albums (as computed above), then the Recording Album for the Album concerned shall be:

IDR1577C

RB [CRU 82-564.3(1)] 1h (1/27/83)

-7-

Exhibit 3

Exhibit 3  Page 41

(i)   two-thirds (2/3) of the average of:

(A) the amount computed pursuant to clause 6.02(b)(1)(i); and

(B)  the amount of such royalties credited for such Net Sales of the more recent of the two (2) Preceding Albums computed as of the dates above.

"The Preceding Albums" means the two (2) Albums of your Recording Commitment hereunder (or under the Prior Agreement, if applicable) released most recently before the commencement of recording of the Album concened.

[For purposes of this subparagraph 6.02(b) only, with respect to royalties calculated for sales that have been made outside the United States but have not been credited to your account, CBS shall make a good faith effort to include such of those sales that have been reported to CBS' New York offices during the preceding periods through its internal thirty (30) day trial balances, which trial balances shall be deemed conclusive.  Notwithstanding the foregoing, in connection with sales in Canada, France, Holland, Sweden, West Germany, and Japan only, CBS shall use the sales figures reported on its "crisis report" (or the equivalent report) in making such good faith effort, which report shall be deemed conclusive.  If at some time in the future sales figures for Italy are included on such "crisis report" (or the equivalent report) then Italy shall thereafter be added to the countries specified in the preceding sentence.]

(c)   In no event shall the Recording Fund computed pursuant to subparagraph 6.02(b) exceed the following amounts:

(1)  Albums (other than the first Album) recorded during the initial Contract Period: $1,750,000.00.

(2)  Albums recorded during the Option Period: $2,000,000.00

6.02.1    Each Advance pursuant to paragraph 6.02 shall be made by payment to you of the following amounts of the applicable Recording Funds promptly after the commencement of recording of the Album concerned and the balance of each such Advance promptly after Delivery of the Album concerned:

(a)   The first Album recorded hereunder: $150,000.00.

ID.1577C

RB [CRU 82-564.3(1)] 1h (1/27/8

-8-

Exhibit 3

Exhibit 3  Page 42

(b)   All other Albums: $250,000.00 [but not more than the amount by which the applicable Recording Fund exceeds the amount of the average Recording Costs incurred in connection with the last two (2) Albums of your Recording Commitment (or the last Album, whichever is greater) which have then been recorded under this agreement multiplied by 110%].

6.03.    Upon the execution of this agreement and the commencement of its term, CBS will pay you an Advance of Eight Hundred Fifty Thousand Dollars ($850,000.00).  This paragraph will not apply to any Option Period.

6.04.    If during the term of this agreement CBS releases in the United States a "Greatest Hits" Album (as such term is commonly understood in the recording industry), you will record for inclusion on such Album at least two (2) Compositions not previously recorded by you.  Provided that you have not, as of the time CBS prepares to release such "Greatest Hits" Album, failed to Deliver the next Album of your Recording Commitment before the last date for timely Delivery pursuant to Article 3 above, CBS will, promptly after such release, make an Advance to you in the amount of Five Hundred Thousand Dollars ($500,000.00) provided, however, that in the event that your royalty account is not in a "fully earned position" (i.e., there are unrecouped Advances or other offsets against your royalties after provision for reasonable reserves not to exceed twenty-five percent (25%) for returns and credits) according to CBS' artist trial balance royalty accounting statement as of the date of the initial release in the United States of such "Greatest Hits" Album, the Five Hundred Thousand Dollar ($500,000.00) Advance otherwise payable to you will be reduced by the amount by which your royalty account is unearned.  Notwithstanding the foregoing, the Advance specified above will not be reduced below the budget initially approved by CBS for the recording of the new Compositions for inclusion on such Album.  Any costs incurred in recording, rerecording, remixing, or re-editing Master Recordings to be included in such "Greatest Hits" Album shall be deemed Recording Costs in respect of such Album and shall reduce the amount of the Advance otherwise payable to you for such Album.  A "Greatest Hits" Album shall not be deemed in fulfillment of, or reduce your, Recording Commitment hereunder.  If you fail to record at least two (2) Compositions not previously recorded by you within sixty (60) days after CBS' request, without limiting CBS' rights, CBS shall nevertheless have the option to release such "Greatest Hits" Album and shall not be required to pay you any Advance in connection therewith.

