(b)  (1)  If worldwide Net Sales Through Normal Retail Channels of Album #1 according to CBS' artist trial balance (after provision for reasonable reserves for returns and credits) as of the date one (1) year after the date Album #1 is Delivered are less than 250,000 units, then the Recording Fund pursuant to paragraph 6.02(a) for all Albums of your Recording Commitment recorded after Album #1 [and the amount of the Advance referred to in paragraph 6.04 (before the deduction of any unrecouped balance) for any "Greatest Hits" Album released after Album #1] shall be $250,000.00 and subparagraph 6.02(b) and (c) shall not apply and subparagraph 2.01.3(c) below shall not apply.

(2)  If such Net Sales of Album #1 are less than the average of such Net Sales of the last two (2) Albums Delivered hereunder (or under the Prior Agreement) embodying the performances of the Artist as presently constituted (the "Last Two Albums") as of the date one (1) year after each of such Last Two Albums were Delivered, then the Recording Fund pursuant to subparagraph 6.02(a) for the first Album recorded after Album #1 ("Album #2") will be $525,000.00 and subparagraphs 6.02(b) and (c) shall apply.

(3)  If such Net Sales of Album #1 are greater than or equal to the average of such Net Sales of the Last Two Albums, then the Recording Fund for Album #2 shall be the amount specified in subparagraph 6.02(a) and subparagraphs 6.02(b) and (c) shall apply.

(c)  (1)  If worldwide Net Sales Through Normal Retail Channels of Album #2 according to CBS' artist trial balance (after provision for reasonable reserves for returns and credits) as of the date one (1) year after the date Album #2 is Delivered are less than 250,000 units, then the Recording Fund pursuant to paragraph 6.02(a) for all Albums of your Recording Commitment recorded after Album #2 [and the amount of the Advance referred to in paragraph 6.04 (before the deduction of any unrecouped balance) for any "Greatest Hits" Album released after Album #2] shall be $250,000,000.00 and subparagraphs 6.02(b) and (c) shall not apply and clause 2.01.3(c)(2)(ii) shall not apply.

(2)  (i)  If such Net Sales of Album #2 are less than the average of such Net Sales of the Last Two Albums as of the date one (1) year after each of such Last Two Albums were Delivered, then the Recording Fund pursuant to subparagraph 6.02(a) for all Albums of your Recording Commitment recorded after Album #2 will be $525,000.00 and subparagraphs 6.02(b) and (c) shall apply.

ID:1577C                              RB [CRU 82-564.3(1)] 1h (1/27/83)

-39-

Exhibit 3

Exhibit 3  Page 73

(ii) Notwithstanding anything to the contrary contained in clause 2.01.3(c)(2)(i) above, if such Net Sales of any two (2) consecutive Albums after Album #2 are greater than or equal to the average of such Net Sales of the Last Two Albums, then the Recording Fund for all Albums of your Recording Commitment recorded after such two (2) consecutive Albums shall be the amount specified in subparagraph 6.02(a) and subparagraphs 6.02(b) and (c) shall apply.

(3) If such Net Sales of Album #2 are greater than or equal to the average of such Net Sales of the Last Two Albums, then the Recording Fund for all Albums of your Recording Commitment recorded after Album #2 shall be the amount specified in subparagraph 6.02(a) and subparagraphs 6.02(b) and (c) shall apply.

(d) If a total of two (2) Key Members become leaving members, than subparagraphs 2.01.3(a), (b), and (c) shall apply, provided that all references to $525,000.00 shall be changed to $250,000.00. If more than two (2) Key Members become leaving members, then subparagraphs 2.01.3(a), (b), (c) shall not apply and the Recording Fund pursuant to subparagraph 6.02(a) for all Albums of your Recording Commitment recorded in whole or in part after the departure of the third such Key Member [and the amount of the Advance referred to in paragraph 6.04 (before the deduction of any unrecouped balance) for any "Greatest Hits" Albums released after the departure of the third such Key Member] shall be $175,000.00 and subparagraphs 6.02(b) and (c) shall not apply.

2.01.4   The term "Key Member" as used in this Group Artist Rider shall mean any member of the Artist who, whether in live concert performances or in recordings, makes a substantial contribution to the sound, style, and/or image of the Artist, as a "lead vocalist," "lead guitarist,"

ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/83)

-40-

Exhibit 3

Exhibit 3  Page 74

"frontman" (i.e., a performer who is a center of attention on stage), principal songwriter, and/or principal producer.

