Pursuant to Local Rule 3-4(a)(1)
please see the last page for a
listing of parties represented

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

STEVEN AMES BROWN,

              Plaintiff,

     v.

ANDREW B. STROUD, an individual and
*dba* STROUD PRODUCTIONS AND
ENTERPRISES, INC.

          Defendant.

_____/

METHVEN & ASSOCIATES
PROFESSIONAL CORPORATION,

          Plaintiff

     v.

SCARLETT PARADIES-STROUD, *ET AL,*

          Defendants

_____/

CIVIL NO. 08-02348 JSW (MEJ)

Related Case: 13-1079 JSW (MEJ)

DECLARATION OF STEVEN AMES
BROWN IN SUPPORT OF
APPLICATION FOR AN ORDER TO
SHOW CAUSE WHY ORCHARD
ENTERPRISES NY, INC. AND/OR
SONY MUSIC ENTERTAINMENT
SHOULD NOT BE FOUND IN
CONTEMPT

I, STEVEN AMES BROWN, declare:

1.      I am the Plaintiff in *Brown v. Stroud*.

2.      I was counsel to Nina Simone in *Simone v. Sehorn,* USDC NDCA 95-3590 CAL.

3.      Marshall Sehorn was the owner of Excell Music, Inc. ("Excell").  Nina sued Mr. Sehorn, Excell and another Sehorn company in the same action.  Excell claimed to own various Nina Simone recorded performances as the successor-in-interest to Stroud Productions & Enterprises, Inc.  Nina also sued The Music Works, LTD *dba* Tomato Records ("Tomato") which claimed rights to exploit those same recordings under a license from Excell.

4.      Among the injunctions issued in that lawsuit was one against Marshall Sehorn and his companies, including Excell Music, Inc. ("Excell injunction").  A true copy of the injunction is attached as *Exhibit 1*.  Mr. Sehorn's wife, Barbara Darcey, had not been named in the *complaint* but voluntarily appeared and submitted herself to the Court's jurisdiction.  Another injunction was issued against The Music Works, LTD. *dba* Tomato Records ("Tomato injunction").  I attach a true copy as *Exhibit 2*.

5.      Tomato was sued because it had been selling a 2-CD set of Nina Simone recordings called *Nina Simone: The Tomato Collection* ("*Tomato Collection*") under the Tomato Records imprint and logo.  I attach as *Exhibit 3* a true copy of the CD front panel artwork and the listing of recordings copied from the product I purchased around 1994, which has been in my custody ever since.

6.      Tomato was owned by Kevin Eggers.  I first met Mr. Eggers when I personally served *summons & complaint* on him as an officer of Tomato.  Subsequently, he has on a number of occasions over the years attempted to engage me in negotiations concerning the *Tomato Collection*.  I attach as *Exhibit 4* a true copy of such an offer dated May 1, 1996 in care of a mutual acquaintance, Chuck Rubin, of Artists Rights

1   Enforcement Corporation.  I attach as *Exhibit 5* a true copy of a redline draft agreement
2   Mr. Eggers sent to me on or about September 16, 1996.  Ultimately, I rejected both
3   written offers.

4       7.      Shortly after it was entered I mailed a copy of the Tomato injunction to Mr.
5   Eggers.  We subsequently discussed it and I informed him of the Excell injunction and
6   told him that he and his company were bound by both injunctions and for that reason
7   Nina Simone was not going license any recordings to him.  Over the years since I have
8   had communications with Mr. Eggers.  He was the only Tomato employee with whom I
9   have ever communicated and during our communications he told me he was Tomato's
10  owner.

11      *8.*     In 2002 I received unsolicited from Charly Records a copy of a notarized
12  personal guarantee Mr. Eggers executed in favor of Charly, pertaining to warranties
13  made by various Eggers companies.  I attach a true copy as *Exhibit 6.*

14      9.      Today, November 16, 2015 I downloaded the web page from amazon.com
15  where the *Tomato Collection* is for sale via digital download.  I attach a true copy as
16  *Exhibit 7.*  Also, today I downloaded the web pages from emusic.com where the *Tomato*
17  *Collection, The Best of Nina Simone* and *The Lady Has the Blues* were for sale via
18  digital download.  I attach true copies of those pages collectively as *Exhibit 8*.  I have
19  compared several of the tracks from each of the releases and they are covered by both
20  the Tomato and Excell injunctions. I tested the "purchase" buttons on all pages identified
21  in *Exhibits 7* and *8* and they are all active as of this writing.  I have been tracking the
22  online Tomato titles since at least 2012 and they have been active on multiple websites
23  continuously since.  The *Tomato Collection* has always been the same since it was
24  originally released in 1994 as a 2-CD set, namely, they always bore the Tomato Records
25  imprint and logo, they always had the same artwork, they always contained the same
26  tracks, in the same order.  I have been a record collector since my childhood.  My

collection of vinyl, CD's, cassettes and digital music has thousands of items.  There is nothing about the Tomato Records releases of today that would suggest they are not from the same Tomato Records that released the original CD's.

10.     I have personally reviewed the discovery responses given to me by Orchard in this action and Tomato Records is listed as one of its clients.  Orchard lists revenue figures for all three of Tomato's Nina Simone releases every semester from July 1, 2009 through June 30, 2015 (the periods for which information was provided).  The contact for Tomato listed on Orchard's discovery responses is J. Freund, jfreund@freundandbrackey.com, 427 Camden Drive, 2nd Floor, Los Angeles, CA 90210, USA, 310-247-2165 x 27.  I know that law firm has represented Mr. Eggers and Tomato Records since at least 2002 because in that year I spoke by telephone with Thomas A. Brackey II, who confirmed that fact.