ID:1577C

RB [CRU 82-564.3(1)] lh (1/27/8

-9-

Exhibit 3

Exhibit 3  Page 43

## 7.   RIGHTS IN RECORDINGS

7.01.     Each Master Recording made under this agreement or during its term, from the Inception of Recording, will be considered a "work made for hire" for CBS; if any such Master Recording is determined not to be a "work made for hire" it will be deemed transferred to CBS by this agreement, together with all rights in it.  All Master Recordings made under this agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of CBS, free from any claims by you or any other Person; and CBS shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world.  You will execute and deliver to CBS such instruments of transfer and other documents regarding the rights of CBS in the Master Recordings subject to this agreement as CBS may reasonably request to carry out the purposes of this agreement, and CBS may sign such documents in your name or the name of the Artist and make appropriate disposition of them.

7.02.     Without limiting the generality of the foregoing, CBS and any Person authorized by CBS shall have the unlimited right to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

7.03.     CBS and any Licensee of CBS each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and Producer(s) and all other persons performing services in connection with the recording of such Master Recordings (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, for the purposes of trade, or for advertising purposes.  No direct endorsement by any such Person of any product or service shall be used without his written consent.  During the term of this agreement neither you nor Artist shall authorize any Party other than CBS to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist) in connection with the advertising or sale of Phonograph Records or blank recording tape.

ID:1577C                              RB [CRU 82-564.3(1)] 1h (1/27/86

-10-

Exhibit 3

Exhibit 3  Page 44

8.   MARKETING PROCEDURES

8.01.      During the term of this agreement, in respect
of Records manufactured for sale in the United States, CBS
will not, without your consent and notwithstanding anything
in Article 9:

(a)   couple Master Recordings made hereunder
with Recordings not embodying the Artist's performances
on any Phonograph Records, except as provided in
paragraph 8.01.1 below.  (CBS may couple without
restriction on Records sold after the end of the term.)
This subparagraph (a) will not apply to promotional
Records and programs for use on public transportation
carriers and facilities;

(b)   Intentionally deleted

(c)   initially release any such Master
Recording under any record label other than the Columbia
label, or other label then used by CBS for the majority
of CBS' best selling pop artists then under exclusive
term contract to CBS;

(d)   release any such Master Recording through
a Club Operation earlier than six (6) months after its
initial release in the Unted States; or

(e)   release any such Master Recording on
non-catalog Phonograph Records created on a custom basis
for clients of CBS' special products operations; or

(f)   use Master Recordings made under this
agreement on "Premium Records".  (A "Premium Record" is
a Record, produced for use in promoting the sale of
merchandise other than Phonograph Records, which bears
the name of the sponsor for whom the Record is
produced.); or

(g)   release any Multiple Record Set; or

(h)   release any Album of your Recording
Commitment as a Midline Record before the date one (1)
year after the initial United States release of such
Album.

8.01.1   CBS may couple Master Recordings made under
this agreement with Recordings not embodying your
performances on "sampler" Records in tape form intended for
free distribution to automobile purchasers, but no such
sampler will contain more than one (1) Recording made under
this agreement.

ID:1577C                      RB [CRU 82-564.3(1)] 1h (1/27

-11-

Exhibit 3

Exhibit 3  Page 45

8.02.     CBS shall not record "sight and sound"
performances hereunder without your prior consent, which may
be withheld for any reason.

8.03.     CBS will furnish you with any biographical
material, liner notes, and photographs to be used on the
disc Album jacket for the initial release of each Album
recorded under this agreement, and will consult with you
regarding their use.

8.04.     Notwithstanding anything to the contrary
contained in this agreement, the total artist royalty and
Mechanical Royalty payable to you in connection with any
Single that embodies only one (1) Side taken from the first
Album made hereunder shall be four cents (4¢).  With respect
to any such Single taken from any other Album made
hereunder, the total artist royalty and Mechanical Royalty
shall be equal to that which CBS then pays to the majority
of its best-selling artists then under exclusive term
contract to CBS (excluding those artists to whom CBS is
obligated to pay a royalty under agreements that do not
specifically provide for a royalty for so-called "one-sided
singles").

9.  ROYALTIES

You will be paid royalties on Net Sales of Records as
hereinafter set forth:

9.01.     (a)  (1)  CBS will pay you a basic royalty as
follows in respect of Net Sales of Phonograph Records
consisting entirely of Master Recordings performed by the
Artist and recorded hereunder and sold by CBS or its
Licensee Through Normal Retail Channels for distribution in
the United States ("USNRC Net Sales"):

(i)  On Albums (disc and tape):
$1.25 per unit.

(ii)  On Singles: 19% of the
applicable Royalty Base Price (which as of the date
hereof is 18.05¢ per unit).