CBS RECORDS, A Division of
CBS Inc.

By

SR. VICE PRESIDENT, BUSINESS AFFAIRS

TOTO INCORPORATED

By
An Authorized Signatory

AGREED IN ACCORDANCE WITH
THE ARTIST'S ASSENT AND GUARANTY
ANNEXED TO THIS AGREEMENT:

DAVID PAICH

STEVEN M. PORCARO

JEFFREY G. PORCARO

MICHAEL PORCARO

ROBERT T. KIMBALL

STEVEN LY LUKATHER
p/k/a "TOTO"

ID:1577C

RB [CRU 82-564.3(1)] 1h (1/27/8)

-41-

Exhibit 3

Exhibit 3  Page 75

## ARTIST'S ASSENT AND GUARANTY

To induce CBS Records to enter into the foregoing agreement
with Toto Incorporated [CRU 82-564.3(1)] (the
"Agreement"):

    1.   Each member of the Artist:

       (a)  represents to CBS that he has read the
Agreement and has had the legal effect of each of its
provisions explained to him by a lawyer chosen by him;

       (b)  assents to the execution of the Agreement and
agrees to be bound by all grants, restrictions, and
other provisions of it relating to the Artist; and

       (c)  acknowledges that CBS will have no obligation
to make any payments to the Artist in connection with
the services rendered by the Artist or the fulfillment
of the Artist's other obligations under the Agreement,
except for the payments specified in paragraph 5.01 and
Article 19.

    2.   (a)  Each member of the Artist:

          (1)  guarantees, absolutely and
unconditionally, the full performance by Toto
Incorporated (the "Furnishing Party") of all of the
Furnishing Party's obligations under the Agreement;
and

          (2)  agrees to indemnify and hold CBS
harmless from any loss, damage, liability or
expense (including but not limited to attorneys'
fees and legal expenses) which arise from any
failure by the Furnishing Party to fulfill the
Furnishing Party's obligations under the Agreement,
or which are incurred by CBS in the enforcement of
its rights under this guaranty.

          (3)  agrees that in the event that he has
not received from the Furnishing Party at least Six
Thousand Dollars ($6,000.00) during any Fiscal
Year, as such term is defined in paragraph 13.04.1
of the Agreement, he will advise CBS in writing at
least forty (40) days prior to the end of such
Fiscal Year.

       (b)  The Artist's liability under this guaranty is
direct and immediate, and is not conditioned upon the
pursuit by CBS of any remedy it may have against the

ID:1577C              RB [CRU 82-564.3(1)] 1h (1/27/8

-42-

Exhibit 3

Exhibit 3  Page 76

furnishing Party.  This guaranty shall not be revocable
at any time or for any reason, including, without
limitation, any modification of the Agreement with or
without notice to the Artist.  No failure by CBS to
exercise any of its rights will operate as a waiver of
those rights or any others.


_____
DAVID PAICH


_____
STEVEN M. PORCARO


_____
JEFFREY T. PORCARO


_____
MICHAEL PORCARO


_____
ROBERT T. KIMBALL


_____
STEVEN L. LUKATHER

p/k/a "TOTO"


ID:1577C                          RB [CRU 82-564.3(1)] 1h (1/27/83

                          -43-

Exhibit 3

Exhibit 3  Page 77

# EXHIBIT 3

Exhibit 3

Exhibit 3  Page 78



**CBS**
**RECORDS**

A Division of CBS Inc.
51 West 52 Street
New York, New York 10019
(212) 975-4321

August 12, 1986

TOTO INCORPORATED
c/o Fitzgerald Hartley Management
7250 Beverly Boulevard, Suite 200
Los Angeles, California  90036

Gentlemen:

The following, when signed by you and by us, will modify,
amend, and form a part of the agreement between CBS and
Toto Incorporated dated January 27, 1983 [CRU 82-564.3(1)],
as amended (the "Agreement").  All terms defined in the
Agreement will have the same meanings below unless
otherwise defined below.

     1.    Promptly after the execution of this
modification, CBS will make an Advance to you in the sum
of Five Hundred Thousand Dollars ($500,000.00).