11.     I first put Orchard on notice of the Tomato injunction by email to its general counsel, Alexis Shapiro, on October 18, 2012.  I attach a true copy of the body of that email as *Exhibit 9.*  As the email indicates, attached to it was the Tomato injunction and a copy of the certificate of Andy Stroud, Inc.'s corporate dissolution.  The email also discussed a subpoena I had recently caused to be served on the California agent for service of process for "Orchard Enterprises NY, Inc.".  Ms. Shapiro never provided a substantive response to the information that Orchard was violating the Tomato injunction.

12.     Attached as *Exhibit 10* is a true copy of a web page that I caused to be downloaded from sonymusic.com on November 4, 2015.

13.     The first time I wrote to Sony about Orchard's representation of Tomato and Andy Stroud, Inc. was on October 12, 2012 to Gil Aronow, who I knew to be the head of business affairs for the Sony division that administers the back RCA catalog of recordings.  I attach a true copy as *Exhibit 11.*  Attached to the email were the Tomato

injunction and the subpoena I had served on Orchard.  I sent a "cc" to Sony's trial, Julia Greer.  I've also complained to Mr. Aronow orally about Orchard's violation of the injunctions.  I received no response from Mr. Aronow, Ms. Greer or from anyone at Sony about Orchard's activities.

14.     Orchard's discovery responses show the current owner for the "Andy Stroud, Inc." catalog as "Andrew B. Stroud Estate" with contact as Scarlett Stroud at the email address abs-estate@optimum.net and the same physical address at which she was served with process in these proceedings.  Orchard's discovery responses also show that the Stroud Estate does business under the online alias "Artwork Media".

15.     In the accompanying *osc* application there are references to my May 22, 2015 letter to Sony Music's chairman, Doug Morris and a citation to *Document 723,* pg. 11-15.  That document is a true copy of my letter.  The last page is the fax transmission report which shows that my four-page letter was in fact delivered.  On that same day I also mailed the letter to Mr. Morris at the address in the letter, with US postage fully prepaid.  Mr. Morris never responded to me, nor has anyone from Sony ever acknowledged receipt of the letter.

16.     I attach collectively as *Exhibit 12*, true copies of web pages I downloaded from emusic.com on May 5, 2015.  I have been tracking the Stroud titles since at least 2012 and they have been active on multiple websites continuously since until approximately the end of September 2015.  I have reviewed Orchard's discovery responses and there were revenue entries domestically and foreign for all Stroud releases for the entire period for which they provided information, *i.e.* July 2009 through June 2015, except the *Family & Friends* album did not start until January 2010.

17.     A review of the client identification information supplied to me by Orchard disclosed it has one with a Walnut Creek address, a "gmail" email account and who operates under a total of 181 online aliases.   Another client is an individual with 47

1 aliases, no address, his telephone number is listed as "555-555-5555" and uses only a

2 "gmail" account for contact.  A third client has 194 aliases.

3       18.    In July 2015 I discovered a new US Nina Simone release digitally

4 distributed by Orchard which clearly pirates recordings from Sony, Universal Music

5 Group, Warner Music Group, BMG Rights, the Simone Estate and me.

6       Pursuant to the laws of the United States, I declare under penalty of perjury the

7 forgoing is true and correct.

8       Dated: November 16, 2015

9                      /X/
                     STEVEN AMES BROWN,

10

11 Listing of counsel filing this paper:

12 **STEVEN AMES BROWN**
Entertainment Law 83363

13 69 Grand View Avenue
San Francisco, California 94114-2741

14 415/647-7700 Tele
415/285-3048 Fax
sabrown@entertainmentlaw.com

15

16 **THERESE Y. CANNATA SBN 88032**

17 Cannata, Ching & O'Toole, LLP
100 Pine Street

18 San Francisco, California 94111-5127
415/409-8900 Tele

19 415/409-8904 Fax
tcannata@ccolaw.com

20 Attorneys for Plaintiff

21

22 **DOROTHY M. WEBER**, *pro hac vice*
Shukat, Arrow, Hafer, Weber &

23 Herbsman, LLP
494 Eighth Avenue, Suite 600

24 New York, NY 10001
212/245-4580 Tele

25 212/956-6471 Fax
dorothy@musiclaw.com

26 Attorneys for Estate of Nina Simone

1   **STEVEN AMES BROWN**
    Entertainment Law 83363
2   69 Grand View Avenue
    San Francisco, California 94114-2744
3   415/647-7700

4   Attorney for plaintiff

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  NINA SIMONE,
                                        CIVIL NO. C-95-3590-CAL
12          Plaintiff,

13          v.

14  MARSHALL SEHORN, an individual and
    *dba* RED DOG EXPRESS & WHITE DOG       JUDGMENT & PERMANENT
15  RECORDS; EXCELL MUSIC, INC.;            INJUNCTION RE: SEHORN
    WHITE DOG RECORDS, LTD.; RED DOG
16  EXPRESS, INC.; ANTHONY SANUCCI,
    an individual; JERRY WILLIAMS *dba*
17  SWAMP DOG ENTERTAINMENT GROUP;
    THE MUSIC WORKS, LTD, *dba* TOMATO
18  RECORDS

19          Defendants.

20  _____/

21

22          Upon the agreement of the parties in their *Stipulation For Entry of Judgment*, and

23  taking into consideration the *Declaration of Steven Ames Brown*, the Court finds there is

24  no just reason for delaying the entry of judgment upon the *Stipulation* and the Court orders

25  that judgment be entered forthwith;

26          IT IS BY THIS COURT ORDERED AND ADJUDGED THIS DAY:

Exhibit 3
Exhibit 1

1    1.   The Court has jurisdiction of the subject matter hereof and the parties hereto,
2    including Barbara Darcy who has voluntarily submitted herself to the jurisdiction of this
3    Court.

4    2.   The provisions of judgment are applicable to and binding upon Marshall Sehorn,
5    Red Dog Express, Inc., White Dog Records, Ltd., Excel Music, Inc. and Barbara Darcy
6    (collectively "Sehorn") and upon all persons acting in concert with them who have actual
7    or constructive notice of hereof.