(2)  If the suggested retail list price
of a majority of single disc albums appearing in the top 200
of Billboard magazine's "Top LP's and Tapes" chart (or
industry equivalent if such chart shall cease to exist) is
other than $8.98, the basic royalty fixed in clause
9.01(a)(1)(i) shall be increased or decreased in proportion
to such variance in the suggested retail list price,
effective as of the beginning of the semi-annual accounting
period following the effective date of the price variance.

ID:1577C                          RB [CRU 82-564.3(1)] 1h (1/27/8

-12-

Exhibit 3

Exhibit 3  Page 46

If at any time the music industry as a whole abandons suggested retail list prices (which for purposes of this clause shall mean that less than one-quarter (1/4) of the single-disc albums appearing in such chart bear suggested retail list prices) then the basic royalty fixed in clause 9.01(a)(1)(i) shall thereafter be increased or decreased in proportion to variances in the Wholesale Price hereunder. If, in addition to its customary short-term "free goods" programs, CBS institutes a general "free goods policy" whereby it automatically invoices a certain percentage of Records shipped as "free" and as a direct result thereof increases the Wholesale Price on "non-free" Records to make up lost income on "free" Records, then the basic royalty fixed in clause 9.01(a)(1)(i) shall thereafter be increased or decreased in proportion to the variances in the Wholesale Price hereunder.

(b)   Solely for the purpose of computing royalties under paragraphs 9.02, 9.03, 9.05, 10.01, 10.02 and 14.08, the basic royalty shall be deemed to be 31.25% of the applicable Royalty Base Price on Albums.

9.02.   In respect of Phonograph Records sold through any Club Operation, the royalty rate shall be determined by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which is 7 and the denominator of which is the basic royalty fixed in paragraph 9.01, and such royalties shall be computed on the basis of 90% of Net Sales of such Records.  Notwithstanding the foregoing, no royalty shall be payable to you with respect to (a) Phonograph Records received by members of any such Club Operation in an introductory offer in connection with joining it or upon recommending that another join it or as a result of the purchase of a required number of Records including, without limitation, records distributed as "bonus" or "free" Records, or (b) Phonograph Records for which such Club Oeperation is not paid.

9.02.1   Notwithstanding clause (a) of the last sentence of paragraph 9.02, at least 50% of all Phonograph Records distributed through any Club Operation during the term of this agreement will be deemed to have been sold. Such computation shall be made on an overall basis rather than at the end of each accounting period.

9.03.   In respect of catalog Phonograph Records sold by CBS special products operation (hereinafter, "CSP") to educational institutions or libraries or to other CSP clients for their promotion or sales incentive purposes (but not for sale to the general public through normal retail channels), the royalty shall be one-half (1/2) of the royalty rate otherwise payable.  In respect of non-catalog



ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/8

-13-

Exhibit 3

Exhibit 3  Page 47

Phonograph Records created on a custom basis for clients of CSP, the royalty rate shall be one-half (1/2) of the royalty rate otherwise payable and shall be computed on the basis of CSP's actual sales price therefor (less all taxes and container charges). In respect of any Master Recording leased by CBS to others for their distribution of Phonograph Records in the United States, CBS will pay you fifty percent (50%) of CBS' net receipts therefrom after deduction of all copyright, AFM and other applicable third party payments; if another artist, a producer, or any other Person is entitled to royalties in respect of such Records, said payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.

9.04.    In respect of Phongraph Records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be the applicable royalty rate which would have been payable to you if such Records were sold in disc form.

9.05.    (a)  The royalty rate on any Budget Record, or Record bearing a Reissue Label shall be one-half (1/2) of the otherwise applicable royalty rate. The royalty rate on any twelve-inch "disco single" shall be 14% of the applicable Royalty Base Price.

(b)  The royalty rate on a Multiple Record Set will be one-half of the applicable Album royalty rate prescribed in paragraph 9.01, if the Royalty Base Price of that Set is the same as the Royalty Base Price applicable to CBS' top-line single-disc Albums in the territory where the Set is sold at the beginning of the royalty accounting period concerned. If a different Royalty Base Price applies to a Multiple Record Set, the royalty rate prescribed in the preceding sentence will be adjusted in proportion to the variance in the Royalty Base Price. For the purpose of those computations, "top-line" Albums will not include "audiophile" or other Records marketed in specially-priced catalog series by reason of their superior sound quality. That apportionment of the royalty rate will be made by using the following formula:

$$\frac{X \text{ multiplied by } Z}{Y} = \text{apportioned royalty rate}$$

("X" represents the Royalty Base Price for the Multiple Record Set concerned; "Y" represents the Royalty Base Price for a top-line single-disc Album described in the first sentence of this subparagraph (b), multiplied by the number of disc Records in the Multiple Record Set concerned; and "Z" equals the otherwise applicable royalty rate.)