     2.    Notwithstanding the provisions of paragraph 6.02
of the Agreement to the contrary, with respect solely to
the third and fourth Albums in the initial Contract
Period, the Recording Fund for each such Album will be
determined as follows:

          (a)  If the Album released to the public
immediately prior to the Album in question (the "Prior
LP") attains USNRC Net Sales less than or equal to three
hundred twenty-five thousand (325,000) units according to
CBS's monthly artist trial balance (after provision for
reasonable returns and credits) as of the earlier of (i)
the date of Delivery of the Album in question or (ii) the
last date for timely Delivery of the Album in question
pursuant to paragraph 3.02 of the Agreement, then the
phrase "$750,000.00" in clause 6.02(a)(2) of the Agreement
shall be deemed deleted and the phrase "$400,000.00"
inserted in lieu thereof.

          (b)  If the Prior LP attains USNRC Net Sales more
than three hundred twenty-five thousand (325,000) units
but less than five hundred thousand (500,000) units
according to CBS's monthly artist trial balance (after
provision for reasonable returns and credits) as of the
earlier of (i) the date of Delivery of the Album in
question or (ii) the last date for timely Delivery of the

0261Gso                        -1-         MG [CRU 86-220(1)]
(08/11/86)

Exhibit 3

Exhibit 3  Page 79

Album in question pursuant to paragraph 3.02 of the Agreement, then the phrase "$750,000.00" in clause 6.02(a)(2) shall be deemed deleted and the following inserted in its place:

> "$750,000.00, minus an amount equal to the product of (i) $2.00 and (ii) the number of USNRC Net Sales less than 500,000 units of the Album released immediately prior to the Album in question computed according to CBS's monthly artist trial balance (after provision for reasonable returns and credits) as of the earlier of (i) the date of Delivery of the Album in question or (ii) the last date for timely Delivery pursuant to paragraph 3.02 of the Album in question; provided that if Net Sales through Normal Retail Channels outside the United States are in excess of 1,175,000 units, according to CBS's monthly artist trial balance (after provision for reasonable returns and credits) as of the earlier of (i) the date of Delivery of the Album in question or (ii) the last date for timely Delivery pursuant to paragraph 3.02 of the Album in question, then the Recording Fund shall be $750,000.00."

(c)  If the Prior LP attains USNRC Net Sales of five hundred thousand (500,000) units or more according to CBS's monthly artist trial balance (after provision for reasonable returns and credits) as of the earlier of (i) the date of Delivery of the Album in question or (ii) the last date for timely Delivery of the Album in question pursuant to paragraph 3.02 of the Agreement, then paragraph 6.02 of the Agreement shall remain unchanged.

3.  (a)  Notwithstanding any provision of the Agreement to the contrary, the royalty on an "Audiophile record" (as such term is defined in this paragraph 3) will be as follows:

> (i)  with respect to Net Sales in the accounting period ending December 31, 1986, and any prior accounting periods:  the amount of money equal to the royalty applicable in the territory concerned to: (1) a "Standard" (as such term is defined below) disc unit of the same Record release; or (2) a Standard tape unit of the same Record release, if no Standard disc version of it is in the active catalog of CBS (or its principal Licensee in that territory); and

0261Gso                    -2-          MG [CRU 86-220(1)]
(08/11/86)

Exhibit 3

Exhibit 3  Page 80

(ii)   (A)  with respect to Net Sales in the accounting period ending June 30, 1987, and thereafter:  seventy-five percent (75%) of the applicable minimum royalty rate prescribed in subparagraph 9.01(b) of the Agreement and paragraph 9.01.6 of the Agreement; provided that in no event shall the royalty payable pursuant to this clause 3(a)(ii) be an amount less than the amount of money equal to the royalty applicable in the territory concerned to: (1) a Standard disc unit of the same Record release; or (2) a Standard tape unit of the same Record release, if no Standard disc version of it is in the active catalog of CBS (or its principal Licensee in that territory).

(B)  Notwithstanding the provisions of paragraph 14.08 of the Agreement to the contrary, the "Container Charge" with respect to Audiophile Records will be twenty-five percent (25%) of the applicable Wholesale Price of such Phonograph Records.

(b)  As used in this paragraph 3, the term "Audiophile records" shall mean Records (other than audiovisual Records) marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical or artistic characteristics (all Records made for digital playback are Audiophile records), and the term "Standard records" shall mean Records other than Audiophile Records and audiovisual Records.

4.   (a) (i)  Prior to the date hereof you have advised us, pursuant to the terms of the Group Artist Rider annexed to and made a part of the Agreement, that Dennis Frederikson p/k/a "Fergie Ferguson" has ceased to perform as a member of Artist.