8    3.   Nina Simone is the sole and exclusive owner of the copyrights and all other
9    rights of reproduction of the sound recordings embodying her vocal land/or musical
10   performances of the compositions: *Do Nothing Till You Hear From Me, I Got It Bad & That*
11   *Ain't Good, Hey Buddy Bolden, Something To Live For, You Better Know It, I Like The*
12   *Sunrise, Solitude, The Gal From Joe's, Satin Doll, It Don't Mean A Thing If It Ain't Got That*
13   *Swing, Black is The Color, Since My Love Is Gone, Blue Prelude, Spring Is Here, I Loves*
14   *You Porgy, When I Was A Young Girl, Near To You, The Thrill Is Gone, Little Liza Jane,*
15   *Here Comes The Sun, My Way, Fine And Mellow, Nina's Blues, Work Song, Angel of*
16   *Morning, Ain't Got No/I Got Life, You Can Have Him (I Don't Want Him), Peace Of Mind,*
17   *Don't Take All Night, Four Women, "No Opportunity Necessary, No Experience Needed,"*
18   *Summertime, How Long Must I Wander, Please Lead Me, Wild Is The Wind, Trouble In*
19   *Mind, After You've Gone, Nobody, I Want A Little Sugar In My Bowl, Ne Me Quitte Pas,*
20   *Don't Let Me Be Misunderstood, Just In Time, Sea Lion Woman, House of the Rising Sun,*
21   *Remind Me, Gin House Blues, Backlash Blues, Assignment Song, "To Be Young, Gifted*
22   *And Black," Ain't No Use, How Can I Make Him Love Me, I Am Blessed, Laziest Gal In*
23   *Town, For All We Know, Night Song, That's All I Want From You; Cotton Eyed Joe; I Wish*
24   *I Knew How It Would Feel To Be Free; But Beautiful; Tell Me More & More & Then Some;*
25   *This Year's Kisses; Strange Fruit; Don't Explain; Pigfoot And A Bottle of Beer; Love Me Or*
26   *Leave Me, The Other Woman, Devil's Workshop, The Way I Love You, Life, One More*

Exhibit 3
Exhibit 1

1   *Sunday in Savannah, I'll Look Around, Blues, When I Was In My Prime, Zungo, Nobody*
2   *Wants You, I Love To Love, Ding Song, I Love My Baby, Sinnerman, Pirate Jenny, For*
3   *Awhile, You Took My Teeth, Do What You Gotta Do, Mississippi Goddamn, I Sing Just To*
4   *Know That I'm Alive, My Baby Just Cares For Me, It's Cold Out Here, Fodder On Her*
5   *Wings, Touching And Caring, Saratoga, You Must Have Another Lover, Flo Me La, I'm*
6   *Blue, In The Evening By Moonlight, He Was Too Good To Me, Children Go Where I Send*
7   *You, Buzzin, Ya Betcha, Lovin' Woman, "Baubles, Bangles and Beads," Bouncin' Back*
8   *Pepper Pie, Rug Cutter, Black Swan, Twelfth of Never, Will I find My Love Today, Samson*
9   *And Delilah, You'd Be So Nice To Come Home To, If He Changed My Name, Day And*
10  *Night* and all alternate versions, excerpts, and outtakes thereof and all artwork pertaining
11  thereto ("*Master Recordings*").

12          4.  Sehorn, their officers, agents, servants, employees, heirs, successors and all
13  persons acting in concert or participation with them, or any of them, are perpetually
14  enjoined from doing, or attempting to do, or causing to be done, either directly or indirectly,
15  by any means, method or device, whether presently known or hereafter to be devised, any
16  and all of the following acts or practices:

17          A.  Manufacturing or vending any items which bear the name "Nina Simone",
18  without the written consent of Nina Simone, or her lawful representative, first had and
19  obtained after this date.

20          B.   Manufacturing or vending any items which bear the likeness of Nina
21  Simone, without the written consent of Nina Simone, or her lawful representative, first had
22  and obtained after this date.

23          C.  Manufacturing or vending any items which bear the voice or any musical
24  performance by Nina Simone, without the written consent of Nina Simone, or her lawful
25  representative, first had and obtained after this date.

26

Exhibit 3
Exhibit 1

1    D.  Soliciting or authorizing any person, firm or entity to perform any of the

2    acts prohibited in subsections "A" through "C" above, without the written consent of Nina

3    Simone, or her lawful representative, first had and obtained after this date.

4    5.  Within 14 days hereof, Sehorn shall deliver to Nina Simone, in care of her

5    attorney, Steven Ames Brown:

6    A.  Each "master recording" (as that phrase is utilized in the recorded music

7    industry) which embodies a performance by Nina Simone, or bears the name Nina Simone

8    or contains a likeness of Nina Simone; each "outtake" (as that phrase is utilized in the

9    recorded music industry) which embodies a performance by Nina Simone, or bears the

10   name Nina Simone or contains a likeness of Nina Simone; all artwork, packages, boxes,

11   wrappers, board labels, track sheets, packing slips and each and every other item which

12   identifies the contents of each box or container pertaining to each "master recording" or

13   "outtake" which are in Sehorn's possession or control.

14   B.  All originals of licenses ever made which pertain to any recordings

15   embodying a vocal or musical performance by Nina Simone, or references the name Nina

16   Simone, unredacted, which are in Sehorn's possession or control.

17   C. All originals of royalty statements ever created concerning any items

18   embodying a vocal or musical performance by Nina Simone or references the name Nina

19   Simone, that were generated for any one and for any purpose, unredacted, which are in

20   Sehorn's possession or control.

21   10.  Nina Simone has reserved all her rights against all others.