ID:1577C

RB [CRU 82-564.3(1)] lh (1/27/83)

-14-

Exhibit 3

Exhibit 3  Page 48

(c)   The royalty rate on any Midline Record shall be eighty-five cents (85¢) per unit with respect to USNRC Net Sales, inclusive of any artist royalty, Mechanical Royalty, or any other royalties otherwise payable to you. Such eighty-five cent (85¢) royalty shall be reduced with respect to other than USNRC Net Sales of such Midline Records in the same proportion and subject to the same conditions as your basic royalty pursuant to clause 9.01(a)(1)(i) is reduced hereunder for other than USNRC Net Sales.

9.06.   The basic royalty under paragraph 9.01 on Phonograph Records sold by CBS or its Licensees for distribution outside of the United States of America shall be computed at the applicable percentage indicated below:

(a)   On Records sold for distribution in any country in which CBS' principal distributing Licensee is a subsidiary corporation controlled by CBS, and more than 50% of the corporate stock of which is owned by CBS: 12% on Albums and 9.5% on Singles.

(b)   On Records sold for distribution elsewhere: 12% on Albums and 9.5% on Singles.

Royalties on the Records referred to in clause "(a)" above will be computed on the basis of 100% of Net Sales of such Records.   Royalties on the Records referred to in clause "(b)" above will be computed on the basis of 90% of Net Sales of such Records, but if any CBS Licensee accounts to CBS on the basis of more than 90% of such Net Sales CBS will account to you on the same basis for the Records concerned.

9.07.   In respect of Phonograph Records derived from Master Recordings leased or otherwise furnished by CBS' Licensees to others for their manufacture and distribution of Records outside the United States, CBS will pay you 50% of the net receipts derived therefrom by CBS after deduction of all applicable third party payments (which payment will be apportioned as provided in the last sentence of paragraph 9.03 if another artist, a producer, or any other Person is entitled to royalties in respect of such Records), but not in excess of the amount of the royalties which would be payable to you for such Records under paragraph 9.06 if they were manufactured and distributed by CBS or its Licensees.

9.08.   Subject to paragraph 8.02, with respect to CBS' exploitation of Artist's audiovisual performances by means other than audiovisual Records, CBS shall pay you royalties equal to fifty percent (50%) of all monies earned and received by CBS in connection with such exploitation computed after deduction of, any production costs, payments

ID:1577C                          RB [CRU 82-564.3(1)] 1h (1/2

-15-

Exhibit 3

Exhibit 3  Page 49

to copyright owners of Compositions embodied in such
performances, and any applicable distribution fees,
out-of-pocket expenses, taxes and adjustments born by CBS in
connection with such exploitation and collection and receipt
by CBS of such monies ("Net Receipts"). Monies earned and
received by CBS Records from any Licensee (rather than
monies earned and received by the Licensee) in respect of
exploitation of Artist's audiovisual performances by means
other than audiovisual Records shall be included in the
computation of Net Receipts. CBS Records shall negotiate at
arms length with respect to such exploitation with any joint
ventures, subsidiaries, wholly or partly owned, and other
divisions of CBS Inc.

10. MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in
Article 9 hereof:

10.01.    In respect of Joint Recordings, the royalty
rate to be used in determining the royalties payable to you
shall be computed by multiplying the royalty rate otherwise
applicable thereto by a fraction, the numerator of which
shall be one and the denominator of which shall be the total
number of royalty artists whose performances are embodied on
a Joint Recording.

10.02.    With respect to Phonograph Records embodying
Master Recordings made hereunder together with other Master
Recordings, the royalty rate payable to you shall be
computed by multiplying the royalty rate otherwise
applicable by a fraction, the numerator of which is the
number of Sides contained thereon embodying Master
Recordings made hereunder and the denominator of which is
the total number of Sides contained on such Record.

10.03.    No royalties shall be payable to you in
respect of Phonograph Records sold or distributed by CBS or
its Licensees for promotional purposes, as cutouts after the
listing of such Records has been deleted from the catalog of
CBS or the particular Licensee, as "free," "no charge" or
"bonus" Records (whether or not intended for resale), or to
radio stations.