(ii)   Pursuant to clause 2.01.2(a)(1) of such Group Artist Rider, you and CBS agree that Dennis Frederikson p/k/a "Fergie Ferguson" is hereby replaced by Joseph Williams who shall be deemed substituted as a party to the Agreement in place of such leaving member pursuant to the Group Artist Rider.  All references in the Agreement to "you" and/or "Artist" shall be deemed to include Joseph Williams, both individually and as a member of "Toto".

(b)  (i)  Notwithstanding the provisions of paragraph 2.01.3 of the Group Artist Rider to the Agreement or any other provisions of the Agreement to the contrary, solely with respect to the prior leaving

0261Gso                        -3-              MG [CRU 86-220(1)]
(08/11/86)

Exhibit 3

Exhibit 3  Page 81

members Robert Kimball and Dennis Frederikson p/k/a
"Fergie Ferguson", CBS waives its right to enforce the
provisions of such paragraph 2.01.3 solely as such
provisions relate to the reduction of Recording Funds
in the event Key Members of Artist become leaving
members.

(ii)  Nothing in this paragraph 4 shall be
deemed to restrict CBS from exercising any other
rights or remedies it may have, at law or in equity,
with respect to such prior leaving members, nor shall
it restrict CBS from any rights or remedies CBS may
have, under paragraph 2.01.3 of the Group Artist Rider
to the Agreement or otherwise, with respect to any
future leaving members.

5.   Notwithstanding any provision of the Agreement to
the contrary, you agree to record and Deliver to CBS, not
later than three (3) months after the date of this
modification, two (2) Master Recordings of Compositions
not previously Delivered by you pursuant to the Agreement
(the "New Compositions").  The New Compositions may be,
but need not be, embodied by CBS in a "Greatest Hits"
Album.  You acknowledge and agree that such "Greatest
Hits" Album need not be released by CBS in the United
States, or may be released outside the United States prior
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

0261Gso                        -4-          MG [CRU 86-220(1)]
(08/11/86)

Exhibit 3

Exhibit 3  Page 82

to release in the United States.  CBS shall not be
required to pay you any Advance in connection with such
"Greatest Hits" Album (whether or not embodying any Master
Recording not previously recorded by you), provided that
such "Greatest Hits" Album shall otherwise be treated as
provided in the Agreement.

Very truly yours,

CBS RECORDS, A Division
of CBS Inc.

By

SR. VICE PRESIDENT, BUSINESS AFFAIRS AND ADMINISTRATION

ACKNOWLEDGEMENT AND CONSENT:

The undersigned acknowledge that they have read the
foregoing and assent to the execution thereof and agree to
be bound thereby to the same extent as if the undersigned
were a party thereto.

David Paich

Steven M. Porcaro

Jeffrey T. Porcaro

Michael Porcaro

Steven L. Lukather

p/k/a "TOTO"

(more signatures follow)

0261Gso                        -5-              MG [CRU 86-220(1)]
(08/11/86)

Exhibit 3

Exhibit 3  Page 83

ACKNOWLEDGEMENT AND CONSENT:

I acknowledge that I have read the foregoing and consent
to the execution thereof and agree to be bound thereby to
the same extent as if I were a party thereto.  My
signature below shall be deemed a ratification of this
modification and shall also constitute a ratification of
the Agreement itself.  I agree to be bound by all the
terms and conditions of the Agreement, including, without
limitation, the terms and conditions of any riders annexed
or amendments thereto.

Joseph Williams

0261Gso                         -6-            MG [CRU 86-220(1)]
(08/11/86)

Exhibit 3

Exhibit 3  Page 84

# EXHIBIT

Exhibit 3

Exhibit 3  Page 85

550 Madison Avenue

New York, New York 10022-3211

(212) 833-8000

February 4, 2002

TOTO INCORPORATED
c/o Manatt, Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, California  90064
Attention: L. Lee Phillips, Esq.

Gentlemen:

The following, when signed by you and by us (sometimes hereinafter referred to as "Sony"), will modify each of the agreements between you and our predecessor CBS Records, a Division of CBS Inc., (i) dated as of January 27, 1983 [CRU 82-564.3(1)], as amended (the "1983 Agreement"), and (ii) dated as of December 10, 1977 [CRU 77-646.2], as amended by each amendment thereto (including, without limitation, that certain amendment dated as of August 12, 1986 [CRU 86-220(1)] (such amendment, the "1986 Amendment")) (the "1977 Agreement" and together with the 1983 Agreement, the "Agreements"), respectively.  Unless otherwise stated, all terms defined in the Agreements will have the same meanings when used in their respective contexts herein.