22   Dated:  7/10 [ 4 *

23                        IT IS SO ORDERED:

24

25                        Charles A. Legge

26

~~Exhibit 3~~
Exhibit 1

1 | **STEVEN AMES BROWN**
Entertainment Law 83363
2 | 69 Grand View Avenue
San Francisco, California 94114-2741
3 | 415/647-7700

**RECEIVED**

JUL 31 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

4 | Attorney for plaintiff

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

11 | NINA SIMONE,

12 |              Plaintiff,

CIVIL NO. C-95-3590-CAL

13 |      v.

14 | MARSHALL SEHORN, an individual and
*dba* RED DOG EXPRESS & WHITE DOG
15 | RECORDS; EXCELL MUSIC, INC.;
WHITE DOG RECORDS, LTD.; RED DOG
16 | EXPRESS, INC.; ANTHONY SANUCCI,
an individual; JERRY WILLIAMS *dba*
17 | SWAMP DOG ENTERTAINMENT GROUP;
THE MUSIC WORKS, LTD, *dba* TOMATO
18 | RECORDS

**FINAL JUDGMENT & PERMANENT
INJUNCTION RE: MUSIC WORKS**

19 |              Defendants.

Page 1
Final Judgment Re: Music Works

Exhibit 3

Exhibit 2

Upon the application of plaintiff, review of the file herein and taking into consideration the *Declaration of Steven Ames Brown*, the Court orders that final judgment be entered forthwith;

IT IS BY THIS COURT ORDERED AND ADJUDGED THIS DAY:

1. The Court has jurisdiction of the subject matter hereof and the defendant The Music Works, Ltd. *dba* Tomato Records ("Music Works").

2. The default of Music Works was duly entered on January 9, 1996.

3. The provisions of judgment are applicable to and binding upon Music Works and upon all persons acting in concert with it who have actual or constructive notice of hereof.

4. Nina Simone is the sole and exclusive owner of the copyrights and all other rights of reproduction of the sound recordings embodying her vocal land/or musical performances of the compositions: *Do Nothing Till You Hear From Me, I Got It Bad & That Ain't Good, Hey Buddy Bolden, Something To Live For, You Better Know It, I Like The Sunrise, Solitude, The Gal From Joe's, Satin Doll, It Don't Mean A Thing If It Ain't Got That Swing, Black is The Color, Since My Love Is Gone, Blue Prelude, Spring Is Here, I Loves You Porgy, When I Was A Young Girl, Near To You, The Thrill Is Gone, Little Liza Jane, Here Comes The Sun, My Way, Fine And Mellow, Nina's Blues, Work Song, Angel of Morning, Ain't Got No/I Got Life, You Can Have Him (I Don't Want Him), Peace Of Mind, Don't Take All Night, Four Women, "No Opportunity Necessary, No Experience Needed," Summertime, How Long Must I Wander, Please Lead Me, Wild Is The Wind, Trouble In Mind, After You've Gone, Nobody, I Want A Little Sugar In My Bowl, Ne Me Quitte Pas, Don't Let Me Be Misunderstood, Just In Time, Sea Lion Woman, House of the Rising Sun, Remind Me, Gin House Blues, Backlash Blues, Assignment Song, "To Be Young, Gifted And Black," Ain't No Use, How Can I Make Him Love Me, I Am Blessed, Laziest Gal In Town, For All We Know, Night Song, That's All I Want From You; Cotton Eyed Joe; I Wish*

~~Exhibit 3~~
Exhibit 2

1   *I Knew How It Would Feel To Be Free; But Beautiful; Tell Me More & More & Then Some;*

2   *This Year's Kisses; Strange Fruit; Don't Explain; Pigfoot And A Bottle of Beer; Love Me Or*

3   *Leave Me, The Other Woman, Devil's Workshop, The Way I Love You, Life, One More*

4   *Sunday in Savannah, I'll Look Around, Blues, When I Was In My Prime, Zungo, Nobody*

5   *Wants You, I Love To Love, Ding Song, I Love My Baby, Sinnerman, Pirate Jenny, For*

6   *Awhile, You Took My Teeth, Do What You Gotta Do, Mississippi Goddamn, I Sing Just To*

7   *Know That I'm Alive, My Baby Just Cares For Me, It's Cold Out Here, Fodder On Her*

8   *Wings, Touching And Caring, Saratoga, You Must Have Another Lover, Flo Me La, I'm*

9   *Blue, In The Evening By Moonlight, He Was Too Good To Me, Children Go Where I Send*

10  *You, Buzzin, Ya Betcha, Lovin' Woman, "Baubles, Bangles and Beads," Bouncin' Back*

11  *Pepper Pie, Rug Cutter, Black Swan, Twelfth of Never, Will I find My Love Today, Samson*

12  *And Delilah, You'd Be So Nice To Come Home To, If He Changed My Name, Day And*

13  *Night* and all alternate versions, excerpts, and outtakes thereof and all artwork pertaining

14  thereto ("*Master Recordings*").

15      5. Music Works, its officers, agents, servants, employees, heirs, successors and

16  all persons acting in concert or participation with them, or any of them, are perpetually

17  enjoined from doing, or attempting to do, or causing to be done, either directly or

18  indirectly, by any means, method or device, whether presently known or hereafter to be

19  devised, any and all of the following acts or practices:

20      A. Manufacturing or vending any items which bear the name "Nina Simone",

21  without the written consent of Nina Simone, or her lawful representative, first had and

22  obtained after this date.

23      B.  Manufacturing or vending any items which bear the likeness of Nina

24  Simone, without the written consent of Nina Simone, or her lawful representative, first had

25  and obtained after this date.

26  *///*

~~Exhibit 3~~
Exhibit 2

1            C. Manufacturing or vending any items which bear the voice or any musical

2  performance by Nina Simone, without the written consent of Nina Simone, or her lawful

3  representative, first had and obtained after this date.