11. ROYALTY ACCOUNTINGS

11.01.    CBS will compute royalties payable to you
hereunder as of June 30th and December 31st for each
preceding six-month period during which Records as to which
royalties are payable hereunder are sold, and will render a
statement and pay such royalties, less any unrecouped
Advances, prior to each succeeding September 30th and March

ID:1577C                              RB [CRU 82-564.3(1)] 1h (1/27/83)

                              -16-

Exhibit 3

Exhibit 3  Page 50

31st, respectively. Without limiting CBS' right to recoupment, CBS, in calculating royalties payable with respect to any semi-annual accounting period, shall not deduct unrecouped Advances paid pursuant to paragraph 6.03 subsequent to such period with respect to Albums timely Delivered, provided you had not completed such Album as of the last day of the semi-annual period and withheld Delivery of the Album until after the last day of the semi-annual accounting period. However, CBS may deduct Advances that are in addition to those specified in this agreement or not attributable to an Album project (e.g., tour support).

11.02.   Royalties for Records sold for distribution outside of the United States ("foreign sales") shall be computed in the national currency in which CBS is paid by its Licensees and shall be paid to you at the same rate of exchange at which CBS is paid. For accounting purposes, foreign sales shall be deemed to occur in the same semi-annual accounting periods in which CBS' Licensees account to CBS Records therefor. If CBS is unable, for reasons beyond its control, to receive payment for such sales in United States dollars in the United States, royalties therefor shall not be credited to your account during the continuance of such inability; if any accounting rendered to you hereunder during the continuance of such inability requires the payment of royalties to you, CBS will, at your request and if CBS is able to do so, deposit such royalties to your credit in such foreign currency in a foreign depository selected by you, at your expense. If any CBS Licensee is required by law to deduct any taxes from its payments to CBS, CBS may deduct a proportionate amount of those taxes from your royalties. If any law, any government ruling, or any other restriction affects the amount of the payments which a CBS Licensee can remit to CBS, CBS may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to CBS.

11.03.   At any time within twenty-four (24) months after any royalty statement is due you hereunder you shall have the right to give CBS written notice of your intention to examine CBS' books and records with respect to such statement. Such examination shall be commenced within thirty (30) days after the date of such notice, at your sole cost and expense, by any certified public accountant or attorney designated by you provided he is not then engaged in an outstanding examination of CBS' books and records on behalf of a person other than you. Such examination shall be made during CBS' usual business hours at the place where CBS maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to CBS and your examination shall be limited to the foregoing.

ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/8

-17-

Exhibit 3

Exhibit 3  Page 51

11.04.    Your sole right to inspect CBS' books and records shall be as set forth in subparagraph 11.03 hereof, and CBS shall have no obligation to produce such books and records more than once with respect to each statement rendered to you. Without limiting the generality of the foregoing, CBS shall have no obligation to furnish you with any records that do not specifically show sales or gratis distributions of Phonograph Records as to which royalties are payable hereunder.

11.05.    Unless notice shall have been given to CBS as provided in paragraph 11.03 hereof, each royalty statement rendered to you shall be final, conclusive and binding on you and shall constitute an account stated. You shall be foreclosed from maintaining any action, claim or proceeding against CBS in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against CBS in a court of competent jurisdiction within three (3) years after the due date of such statement or accounting. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you or the Artist by reason of any claim related to CBS' royalty accountings. Without limiting the generality of the preceding sentence, neither you nor the Artist will have any right to seek termination of this agreement or avoid the performance of your obligations under it by reason of any such claim. The preceding three (3) sentences shall not apply if CBS shall be adjudged guilty of fraud pursuant to a final determination in a court of competent jurisdiction.

## 12. LICENSES FOR MUSICAL COMPOSITIONS

12.01.    (a) Each Controlled Composition is hereby licensed to CBS, for the United States and Canada, at the royalty rate of 4-1/4¢ for the United States and 2¢ for Canada (or such higher rate, if any, as shall be equal to the minimum compulsory license rate applicable under the copyright law of the country concerned at the time of recording), on the basis of Net Sales of Phonograph Records, except that no copyright royalties shall be payable with respect to Records described in paragraph 10.03. The royalty rate with respect to records described in paragraph 9.05 or distributed through a Club Operation shall be three-fourths (3/4) of said rate, and arranged versions of public domain Compositions which are claimed by you to be

ID:1577C                                    RB [CRU 82-564.3(1)] 1h (1/27/83)

-18-

Exhibit 3

Exhibit 3  Page 52