1.      Following the execution of this modification we will pay you Three Hundred Thousand Dollars ($300,000).

2.      All controversies with respect to royalty accountings rendered to you by us for all periods from July 1, 1996 through December 31, 1998 are hereby fully compromised and settled, and those accountings will be deemed conclusively accepted by and binding upon you.  You hereby withdraw and waive all objections which you have asserted or might have asserted with respect to those accountings, and we will be deemed to have fulfilled all obligations regarding royalties or other payments due you in respect of those periods under the Agreements.  Sony hereby withdraws and waives any claims of overpayments to you which it has asserted or might have asserted with respect to those accountings. Notwithstanding anything contained in the Agreements to the contrary, solely with respect to any controversies regarding royalty accountings rendered to you by us for the period from January 1, 1998 through the date hereof, (i) you shall have until December 31, 2002 to give Sony written notice of your intention to examine Sony's books and records with respect to such statements and (ii) you shall be foreclosed from instituting any action, claim or proceeding against Sony with respect to any such statements after December 31, 2003.

ID: 230350.3/dl/vlb/dl/vlb                              -1-                              CW [SMU 02-35.2(1)]

A Group Of Sony Music Entertainment Inc.
03/04/02

Exhibit 3

Exhibit 3  Page 86

3.      (For the purpose of this paragraph 3, "you" shall be deemed to refer to each of Toto Incorporated and the Artist.)  You agree that you shall, and you shall instruct in writing your respective attorneys, accountants and other professional advisors (collectively, "Your Advisors") to, hold in confidence and not communicate, transmit, publish, disseminate or otherwise disclose any of the terms and conditions of this agreement or any fact, matter, event or surrounding circumstance leading to or relating to the negotiation thereof to which you were privy or of which you were otherwise made aware (e.g., by being copied on correspondence or by being advised of such fact, matter, event or circumstance by another party to the negotiation) (collectively, "Confidential Information"); provided, however, that nothing in this paragraph 3 shall prohibit disclosure of such Confidential Information:  (a) to Your Advisors, to the extent that such disclosure is in the opinion of such professional advisors required to enable such advisors fully to represent you; (b) in connection with any legal or governmental proceeding; or (c) to any judicial, governmental or regulatory body. You and Sony agree that the disclosure of any Confidential Information or any such material terms in the context of a formal press announcement or press conference shall be subject to your and Sony's mutual approval.

4.      (a)      Notwithstanding anything to the contrary contained in Article 9 of the 1977 Agreement and solely with respect to sales after December 31, 1998 of Audiophile Records released under either of the Agreements, the royalty rate on such Records shall be eighty percent (80%) of the royalty rate specified in subparagraph 9.01(b) of the 1983 Agreement subject to the terms thereof, including, without limitation, subsection 3(a)(ii)(A) of the 1986 Amendment).

        (b)      You and Sony hereby agree that solely with respect to sales after December 31, 1998 of Records released under the Agreements, only fifty percent (50%) of excise, purchase, value added or similar taxes shall be deducted from the Wholesale Price for such Records in determining the Royalty Base Price for such Records.

5.      You acknowledge that neither Sony nor any person acting on behalf of Sony (including its agents, its representatives or its attorneys) has made any promise, representation or warranty whatsoever, express or implied, oral or written, not contained herein, and you further acknowledge that you have not executed, and have not been induced to execute, this agreement in reliance upon any promise, representation or warranty.  Except as expressly modified herein, each of the Agreements shall be unaffected and shall remain in full force and effect.  This agreement constitutes the entire understanding between you and us
///
///
///
///
///
///
///
///
///

ID: 230350.3/dl/vlb/dl/vlb                    -2-                    CW [SMU 02-35.2(1)]
03/04/02

Exhibit 3

Exhibit 3  Page 87



with respect to its subject matter and cannot be changed orally. This agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York.

Very truly yours,

SONY MUSIC, A Group
of Sony Music Entertainment Inc.

CTW   By: _____
Daniel F. Wynn
Senior Vice President
Business Affairs

ACCEPTED AND AGREED:

TOTO INCORPORATED

By _____
An Authorized Signatory

ID: 230350.3/dl/vlb/dl/vlb
03/04/02

-3-

CW [SMU 02-35.2(i)]

Exhibit 3

Exhibit 3  Page 88