4            D. Soliciting or authorizing any person, firm or entity to perform any of the

5  acts prohibited in subsections "A" through "C" above, without the written consent of Nina

6  Simone, or her lawful representative, first had and obtained after this date.

7       6. Within 14 days hereof, Music Works shall deliver to Nina Simone, in care of her

8  attorney, Steven Ames Brown:

9            A. Each "master recording" (as that phrase is utilized in the recorded music

10 industry) which embodies a performance by Nina Simone, or bears the name Nina Simone

11 or contains a likeness of Nina Simone; each "outtake" (as that phrase is utilized in the

12 recorded music industry) which embodies a performance by Nina Simone, or bears the

13 name Nina Simone or contains a likeness of Nina Simone; all artwork, packages, boxes,

14 wrappers, board labels, track sheets, packing slips and each and every other item which

15 identifies the contents of each box or container pertaining to each "master recording" or

16 "outtake" which are in Music Works' possession or control.

17           B. All originals of licenses ever made which pertain to any recordings

18 embodying a vocal or musical performance by Nina Simone, or references the name Nina

19 Simone, unredacted, which are in Music Works' possession or control.

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

~~Exhibit 3~~
Exhibit 2

1          C. All originals of royalty statements ever created concerning any items

2    embodying a vocal or musical performance by Nina Simone or references the name Nina

3    Simone, that were generated for any one and for any purpose, unredacted, which are in

4    Music Works' possession or control.

5          Dated:   10 /30 /98

6                              IT IS SO ORDERED:

7

8                              _Charles a. Jagge_

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Exhibit 3
Exhibit 2



## NINA SIMONE "The Tomato Collection"

**COMPACT DISC A**

| | |
|---|---|
| 1. Cotton Eyed Joe | 3:42 |
| 2. I Got It Bad And That Ain't Good | 4:01 |
| 3. You Better Know It | 2:20 |
| 4. Satin Doll | 3:31 |
| 5. It Don't Mean A Thing If You Don't Swing | 2:24 |
| 6. The Laziest Girl In Town | 2:09 |
| 7. The Assignment Song | 4:56 |
| 8. See Line Women | 3:56 |
| 9. Ne Me Quitte Pas | 5:11 |
| 10. Remind Me | 3:39 |
| 11. No Opportunity Necessary | 4:10 |
| 12. Backlash Blues | 3:04 |
| 13. Ain't Got No | 6:09 |
| 14. But Beautiful | 5:23 |
| 15. Blue Prelude | 4:36 |
| 16. Blues | 4:21 |
| 17. One More Sunday In Savannah | 2:22 |
| 18. I Want A Little Sugar In My Bowl | 2:19 |

| | |
|---|---|
| 19. Ain't No Use | 2:41 |
| 20. Young, Gifted And Black | 4:10 |

**COMPACT DISC B**

| | |
|---|---|
| 1. Gin House Blues | 5:06 |
| 2. Zungo | 2:31 |
| 3. Spring Is Here | 4:14 |
| 4. Just In Time | 4:37 |
| 5. Please Don't Let Me Be Misunderstood | 3:48 |
| 6. House of The Rising Sun | 6:54 |
| 7. Near To You | 4:19 |
| 8. When I Was A Young Girl | 4:57 |
| 9. Porgy | 3:57 |
| 10. Solitude | 3:57 |
| 11. Hey Buddy Bolden | 2:24 |
| 12. Four Women | 8:45 |
| 13. The Thrill Is Gone | 5:26 |
| 14. Since My Love Is Gone | 3:52 |
| 15. Black Is The Color | 3:04 |
| 16. I'll Look Around | 2:42 |
| 17. When I Was In My Prime | 4:15 |

© 1994 Tomato, a trade name of the Music Works, New York, NY.  R2 71712

Exhibit 3



## TOMATO



# The Tomato Company, LLC

38 East 57th Street

New York, New York 10022

Voice 212 421 8415  Fax 212 755 7246

## MEMO

| | |
|---|---|
| **Date:** | **01 May 1996** |
| **To:** | **Chuck Rubin** |
| | **Artists Rights Enforcement** |
| | **212 977 3110** |
| **From:** | **W. Kevin Eggers** |
| **Subject:** | **Nina Simone** |

Dear Chuck:

As a follow up to our recent conversation I would like to suggest the following new royalty structure for Nina Simone. As you are aware Steven Brown has been receiving checks from Rhino. Therefore any increase in our current royalty payment will have to be adjusted for moneys already paid.

Nina Simone would grant a non-exclusive license in perpetuity and indemnify us from any claims by third parties.

| 1. | Royalty | Full Price | 8% | **Suggested Retail Price** |
|---|---|---|---|---|
| | | Mid-Price | 6% | |
| | | Budget | 4% | |
| | | Premiums | 4% | |
| | | Military | 4% | |
| | | Record Club | 4% | |

| 2. | Packaging Deduction | 20% CD |
|---|---|---|

Exhibit 4

3.   Royalties paid on records sold and paid for.

4.   Accounting - Semi - annual

5.   Reserve        30%
     Liquidated over four accounting periods.

6.   Artist would be paid directly from Rhino. We would account for all other sales on a semi-
     annual basis.

Kind personal regards.

Kevin Eggers

Exhibit 4

## MASTER LICENSING AGREEMENT

AGREEMENT made between Dr. Nina Simone c/o Steven Ames Brown, Client Trust 69 Grand View Avenue San Francisco, California 94114-2741 USA ("Licensor") and AnnaBanana Music Company, Ltd. (a Bahamian corporation) & The Tomato Company, LLC Music Works, Ltd. dba Tomato Records 38 East 57th Street, 14th Floor, New York, New York 10022 (a New York corporation), (jointly & severally "Licensee");

Licensor is engaged in the production of Master Recordings throughout solely within the United States of America the world.

Licensee is engaged in manufacturing and selling copies of master recordings in the Licensed Territory and is desirous of obtaining a license to sell copies of certain Master Recordings belonging to Licensor.

In exchange for the mutual promises herein contained, the parties hereby agree as follows:

1. RIGHT TO DUPLICATE MASTERS. Licensor grants to Licensee, subject to the terms of this license, the non-exclusive right in the entire world ("Licensed Territory"), to reproduce in audio-only configurations, and solely on Licensors' own Tomato label, the performance of Nina Simone ("Artist"), as embodied in the long playing album commonly known as *Nina Simone / The Tomato Collection* as configured in the Rhino catalog R2-71712 as of this date ("Master Recordings.")

All other rights of exploitation are reserved to Licensor, who may utilize same without notice or obligation to Licensee but not in the same order of sequence or similar packing or the same album title.

2. RIGHT TO USE NAME & LIKENESS. Licensor grants to Licensee, subject to the terms of this license, the non-exclusive right, in the Licensed Territory, to use the name, approved likeness, and approved biography of Artist in connection with the advertising, publicizing or sale of authorized copies, manufactured from the Master Recordings.

3. RIGHT TO BROADCAST MASTERS. Licensor grants to Licensee, subject to the terms of this license, the non-exclusive right, in the Licensed Territory, to publicly perform and broadcast authorized copies manufactured by Licensee from the Master Recordings, and to allow others to do the same.

4. TERM OF AGREEMENT. The term of the rights granted to Licensee herein shall be as of May 1, 1993 and terminate on June 30, 2001, followed by a six month "sell-off" period, unless earlier terminated as provided for herein. Licensee shall not manufacture copies of the Master Recordings during such "sell-off" period.

Exhibit 5

C:\DOCS\CONTRACT.LIC\NSIMONE2.LIC1

5. CONFIGURATION. Licensee shall not re-configure the Master Recordings by the edition of any other masters (whether or not embodying any performance by Artist) or by the deletion of any masters.

6. ROYALTIES OWING LICENSOR. Licensee's rights hereunder are conditioned upon Licensor being timely paid:

a. Licensee shall pay to Licensor the sum of Sixteen Thousand United States Dollars ($16,000.00) as a non-recoupable, non-returnable fee. Such sum will be paid at the rate of One Thousand United States Dollars ($1,000.00) upon the execution hereof and five (5) payments of Three Thousand United States Dollars ($3,000.00) each, commencing ninety (90) days from the execution hereof and thereafter one payment every ninety (90 days) until fully paid;.

b.) A royalty which is the higher of ten percent (10%) of the retail list selling price for every copy manufactured from the Master Recordings in the United States or Two United States Dollars and Seventy Nine Cents ($2.79), which such sum Licensee shall irrevocably direct Rhino Records to directly remit to Licensor on terms provided for herein.

c.) A royalty of seven percent (7%) of the retail list selling price for every copy manufactured and sold from the Master Recordings outside of the United States. For territories which do not have suggested retail selling prices, the royalty shall be nine and one/half percent (9.5%) of the so-called price-per-dealer ("p.p.d.").

d.) A royalty of fifty percent (50%) of all public performance and broadcasting fees received by or credited on account of the use of the Master Recordings, without any deductions, except a pro-rata share of any third party collection fees imposed by a recognized collection society. However, should performance or broadcasting fees not be computed or reported by the title and artist of each master, then for the purposes of this agreement, Licensee shall pay to Licensor a percentage of all public performance and broadcasting fees received by Licensee which such percentage shall be the same as the number of phonograph records manufactured and sold hereunder is of the total number of all phonorecords manufactured and sold by Licensee during the same period Licensee earned such public performance and broadcasting fees.

7. AUTHORIZED DEDUCTIONS. Licensee may not make any deductions from the royalties specified in paragraph 6 above:

8. ACCOUNTING & PAYMENT DUE DATES. Licensee's rights hereunder are further conditioned upon Licensee's distributor accounting to Licensor in a timely manner for the royalties specified in paragraph 6 by delivering to Licensor's place of business, accountings and royalties due within forty five (45) days following the close of each one/quarter year, commencing with the quarter in which copies of the Master Recordings are first distributed by Licensee and continuing until the termination of this agreement or until all manufactured copies have been accounted for, whichever is later. Quarters end on March 31st, June 30th, September 30th and December 31st.

The accountings shall specify at least:

C:\DOCS\CONTRACT.LIC\NSIMONE2.LIC2

Exhibit 5

a.) The identity of copies ~~sold~~ manufactured from the Master Recordings, by title of selection, artist and catalog number;

b.) The retail list price of copies manufactured from Master Recordings, specified by catalog number;

c.) ~~The total number of copies manufactured from the Master Recordings, specified by catalog number;~~

d.) The total number of copies manufactured from the Master Recordings which were sold, specified by catalog number;

e.) The royalties accrued from the sale of copies manufactured from the Master Recordings;

f.) ~~The numbers of copies manufactured from the Master Recordings and distributed as promotional material, specified by catalog numbers.~~

g.) The total public performance & broadcasting revenue earned by the Master Recordings.

h.) The exact mathematical method or formula used by Licensee in calculating the royalty base upon which the royalties payable to Licensor have been computed;

9. MECHANICAL PARTS & ARTWORK. Licensee shall manufacture copies solely from the existing Master Recordings and such remixes or over-dubs as are approved by Licensor; Licensee shall not dub or otherwise duplicate copies from any other source. ~~Licensee shall create such new artwork as Licensee deems useful. Licensee shall submit the artwork to Licensor for approval, prior to the distribution of copies to the public or the trade. Such new artwork shall be created solely at Licensee's expense. Licensee shall provide negatives, separations or original artwork to Licensor promptly upon Licensor's request therefor. Licensee shall charge Licensor no more than the actual costs incurred by Licensee for making the copies.~~ Licensor hereby approves artwork of the Tomato album, Nina Simone, The Tomato Collection. It is further agreed that licensee shall not change or alter said artwork without the approval of Licensor.

~~Any all right, title and interest to any such new artwork including, but not limited to, all copyrights (and renewals and extensions thereof) and rights to the physical objects in which the artwork is embodied, and all other rights now known or hereafter recognized are transferred to Licensor to hold as its own, in perpetuity, and free of any liens or security interests or obligation to Licensee. Such transfer shall be both by Licensee as a proprietor to Licensor as a vendee and as a "work made for hire", whichever shall prevail for the longest period.~~

10. AUDIT. Licensee agrees to maintain complete and accurate records of all transactions which in any manner relate to the manufacture or sale of copies of the Master Recordings, or to any other matter pertaining to this agreement, for a period of four years after

the termination of this agreement. Licensor, or its representative, shall have the right to inspect the books and records of Licensee, its subsidiaries, affiliates and all others deriving rights through this agreement, and to make copies thereof. Such right of inspection extends to all records reflecting any manufacturing or sales of copies of the Master Recordings and any other matter which pertains to this agreement or any modifications or extensions hereof. Licensee shall also secure for Licensor access to the books and records of any person, firm or corporation which presses records, duplicates tapes, packages or distributes copies, collects funds, or in any manner assists Licensee in performing its duties hereunder. Licensor shall bear the cost of any such inspection, unless any error is found in excess of 5% in such records or accounting statements, in which event Licensee shall immediately pay to Licensor the amount shown properly to be due Licensor, and in addition Licensee shall reimburse Licensor all costs connected with such inspection, including professional fees, airfare and hotel. No reimbursement for inspection shall exceed an amount equal to the error discovered.

11. GOVERNMENT CURRENCY RESTRICTIONS. Should payment of any amounts owing by Licensor to Licensee be delayed or stopped, partially or fully, by any actions of the government in the Licensed Territory, Licensor shall have the sole option to accept payment in a bank selected by Licensor within said territory, in the name of Licensor, or order, and Licensee shall immediately forward to Licensor all passbooks and papers necessary for a withdrawal of such sums.

12. PROMOTIONAL EXPENSES. Licensee is responsible for any promotional expenses it incurs. Should Licensee make any arrangements for appearances by Artist, or others, it shall be solely responsible for all costs and fees incurred thereby, even if Licensor assists Licensee in securing such appearances. No portion of such expenses shall be owing by Licensor, or deducted from funds owing by Licensee to Licensor.

13. LICENSOR'S WARRANTIES. Licensor warrants that:

a.) She has the full right and authority to grant to Licensee all rights granted hereunder.

b.) She possesses full right, power and authority to enter into and to perform this agreement.

c.) Notwithstanding the foregoing, Licensor licenses only her performance and makes no warranties concerning the ownership of the Master Recordings.

14. LICENSEE'S WARRANTIES. Licensee warrants that:

a.) It possesses the full right, power and authority to enter into and perform this agreement.

b.) It is now and will continue to be engaged in the manufacture, sale, distribution and exploitation of phonograph records and audio tapes in the Licensed Territory until six months after the end of Licensee's rights hereunder.

c.) It will use its best efforts to promote the manufacture, sale, distribution and exploitation of same in the Licensed Territory.

d.) It will only use artwork approved by Licensor on the jackets and sleeves. It will print on the labels and containers of all reproductions and shall not register any copyrights in the Master Recordings in its name.

e.) It will deliver to Licensor, free of charge, six fully packaged copies of each different configuration of the Master Recordings, freight pre-paid by Licensee, within ten days of Licensee's release of copies of the Master Recordings.

f.) It will deliver to Licensor a notice stating the retail list price for copies of the Master Recordings, specified by title of selection, catalog number and length of performance embodied therein, within ten days of Licensee's commercial release. Thereafter Licensee shall not change the retail list price without first advising Licensor in writing.

g.) It will not assign or in any manner sublicense the rights granted herein except Licensees for the Tomato label.

h.) It will not synchronize the Master Recordings with any visual images, nor authorize or permit others to do so (that right vesting solely in Licensor) with the except for a Tomato Sampler. Licensor shall receive a pro-rated royalty based on the number of artist contained in a Tomato Sampler.

i.) it will not "compile" or "couple" any Master Recording with those of any other artist on so-called "compilations (that right vesting solely in Licensor).

j.) It shall manufacture copies from first quality supplies and manufactured to commercially reasonable standards.

k.) It will separately arrange with the proprietors of any copyrights and any others of any of the Master Recordings to secure a license from them and account to them for the use of any matter, copyrighted or otherwise, embodied in the Master Recordings, at no cost to Licensor.

l.) It has terminated the purported license from Excell Music, Inc., dated May 1, 1993 insofar as any Nina Simone recordings are concerned and that any and all future manufacturing of the Master Recordings will be pursuant to this *Master Licensing Agreement*, or any successor hereto executed by Licensor or under her authority, and not otherwise.

m.) It will promptly supply Licensor with copies of all prior, existing and future licenses concerning Nina Simone recordings and a retroactive accounting for accrued royalties.

Exhibit 5

Case 4:13-cv-01079-JSW   Document 274   Filed 11/17/15   Page 24 of 28

15.   DEFAULT.   A "default" by Licensee hereunder includes either Licensee or Licensee's distributor:

a.) Failing to deliver to Licensor's place of business any accounting by its due date.

b.) Failing to deliver to Licensor's place of business any royalty payment by its due date, or failing to deposit any royalty payment by its due date in a bank local to Licensee upon the instructions of Licensor.

c.) Failing to permit an audit or inspection of books or records as guaranteed herein.

~~d.) Failing to perform any act required under this Agreement.~~

~~e.) Performing any act prohibited by this Agreement.~~

Should Licensee or Licensee's distributor default and not cure such default within <u>thirty</u> ~~fourteen~~ days of written notice by Licensor, or should Licensee go into bankruptcy, make any assignment for the benefit of creditors or commence any reorganization proceedings (whether voluntary or involuntary) Licensor may immediately terminate this agreement, without any prejudice to any rights or claims it may have, and all rights hereunder shall thereupon revert to Licensor.

16.   TERMINATION.   In the event of any termination or the expiration of this Agreement, Licensee shall submit to Licensor in writing, a physical inventory, certified by an officer of Licensee, of its entire stock of copies of the Master Recordings. Immediately thereafter, Licensee shall offer to Licensor the right to purchase Licensee's inventory of manufactured copies of the Master Recordings at Licensee's cost of pressing and packaging (without any regard to the artistic content). Should Licensor decline the option to purchase, Licensee shall <u>have the right to sell</u> ~~immediately destroy~~ all such stock <u>as cutouts without any further royalty obligation to Licensor</u>.   Licensee shall not permit further manufacturing, distribution or sales of such copies and shall send to Licensor, freight prepaid, <u>a digital master.</u>~~all two-track master tapes, mothers, matrices, stampers, derivatives, printing plates, artwork and photographs which pertain to the Master Recordings.~~

~~Licensee's obligation to pay royalties to Licensor, and Licensee's liability to licensor for any damages shall not be discharged, even though Licensee is obligated to offer its inventory to Licensor and even if Licensee has to destroy all inventory.~~
Licensee shall not terminate this agreement unless Licensor shall fail to cure any breach within <u>thirty</u> ~~fourteen~~ days of the delivery of written notice.

17.   This agreement binds the parties hereto, their legal representatives, and all other successors in interest.

18. This agreement contains the entire agreement between the parties and supersedes any and all oral and written statements and representations, which are merged herein.

19. The provisions of this agreement are severable. Should any portion of this agreement be declared void or unenforceable, the remaining provisions shall continue in full force and effect.

20. The rights and remedies granted to Licensor are cumulative.

21. The parties shall execute any and all documents, instructions, or other conveyances and shall perform all acts which are reasonable to effectuate the purposes of this agreement.

22. This agreement may be executed in counter-parts, but the agreement shall be taken as a whole and constitute only one agreement.

23. No waiver of any provision of this agreement shall be deemed to be a waiver of any other past or future breach; nor shall any failure to act be deemed a waiver. A waiver shall exist only when it is in written form and executed by all the parties.

24. Time is of the essence of this agreement. Timely payment of all royalties is also of the essence of this agreement.

25. This agreement is made in and shall be interpreted in accordance with the laws of California, U.S.A. Licensee solicited Licensor's place of business in California to enter into this agreement. Licensee agrees that all disputes between the parties, if litigated, shall be done solely in the courts within Los Angeles or San Francisco County. Licensee agrees that all process in any action or suit which pertains to this agreement may be served on Licensee by mail with the same force and effect as if Licensee was served in Los Angeles or San Francisco County and maintained a place of business in Los Angeles or San Francisco County.

26. ~~Neither this agreement, nor the rights granted to Licensee hereunder may be assigned by Licensee without the written consent of Licensor and any such attempted assignment shall be void.~~ Licensor and Licensee shall be entitled to assign this agreement to any parent, affiliate, or subsidiary company or corporation, or to anyone owning or acquiring substantially of the capital stock or assets of Licensor or Licensee.

Date: As of May 1, 1993

                                    _____
                                    AnnaBanana Music, Ltd. & The Tomato Company
                                    LLC  ~~The Music Works, Ltd. dba~~
                                    ~~Tomato Records~~ by,
                                    Kevin Eggers, President,
                                    Licensee

_____
DR. NINA SIMONE,
Licensor

**DEED OF INDEMNITY AND UNDERTAKING** made this 5th day of February 1998

**PARTIES:**

(1)     Charly Acquisitions Limited of 27-29 Lower Pembroke Street, Dublin 2, Ireland ("Charly"); and

(2)     Kevin Eggers of 38 East 57th Street, New York, NY 10012, USA ("Eggers").

**RECITALS:**

1.     By an agreement dated the 5th day of February 1998 ("the Agreement"), The Tomato Company LLC of New York assigned to Charly all of its right title and interest in and to certain recordings on the terms contained therein ("the Recordings").

2.     The parties have agreed to enter into this indemnity and undertaking to set out the terms upon which Eggers will guarantee that The Tomato Company LLC has the full right title and interest to enter into the Agreement.

**NOW IT IS HEREBY AGREED** as follows:

In consideration of the sum of £1 now paid to Eggers by Charly (receipt of which is hereby acknowledged) and as an inducement to Charly to enter into the Agreement which is inter alia to Eggers' benefit, Eggers hereby undertakes:

A.     The Tomato Company LLC has the full right title and power to enter into the  Agreement and to grant to Charly the rights granted therein in respect of the Recordings upon the terms contained therein.

B.     Eggers is a Director and majority stockholder/shareholder of the following companies:

The Gomelsky Eggers Music & Information Corporation Limited (NY)
The Tomato Company Limited (NY)
WKA S.A. (Panama)
The Tomato Company LLC (NY)
("the Companies")

C.     Eggers warrants and undertakes that all rights in respect of the Recordings owned and/or controlled by the Companies or any of them have been validly transferred to The Tomato Company Limited so as to

Exhibit 6

enable The Tomato Company Limited to enter into the Agreement with Charly and to grant Charly the rights contained therein.

D.   Eggers undertakes that he will indemnify Charly and hold it harmless from and against any and all costs damages losses or expenses suffered by Charly as a consequence of any breach of the terms of this Deed and Undertaking and/or claim by the Companies or any of them that The Tomato Company Limited is not entitled to enter into the Agreement and grant Charly the rights granted thereunder.

This agreement shall be governed in all respects by the laws of England and Wales and the parties hereto submit to the exclusive jurisdiction of the High Court of Justice in England.

**IN WITNESS WHEREOF** this Deed has been executed by the parties hereto and is hereby delivered on the date first above written.

Executed as a Deed by
**KEVIN EGGERS**

in the presence of:

HECTOR RIVERA
Notary Public, State of New York
No. 31-4970512
*Qualified in New York County
Commission Expires August 13, 1996
March 31, 1998

Exhibit 6